# EXHIBIT 1

**HIGHLIGHTING SUPPLIED**



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/012,957 | 08/26/2013 | 6465961 | C1160.10003US04 | 6150 |

109488    7590    01/23/2014
Maschoff Brennan
1389 Center Drive, Suite 300
Park City, UT 84098

| EXAMINER |
|---|
| KIELIN, ERIK J |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 01/23/2014 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A  (Rev. 04/07)

CAO_DE_004834

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

FISH & RICHARDSON P.C. (DC)

P.O. BOX 1022

MINNEAPOLIS, MN  55440-1022

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/012,957*.

PATENT NO. *6465961*.

ART UNIT *3992*.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

PTOL-465 (Rev.07-04)

CAO_DE_004835

| **Office Action in Ex Parte Reexamination** | **Control No.** 90/012,957 | **Patent Under Reexamination** 6465961 |
|---|---|---|
| | **Examiner** ERIK KIELIN | **Art Unit** 3992 | **AIA (First Inventor to File) Status** No |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

a.☒ Responsive to the communication(s) filed on *8/26/2013* .

☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____ .

b.☐ This action is made FINAL.

c.☒ A statement under 37 CFR 1.530 has not been received from the patent owner.

A shortened statutory period for response to this action is set to expire _2_ month(s) from the mailing date of this letter.
Failure to respond within the period for response will result in termination of the proceeding and issuance of an *ex parte* reexamination certificate in accordance with this action. 37 CFR 1.550(d). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**
If the period for response specified above is less than thirty (30) days, a response within the statutory minimum of thirty (30) days will be considered timely.

Part I    THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:

1. ☒ Notice of References Cited by Examiner, PTO-892.    3. ☐ Interview Summary, PTO-474.
2. ☐ Information Disclosure Statement, PTO/SB/08.    4. ☐ _____ .

Part II    SUMMARY OF ACTION

1a. ☒ Claims *8 and 9* are subject to reexamination.

1b. ☒ Claims *1-7 and 10-20* are not subject to reexamination.

2. ☐ Claims _____ have been canceled in the present reexamination proceeding.

3. ☐ Claims _____ are patentable and/or confirmed.

4. ☒ Claims *8 and 9* are rejected.

5. ☐ Claims _____ are objected to.

6. ☐ The drawings, filed on _____ are acceptable.

7. ☐ The proposed drawing correction, filed on _____ has been (7a) ☐ approved (7b) ☐ disapproved.

8. ☐ Acknowledgment is made of the priority claim under 35 U.S.C. § 119(a)-(d) or (f).

   a) ☐ All  b) ☐ Some*  c) ☐ None    of the certified copies have

   1 ☐ been received.

   2 ☐ not been received.

   3 ☐ been filed in Application No. _____ .

   4 ☐ been filed in reexamination Control No. _____ .

   5 ☐ been received by the International Bureau in PCT application No. _____ .

   * See the attached detailed Office action for a list of the certified copies not received.

9. ☐ Since the proceeding appears to be in condition for issuance of an *ex parte* reexamination certificate except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte* Quayle, 1935 C.D. 11, 453 O.G. 213.

10. ☐ Other: _____

cc: Requester (if third party requester)

U.S. Patent and Trademark Office
PTOL-466 (Rev. 08-13)    Office Action in Ex Parte Reexamination    Part of Paper No. 20131121

CAO_DE_004836

Application/Control Number: 90/012,957                                Page 2

Art Unit: 3992

## DETAILED ACTION

This action is on the claims for which a substantial new question of patentability has been requested and determined to exist; that is claims 8 and 9 of US Patent No. 6,465,961 (the '961 patent, hereafter).

The present application is being examined under the pre-AIA first to invent provisions.

## Table of Contents

I. The References.................................................................................................. 3

II. Statute ........................................................................................................... 4

III. Rejections ...................................................................................................... 4

  A. Begemann and Sugiura ................................................................................ 4

    1. Claim 8 is rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over Begemann in view of Sugiura, and any of Abe, Waitl, Bogner, Matsubara, and Shimizu, as evidenced by Scholl. ................................................................................. 4

    2. Claim 9 is rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over Begemann in view of Sugiura, and any of Abe, Waitl, Bogner, Matsubara, and Shimizu, as applied to claim 8, above, and further in view of Karwacki. ............................... 19

  B. Begemann and Nakamura ........................................................................... 21

    1. Claim 8 is rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over Begemann in view of Nakamura, and any of Abe, Waitl, Bogner, Matsubara, and Shimizu. ...................................................................................................... 21

    2. Claim 9 is rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over Begemann in view of Nakamura, and any of Abe, Waitl, Bogner, Matsubara, and Shimizu, as applied to claim 8, above, and further in view of Karwacki, as evidenced by RP Photonics Encyclopedia. ......................................................................... 25

  C. Begemann and Floyd .................................................................................. 27

    1. Claim 8 is rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over Begemann in view of Floyd, and any of Abe, Waitl, Bogner, Matsubara, and Shimizu. 27

    2. Claim 9 is rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over Begemann in view of Floyd, and any of Abe, Waitl, Bogner, Matsubara, and Shimizu, as applied to claim 8, above, and further in view of Karwacki, as evidenced by RP Photonics Encyclopedia. ........................................................................... 32

Conclusion ......................................................................................................... 33

CAO_DE_004837

Application/Control Number: 90/012,957                                          Page 3

Art Unit: 3992

### I. The References

(1) WO 00/17569 published 30 March 2000 (Begemann)

(2) US 6,220,722 issued 24 April 2001 (Begemann-722)

(3) US 6,015,979 issued 18 January 2000 (Sugiura)

(4) US PG Publication 2002/0159490 filed 29 March 2001 (Karwacki)

(5) US 5,777,350 issued 7 July 1998 (Nakamura)

(6) US 5,535,230 issued 9 July 1996 (Abe)

(7) CA 2 260 389 published 30 July 1999 (Waitl)

(8) Bogner et al., "White LED" in *Proceedings of the SPIE*, pp. 143-150, 28 January 1999 (Bogner)

(9) EP 0 977 278 A2 published 2 February 2000 (Matsubara)

(10) US 5,998,925 issued 7 December 1999 (Shimizu)

(11) US 6,160,833 filed 6 May 1998 (Floyd)

(12) RP Photonics Encyclopedia, "Bragg Mirrors," reprinted from http://www.rp-photonics.com/bragg_mirrors.html, last visited August 24, 2013 (RP Photonics Encyclopedia)

(13) US 4,766,470 issued 23 August 1988 (Scholl)

The application that matured to the '961 patent was filed 24 August 2001.

Each of the above US, CA, WO, and EP publications (except for Begemann-772, Karwacki, Floyd, and RP Photonics Encyclopedia) issued or published more than one year before the filing of the application that matured to the '961 patent; therefore, each of Begemann, Sugiura, Nakamura, Abe, Waitl, Bogner, Matsubara, Shimuzu, and Scholl qualifies as prior art under 35 USC 102(b).

Each of Begemann-772, Karwacki, and Floyd was filed in the USA before the filing of the '961 patent; therefore, each qualifies as prior art under 35 USC 102(e).

RP Photonics Encyclopedia is used only for evidence and need not qualify as prior art.

CAO_DE_004838

Application/Control Number: 90/012,957                                                          Page 4

Art Unit: 3992

### II. Statute

The following is a quotation of **35 U.S.C. 103(a)** which forms the basis for all obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.  Patentability shall not be negatived by the manner in which the invention was made.

### III. Rejections

**A. Begemann and Sugiura**

1. Claim 8 is rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over Begemann in view of Sugiura, and any of Abe, Waitl, Bogner, Matsubara, and Shimizu, as evidenced by Scholl.

Claim 8 depends from claim 7 which depends, in turn from claim 1.  Accordingly, the features of claims 1 and 7 will be addressed as well.

Claim 1 reads,

> [1] 1. A semiconductor light source for emitting light to illuminate a space used by humans, the semiconductor light source comprising:
>
> [2] an enclosure, said enclosure being fabricated from a material substantially transparent to white light, an interior volume within said enclosure,
>
> [3a] a heat sink located in said interior volume,
>
> > [3b] said heat sink being capable of drawing heat from one or more semiconductors devices,
> >
> > [3c] said heat sink having a plurality of panels on it suitable for mounting semiconductor devices thereon,
> >
> > [3d] said panels on said heat sink being oriented to facilitate emission of light from the semiconductor light source in desired directions around the semiconductor light source,
>
> [4a] at least one semiconductor chip capable of emitting light mounted on one of said panels,

CAO_DE_004839

Application/Control Number: 90/012,957                                              Page 5

Art Unit: 3992

> *[4b] said semiconductor chip being capable of emitting monochromatic light,*
>
> *[4c] said semiconductor chip being selected from the group consisting of light emitting diodes, light emitting diode arrays, laser chips, LED modules, laser modules, and VCSEL chips, and*
>
> *[5] a coating for converting monochromatic light emitted by said chip to white light.*

With regard to the preamble [1]:

> *[1] 1. A semiconductor light source for emitting light to illuminate a space used by humans, the semiconductor light source comprising:*

Begemann states,

> The invention relates to a **LED [light emitting diode] lamp**…
>
> (Begemann, abstract; emphasis added)
>
> The invented lamp enables continuous, uniform, high-intensity **lighting** to be achieved.
>
> (Begemann, p. 2, lines 1-2; emphasis added)
>
> FIG. 4 diagrammatically shows an application of a LED lamp, which requires an asymmetric light distribution. **The LED lamp (20) is used as outdoor lighting** and is situated on a holder (21) which is secured to the wall (22) of a building.
>
> (Begemann, p. 6, lines 22-24; emphasis added)

The light-emitting diode, or LED, is a semiconductor light source.

With regard to features [2], Begemann's Figs. 1 and 2, show LED lamps, including

> *[2] an enclosure **5**, said enclosure being fabricated from a material substantially transparent to white light, an interior volume within said enclosure,*

Begemann's Fig. 1 (reproduced below) shows one embodiment of the LED lamp. The figure has been annotated with larger numbers and a legend.

CAO_DE_004840

Application/Control Number: 90/012,957                                              Page 6

Art Unit: 3992



FIG. 1

1: hollow gear column
2: lamp cap
3: substrate (heat sink)
4: LEDs
5: envelope
6: outlet holes for air flow
7: inlet holes for air flow

(Begemann:
p. 4, line 17 to p. 5, line 12)

The "envelope (5)" can be made from "glass" or "synthetic resin" and reads on the claimed *enclosure* (Begemann, p. 1, lines 22-23). The "envelope (5)" can be made from "glass" or "synthetic resin" and reads on the claimed *enclosure having an interior volume* (Begemann, p. 1, lines 22-23). At least glass is *transparent to white light*.

Regarding the heat sink, features [3a]-[3d], Begemann's Figs. 1 and 2 show

> [3a] *a heat sink* **1, 3** *located in said interior volume,*
>
> [3b] *said heat sink* **1, 3** *being capable of drawing heat from one or more semiconductors devices* **4**,
>
> [3c] *said heat sink* **1, 3** *having a plurality of panels on it suitable for mounting semiconductor devices* **4** *thereon,*
>
> [3d] *said panels on said heat sink being oriented to facilitate emission of light from the semiconductor light source in desired directions around the semiconductor light source,*

With regard to the heat sink **1, 3**, Begemann states,

> In the example described herein, the **substrate (3)** has the shape of a regular pyramid with four flat faces and is connected to the **gear column (1)** via a vertex of the pyramid. **The outer surface of the substrate (3) is made of a metal or a metal alloy, thereby enabling a good heat conduction from the LEDs (4) to the column (1)**. In the present case, said **outer surface of the substrate is made of a copper alloy**. Each of the faces of the pyramid is provided with a number (five or six) LEDs (4),

Application/Control Number: 90/012,957                                    Page 7

Art Unit: 3992

> which are secured to the faces by means of a **heat-conducting adhesive**.
> …
>
> **The outer surface of the gear column (1) of the LED lamp is made of a metal or a metal alloy**. This enables a **good heat conduction from the substrate (3) to the (metal) lamp cap (2)** to be attained. In the present example, a copper alloy is used for the column. The use of the above-mentioned heat-dissipating means enables the LEDs with the relatively high luminous flux to be used without heat problems in a LED lamp of the above-described type.

(Begemann, p. 4, line 26 to p. 5, line 5; emphasis added)

The "faces" of the polyhedron substrate **3** read on the claimed *panels*. Fig. 1, above, shows a plurality of LEDs **4** mounted on each of the panels of the polygonal substrate **3**.

Because the panels of the polyhedron substrate **3** face different directions, they necessarily are *oriented to facilitate emission of light from the semiconductor light source in desired directions around the semiconductor light source*. Further in this regard, Begemann states,

> The use of a substrate which is composed of a **regular polyhedron** of at least four faces enables the **intended uniform lighting** to be achieved. The regular polyhedron is connected to the gear column, preferably, via a vertex. However, the polyhedron may in principle also be connected to the gear column in the center of one of the faces. The greatest uniformity in lighting is obtained if each one of the faces is provided with the same number of LEDs of the same type.
>
> In experiments leading to the present invention, it has been found that favorable results can be achieved with polyhedrons in the form of an octahedron (regular polyhedron of eight faces) and dodecahedron (regular polyhedron of twelve faces). Better results, however, are achieved with substrates in the form of a hexahedron (polyhedron of six faces, cube). In practice it has been found that a **good uniformity in light distribution** can already be obtained using substrates in the form of a tetrahedron (regular polyhedron of four faces, pyramid). In an alternative embodiment the substrate comprises a three-dimensional body like a sphere or an ellipsoid, or a pat [sic] of a sphere or an ellipsoid.

(Begemann, p. 2, lines 8-21; emphasis added)

Regarding the light-emitting semiconductor chips, features [4a]-[4c],

> *[4a] at least one semiconductor chip **4, 11** capable of emitting light mounted on one of said panels,*
>
> *[4b] said semiconductor chip **4, 11** being capable of emitting monochromatic light.*

CAO_DE_004842

Application/Control Number: 90/012,957                                              Page 8

Art Unit: 3992

> *[4c] said semiconductor chip **4, 11** being selected from the group consisting of light emitting diodes, light emitting diode arrays, laser chips, LED modules, laser modules, and VCSEL chips,*

Begemann's Fig. 1 shows the LED modules **4**, or "light emitting diodes" (LEDs) mounted on the panel.  Fig. 3A (reproduced below) shows the LED modules include a semiconductor chip **11**:

> **Fig. 3-A shows a LED** which comprises **single-chip LEDs**, which each have only one light point (11) per **LED**.  This light point (11) is placed on a so-called **MC-PCB (12)**, **which is responsible for a good heat transfer**.  …  A heat-conducting adhesive between **MC-PCB (12) and <u>substrate (3)</u>** is responsible for a **good heat dissipation from the LED to the substrate**.

(Begemann, p. 6, lines 4-11; emphasis added)

The semiconductor chips **11** emit monochromatic light, e.g. red, blue, green, or yellow:

> A further embodiment of the invented LED lamp is characterized in that the faces of the polyhedron are provided with an array of LEDs, which preferably comprises at least one **green**, at least one **red** and at least one **blue** LED or at least one **green**, at least one **red**, at least one **yellow** and at least one **blue** LED **or** at least one **white** LED.

(Begemann, p. 3, lines 6-9; emphasis added)



FIG. 3A

(Begemann, Fig. 3A)

Regarding the conversion coating, feature [5],

> *[5] a coating for converting monochromatic light emitted by said chip to white light.*

Although Begemann discloses using white LEDs (*id*.), it does not give details of the white LED.  As such, Begemann fails to disclose the claimed conversion coating of

CAO_DE_004843

Application/Control Number: 90/012,957                                                    Page 9

Art Unit: 3992

feature [5].  It is clear from the passage, however, that Begemann, in general, desires producing white light output from the LED lamps shown in Figs. 1 and 2.

It is noted that the claim, as currently drafted, does not limit the location of the conversion coating, so it may be placed anywhere that it is in receiving relationship to the monochromatic light emitted by a single LED or multiple LEDs, to thereby allow conversion of said LED light to white light.

Each of Abe, Waitl, Bogner, Matsubara, and Shimizu teaches *a coating for converting monochromatic light emitted by said chip [i.e. a light-emitting semiconductor chip] to white light*.  These references are representative of two different locations for the conversion coating: (1) directly on the semiconductor chip, and (2) on the interior surface of an enclosure, spaced away from the semiconductor chip.

With regard to option (1), each of Bogner, Matsubara, and Shimizu locates the coating directly on the chip.  Bogner is representative.

Bogner teaches a white LED comprising a GaN-based semiconductor LED emitting monochromatic blue light having a conversion coating deposited directly on the LED.  In this regard, Bogner states,

> For **white LED** high brightness blue light emitting diodes based on gallium nitride (**GaN**) or indium gallium nitride (**InGaN**) are used.  This light source works as an efficient pump exciting the luminescent material to higher energy levels.  The lifetime of these levels is only a few nanoseconds.  The luminescent molecules come back to their ground state by radiation of surplus energy as green, yellow or red light.

(Bogner, p. 144, ¶ 2; emphasis added)

> For the production of a **white LED** with **luminescence converte**r different methods can be used.  One possibility is to **coat the blue chip with a thin high concentrate mixture of resin and converter**.  A [sic] adequate layer can also be brought up like a window on the top surface of the plastic.  In this way converter concentration and thickness of the layer have to be very exact to get the wished hue.  A further method used also for the production of the Siemens **Single Chip White LED** is to mix the phosphor in the whole plastic volume.  Patents for this method are taken out.  **Fig. 8** shows a cross section of **white TOPLED®**.  The chip is mounted on a premolded leadframe and embedded in the resin including the fluorescent.

(Bogner, paragraph bridging pp. 146-147; emphasis added)

Bogner's Fig. 8 is shown below.

CAO_DE_004844

Application/Control Number: 90/012,957                                            Page 10
Art Unit: 3992



(Bogner, Fig. 8, p. 147)

Because Begemann desires white light, it would have been obvious to one of ordinary skill in the art, at the time of the invention to use Bogner's white LEDs including the GaN-based LEDs having the phosphor-containing conversion coating, as Begemann's "white LED" (Begemann, p. 3, lines 6-9), in order to produce white light.  So modified, Begemann in view of Bogner teaches feature [5], *a coating for converting monochromatic light emitted by said chip to white light*.

The rationale for combining the references meets at least rationale B in MPEP 2143: simple substitution of one known element for another to obtain predictable results.

The details of how **Matsubara** and **Shimizu** apply to the conversion coating are incorporated by reference from the Request at pp. 20-25.

With regard to option (2) each of Abe and Waitl locates the conversion coating on the interior surface of an enclosure, specifically a bulb, in which is located a plurality of semiconductor LED or laser diode (LD) chips.

**Waitl**, like Begemann, teaches a semiconductor light source intended to replace incandescent lamps that are used for general illumination purposes.  Even though statements of intended use fail to have patentable weight, Waitl's semiconductor light source, like Begemann's is *for emitting light to illuminate a space used by humans*.  In this regard, Waitl states,

> The present invention relates to opto-electronic **semiconductor** elements, particularly suitable for **general illumination**, and especially adapted to be used with luminescence or light wavelengths conversion phosphors, in which the respective components of the semiconductor element, when integrated to form a light source, are so constructed that thermal coefficients of expansion of the respective elements are similar, and to a **method of manufacturing** such elements.  The light emitting elements are, for example, light emitting

CAO_DE_004845

Application/Control Number: 90/012,957                                      Page 11

Art Unit: 3992

> diodes (LEDs), which emit light in the region of between about 320 to 1600 nm. **Preferably, the LEDs emit ultraviolet (UV) light, and are used in combination with luminescence conversion materials to emit white or other visible light**. These elements can then be used for **general illumination** purposes.

(Waitl, p. 2, lines 2-15; emphasis added)

> The concept in accordance with the present invention is especially suitable for elements intended as **replacements for incandescent lamps**, utilizing LEDs.

(Waitl, p. 8, lines 3-5; emphasis added)

Waitl's Fig. 4, (reproduced below) shows one embodiment of the LED lamp. The figure has been annotated with a legend.



30: compact lamp
31: outer bulb
32: screw base
33: round rod
34. LEDs (emitting e.g. blue or UV light)
35: electronics
36: luminescence conversion layer (e.g. phosphor)

(Waitl: p. 11, line 30 to p. 12, line 11)

FIG. 4

The luminescence conversion layer **36** reads on the claimed *coating for converting monochromatic light emitted by said chip to white light* and is coated on the inside of the enclosure **31**:

> The **outer bulb 31** is covered at its **inner surface with a luminescence conversion layer 36**. The **LEDs 34 may emit, for example, UV, or blue**

CAO_DE_004846

Application/Control Number: 90/012,957                                        Page 12

Art Unit: 3992

> **light**.  The general principle is **well known** and reference is made, for example, to the referenced article in OLE of Oct. 1997 by Philip Hill.

(Waitl, p. 12, lines 5-9; emphasis added)

Thus, Waitl's GaN-based LEDs emit monochromatic light, i.e. UV or blue, that is converted by the luminescence conversion layer **36** to white light.

Because Begemann desires white light, it would have been obvious to one of ordinary skill in the art, at the time of the invention to use Waitl's GaN-based LEDs as Begemann's LEDs **4** and to apply Waitl's phosphor layer coating **36** on the interior surface of Begemann's envelope **5**, in order to produce white light.  So modified, Begemann in view of Waitl teaches feature [5], *a coating for converting monochromatic light emitted by said chip to white light*.

The rationale for combining the references meets at least rationale B in MPEP 2143: simple substitution of one known element for another to obtain predictable results.

Begemann produces white light either by using white LEDs or mixing light from separate LEDs emitting light of each of the primary colors.  Waitl produces white light by converting blue or UV light from the LEDs to white light using the "luminescence conversion materials" **36** on the inner surface of the bulb **31**, as discussed above.  As such, the results of making the substitution would be predictable, i.e. white light would still be produced.

The details of how **Abe** applies to the claimed conversion coating are incorporated by reference from the Request at pp. 20-22.

This is all of the features of claim 1.

Claims 7 and 8 read,

> *7. A device as recited in claim 1 wherein said chip includes*
>
> *a substrate on which epitaxial layers are grown,*
>
> *a buffer layer located on said substrate, said buffer layer serving to mitigate differences in material properties between said substrate and other epitaxial layers,*
>
> *a first cladding layer serving to confine electron movement within the chip, said first cladding layer being adjacent said buffer layer,*
>
> *an active layer, said active layer emitting light when electrons jump to a valance state,*
>
> *a second cladding layer, said second cladding layer positioned so that said active layer lies between cladding layers, and*

CAO_DE_004847

Application/Control Number: 90/012,957                                      Page 13
Art Unit: 3992

> *a contact layer on which an electron [sic] may be mounted for powering said chip.*
>
> *8. A device as recited in claim 7 further comprising a first and a second reflective layers, each of said first and second reflective layers being located on opposite sides of said active layer, said reflective layers serving to reflect light emitted by said active layer.*

At the outset, an "electron" is an atomic particle and cannot be "mounted". It is assumed that the claim, instead, means "electrode".

In general, claims 7 and 8 are directed to the layers included in a semiconductor light-emitting diode.

Begemann does not discuss the composition of the LEDs, nor do Bogner and Waitl teach the specific composition of the GaN-based LEDs.

Sugiura, like each of Bogner and Waitl, teaches GaN-based LEDs. ("The present invention relates to a **nitride-based** semiconductor element such as a **semiconductor laser, a light-emitting diode**, an electronic device, or the like and a method for manufacturing the same." Sugiura, col. 1, lines 5-9; emphasis added.)

Sugiura's Fig. 15 (reproduced below) teaches each of the features of claims 7, 8, and 18.



F I G.15

With regard to Fig. 15, Sugiura states,

CAO_DE_004848

Application/Control Number: 90/012,957                                      Page 14

Art Unit: 3992

> Referring to FIG. 15, numeral **511** denotes a sapphire substrate, and, on the **sapphire substrate 511**, an n-type **GaN buffer layer 512** is formed.  On the GaN buffer layer **512**, an $SiO_2$ mask **510** is provided in the form of stripes.  By the use of this mask **510**, the buffer layer **512** is etched down to a predetermined depth.  **On the GaN buffer layer 512** and the $SiO_2$ mask 510, an n-type AlGaN **clad layer 513 is formed flat by utilizing the lateral growth**, and, **on the clad layer 513**, an undoped GaN **optical guide layer 514**, **a quantum well layer 515 consisting of an InGaN/InGaN**, a p-type GaN **optical guide layer 516**, and a p-type AlGaN **clad layer 517** are formed.
>
> Further, a portion of the above-mentioned laminate or stack structure is removed from the surface side thereof down to the clad layer **513**, and, on the clad layer **513** thus exposed, an n-side electrode **519** is formed.  **On the** p-type AlGaN **clad layer 517**, a **p-side electrode 520 is formed through** a low-resistance p-type GaN **contact layer 518**.  These electrodes **519** and **520** are each narrowed to a width of 3 μm.
>
> Here, it is pointed out that, **for the growth of the respective layers, the MOCVD method is used**.

(Sugiura, col. 23, line 62 to col. 24, line 16; emphasis added)

Thus, Sugiura teaches the features of claim 7 as follows:

> *7. A device as recited in claim 1 wherein said chip includes*
>
> *a substrate **511** on which epitaxial layers are grown,*

"…semiconductor layers are formed by the **MOCVD** method.  However, the hydride **VPE** [vapor phase **epitaxy**] method or the molecular beam **epitaxy** (**MBE**) method may be used instead." (Sugiura, col. 12, lines 16-19; emphasis added)  MOCVD is also a method of epitaxy because crystalline semiconductor is grown using lateral growth.

Claim 7 continues,

> *a buffer layer **512** located on said substrate **511**, said buffer layer serving to mitigate differences in material properties between said substrate and other epitaxial layers,*

Because the substrate material is sapphire (single crystal $Al_2O_3$) and the cladding layer is AlGaN, the buffer layer of GaN inherently *mitigates differences in material properties between said substrate and other epitaxial layers*.

Claim 7 continues,

> *a first cladding layer **513** serving to confine electron movement within the chip, said first cladding layer being adjacent said buffer layer **512**,*

CAO_DE_004849

Application/Control Number: 90/012,957                                           Page 15

Art Unit: 3992

Electron confinement in the chip by the AlGaN cladding layer **513** is inherent because AlGaN has a wider bandgap energy than the InGaN in the active layer **515**. In addition, the '961 patent admits AlGaN cladding layers confine electrons:

> Then a **cladding layer 1204**, such as **n-AlGaN**, is provided. **Cladding layers serve to confine the electrons** as they jump from a conduction band to valance and give up energy that converts to light. An **active layer 1205 p-InGaN** is then provided where electrons jump from a conduction band to valance and emit energy which converts to light.

(the '961 patent, col. 4, lines 50-55; emphasis added)

Thus it is held, absent evidence to the contrary, that Sugiura's cladding layer **513** confines electron movement in the LED chip. See *In re Best*, 195 USPQ 428 (CCPA 1977) and *In re Fitzgerald*, 205 USPQ 594 (CCPA 1980) and MPEP 2112.

Claim 7 ends,

> *an active layer **515**, said active layer emitting light when electrons jump to a valance state,*
>
> *a second cladding layer **517**, said second cladding layer positioned so that said active layer **515** lies between cladding layers **513, 517**, and*
>
> *a contact layer **518** on which an electron [electrode **520**] may be mounted for powering said chip.*

With regard to **claim 8**, the optical guide layers **514, 516**, located on opposite sides of the active layer **515**, are inherently reflective. Evidence that the optical guide layers are inherently reflective comes from their reliance on reflection to guide the light emitted by the active layer to emit at the edge.

Further evidence that the optical guide layers are inherently reflective comes from Scholl:

> In conventional edge-emitting LED's, the active layer is typically surrounded by two confining layers which in turn are surrounded by two **optical guide layers** and light is emitted from the LED after multiple internal **reflections** at **the interface between a confining layer and an optical guide layer**.

(Scholl, col. 1, lines 42-47; emphasis added)

In addition, Sugiura discloses a surface emitting laser (Sugiura, col. 15, lines 50-52) in Fig. 9 (reproduced below).

CAO_DE_004850

Application/Control Number: 90/012,957                                   Page 16
Art Unit: 3992



61: electrode
59: first reflector
58: contact layer
57: current confinement
56: current injection/
    cladding layer
55: active layer
54: current injection
    layer
53: contact/cladding
    layer
51: second reflector
50: substrate

Buffer layer grown on
substrate is not shown

**FIG.9**

In regard to the layers making up the laser, Sugiura states,

> On the **sapphire substrate 50** on which the mask **51** has been formed, a **GaN buffer layer** (not shown) is grown for two minutes. Grown on the thus grown GaN buffer layer is an **n-type GaN contact layer 53** (with a thickness of 2 µm) into which silicon has been doped. ...

> Subsequently grown is an $In_{0.1}Ga_{0.9}N$ **active layer 55** which has a thickness of 0.1 µm, and, on the thus grown active layer **55**, a **p-type $Ga_{0.8}Al_{0.2}N$ current injection layer 56** into the upper portion of which Mg has been doped and an n-type $Ga_{0.8}Al_{0.2}N$ current narrowing layer **57** are successively grown in such a manner that the current injection film **56** and the current narrow layer **57** each have a thickness of 0.25 µm. ...

> Next, the wafer is put into the MOCVD apparatus again, and, on the current narrowing layer **57**, there is grown a p-type GaN **contact layer 58** into which Mg has been doped. After the growth of the p-type GaN contact layer **58**, the wafer is removed from within the MOCVD apparatus. Further, over approximately the whole surface of the p-type GaN contact layer **58**, a multi-layer film comprising $SiO_2$ and $TiO_2$ is laminated by vapor deposition. Subsequently, by the use of the photolithography technique, the multi-layer film is processed into a predetermined shape, whereby a **first reflector 59** is formed. On the other hand, the multi-layer film (mask) **51**--comprising $SiO_2$ and $TiO_2$ --formed on the sapphire substrate **50** is rendered into a **second reflector**.

CAO_DE_004851

Application/Control Number: 90/012,957                                    Page 17

Art Unit: 3992

> …On the other hand, on the p-type GaN **contact layer 58**, also a p-type **electrode 61** is formed, forming a chip-shaped laser element separated as shown in FIG. 9.

(Sugiura, col. 15, line 50 to col. 16, line 39; emphasis added)

Thus, Sugiura teaches the features of claim 7 as follows:

> *7. A device as recited in claim 1 wherein said chip includes*
>
> *a substrate 50 on which epitaxial layers are grown,*
>
> *a buffer layer ["GaN buffer layer (not shown)" (id.)] located on said substrate 50, said buffer layer serving to mitigate differences in material properties between said substrate and other epitaxial layers,*

Because the substrate material is sapphire (single crystal $Al_2O_3$) and the cladding layer is AlGaN, the buffer layer of GaN inherently *mitigates differences in material properties between said substrate and other epitaxial layers*.

> *a first cladding layer 53 serving to confine electron movement within the chip, said first cladding layer being adjacent said buffer layer 512,*

As noted above, Sugiura states "Grown on the thus grown GaN buffer layer is an n-type GaN contact layer **53**" (*id.*).  The contact layer **53** is also a cladding layer.

Evidence of the dual function of the cladding/contact layer **53** comes from the '961 patent's Fig. 3b.  Fig. 3b labels layer **1203** of the LED as an "n-GaN cladding layer".  The associated description in the specification indicates that layer **1203** is also a contact layer:

> Then a **conductive layer 1203 is provided, such as n-GaN**.  This layer acts as a connector for a negative electrode.  Then a cladding layer **1204**, such as n-AlGaN, is provided.  **Cladding layers serve to confine the electrons** as they jump from a conduction band to valance and give up energy that converts to light.  An **active layer 1205 p-InGaN** is then provided where electrons jump from a conduction band to valance and emit energy which converts to light.

(the '961 patent, col. 4, lines 50-55; emphasis added)

Thus, it is held, absent evidence to the contrary, that Sugiura's n-GaN contact layer **53** inherently functions as both a cladding layer and contact layer.  (See *Best Fitzgerald* and MPEP 2112, *supra*.)

This is also consistent with the '961 patent's Fig. 3f, which shows layer **1223** functioning as both a cladding layer and contact layer, and this is corroborated in the description in the specification (the '961 patent, col. 5, line 35: "a cladding layer and contact layer **1223** such as n-GaN").

CAO_DE_004852

Application/Control Number: 90/012,957                                      Page 18
Art Unit: 3992

Claim 7 continues,

> *an active layer **55**, said active layer emitting light when electrons jump to a valance state,*
>
> *a second cladding layer **56**, said second cladding layer positioned so that said active layer **55** lies between cladding layers **53, 56**, and*

The p-type $Ga_{0.8}Al_{0.2}N$ current injection layer **56** inherently functions as a second cladding layer, as evidenced by the '961 patent. In each of the '961 patent's Figs. 3b, 3d, 3f, and 3h, p-AlGaN functions as a second cladding layer that confines electrons. As to Fig. 3b, the '961 patent states,

> On the active layer **1205**, another **cladding layer 1206**, such as **p-AlGaN** is provided that also **serves to confine electrons**.

  (the '916 patent, col. 4, lines 55-57; emphasis added )

As to Fig. 3d, the '961 patent states,

> On the active layer **1215**, another **cladding layer 1216**, such as **p-AlGaN** is provided.

  (the '916 patent, col. 5, lines 19-20; emphasis added )

As to Fig. 3f, the '961 patent states,

> The active layer **1227** is followed by **another cladding layer p-AlGaN 1228** which is followed by a second reflective layer **1229** AlN/AlGaN MQW. … The second reflective layer **1229** is followed by a **cladding layer p AlGaN 1230** and a contact layer p+-GaN **1231**.

  (the '916 patent, col. 5, lines 42-49; emphasis added )

As to Fig. 3h, the '961 patent states,

> The active layer **1247** is followed by **another cladding layer p-AlGaN 1248** which is followed by a second reflective layer **1429** AlN/AlGaN MQW. The second reflective layer **1249** is followed by a **cladding layer p AlGaN 1250** and a contact layer p+-GaN **1251**.

  (the '916 patent, col. 6, lines 5-10; emphasis added )

Thus, it is held, absent evidence to the contrary, that Sugiura's p-type $Ga_{0.8}Al_{0.2}N$ current injection layer **56** inherently functions as both a cladding layer. (See *Best Fitzgerald* and MPEP 2112, *supra*.)

Claim 7 ends,

> *a contact layer **58** on which an electron [electrode **61**] may be mounted for powering said chip.*

CAO_DE_004853

Application/Control Number: 90/012,957                                    Page 19

Art Unit: 3992

With regard to **claim 8**, the first and second reflectors **59, 51**, are located on opposite sides of the active layer **55**, as shown in Sugiura's Fig. 9.

It would have been obvious to one of ordinary skill in the art, at the time of the invention to use Sugiura's layer order of the GaN-based LED in the GaN-based LEDs of either of Bogner and Waitl that is used in Begemann, or to use Sugiura's GaN-based LED as the GaN-based LED of either of Bogner and Waitl that is used in Begemann, because each of Begemann, Bogner, and Waitl are silent to the structure of the LED, such that one of ordinary skill would use a known LED that serves the same purpose of emitting a primary monochromatic light for conversion.

This reason satisfies at least rationale B in MPEP 2143: simple substitution of one known element for another to obtain predictable results. This is simple substitution of Sugiura's GaN-based LED for either of Bogner's and Waitl's GaN-based LEDs because Bogner and Waitl do not provide the details of the GaN-based LED. The results are predictable because both GaN-based LEDs produce shorter wavelength light in the same region of the spectrum.

More generally, it would have been obvious to one of ordinary skill in the art, at the time of the invention to produce a white LED lamp, as taught by Begemann, using an appropriate combination of LEDs and conversion coatings appropriate for the monochromatic LED light, as taught by each of Bogner, Waitl, Abe, Matsubara, and Shimizu, wherein the order of layers in the LED can be as in Sugiura.

This is all of the features of claims 7 and 8.

<u>2. Claim 9 is rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over Begemann in view of Sugiura, and any of Abe, Waitl, Bogner, Matsubara, and Shimizu, as applied to claim 8, above, and further in view of Karwacki.</u>

Claim 9 reads,

> *9. A device as recited in claim 8 wherein said reflective layers include multiple quantum wells.*

The prior art of Begemann in view of Sugiura, and any of Abe, Waitl, Bogner, Matsubara, and Shimizu, as explained above, discloses each of the features of claim 8.

None of the references, Sugiura in particular, teaches the reflective layers are multiple quantum well layers.

Karwacki teaches a light-emitting device having a reflective layer composed of multiple quantum wells, called a "Quantum Well Mirror" or QWM used to replace at least one of the DBRs. In this regard, Karwacki states,

Application/Control Number: 90/012,957                                    Page 20

Art Unit: 3992

> The present invention relates to semiconductor lasers that emit light at visible wavelengths, and more particularly, to Vertical-Cavity Surface Emitting Lasers (VCSELs) that produce N-frequencies of visible light in a single cavity by altering the optical length of the cavity through the use of a **Quantum Well Mirror (QWM) replacing one of the Distributed Bragg Reflectors (DBRs)** typically found in a VCSEL.

(Karwacki, ¶ [0002]; emphasis added)

> It is a further object of the present invention to provide for a VCSEL device that may be fabricated of different semiconductor materials that provide a desired bandgap for fundamental light frequencies of interest.

(Karwacki, ¶ [0009]; emphasis added)

> With reference to the drawing, FIG. 1 illustrates a schematic diagram of a tunable multi-frequency VCSEL device **10** of the present invention.  **The VCSEL device 10 is tunable to N visible frequencies and comprises a QWM that replaces at least one of the DBRs commonly found in the prior art VCSEL devices.**  As will be further described hereinafter, the QWM element in the VCSEL is tunable so as to develop one of the visible light frequencies, by applying a specific voltage to its electrode, making up the multiple visible light spectrum developed by the this device **10**.

(Karwacki, ¶ [0016]; emphasis added)

See also ¶¶ [0018]-[0020].

> With reference to FIG. 1, it is seen that a single **QWM device 18 is used to replace one of the DBR** of a typical VCSEL device, such as those disclosed in U.S. Pat. Nos. 5,557,627 and 5,719,892.  The fundamental frequency within the cavity can be set by applying a DC voltage, having a possible value between 0 to 10 volts, across the electrodes **26** and **28** of the QWM device **18**.  This will set a particular cavity length for the VCSEL device **10**.  If modulation is required, an additional time varying signal can be applied across the electrodes **26** and **28**, in a manner to be described hereinafter with reference to FIG. 3.

(Karwacki, ¶ [0022]; emphasis added)

As stated in the Request in the page 29, it would have been obvious to one of ordinary skill in the art, at the time of the invention to replace  reflective layers **51** and/or **59** or the optical guide layers **514** and/or **516** of Sugiura with the QWM described by Karwacki to fine tune a laser within a semiconductor light source to the optimum absorption wavelength of the phosphor coating that is used to make white light or, alternatively, to rapidly modulate the output wavelength of the laser in order to generate a broader spectrum white light, as taught by Karwacki.

CAO_DE_004855

Application/Control Number: 90/012,957                                              Page 21

Art Unit: 3992

### B.  Begemann and Nakamura

1. Claim 8 is rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over Begemann in view of Nakamura, and any of Abe, Waitl, Bogner, Matsubara, and Shimizu.

Claims 7 and 8 read,

> 7. A device as recited in claim 1 wherein said chip includes
>
> a substrate on which epitaxial layers are grown,
>
> a buffer layer located on said substrate, said buffer layer serving to mitigate differences in material properties between said substrate and other epitaxial layers,
>
> a first cladding layer serving to confine electron movement within the chip, said first cladding layer being adjacent said buffer layer,
>
> an active layer, said active layer emitting light when electrons jump to a valance state,
>
> a second cladding layer, said second cladding layer positioned so that said active layer lies between cladding layers, and
>
> a contact layer on which an electron [sic] may be mounted for powering said chip.
>
> 8. A device as recited in claim 7 further comprising a first and a second reflective layers, each of said first and second reflective layers being located on opposite sides of said active layer, said reflective layers serving to reflect light emitted by said active layer.

The prior art of Begemann in view of any of Abe, Waitl, Bogner, Matsubara, and Shimizu, as explained in the previous rejection, discloses each of the features of claim 1.

Again, Begemann does not provide the details of the white LED and therefore does not teach the features of claims 7 and 8.

Nakamura teaches the features of claims 7 and 8.  Nakamura's Fig. 12 (reproduced below) shows a GaN-based LED having all of the features of claims 7 and 8, as set forth below.

CAO_DE_004856

Application/Control Number: 90/012,957                                                    Page 22

Art Unit: 3992



**FIG. 12**

159: p-GaN contact layer
200: light-reflecting film
158: p-AlGaN cladding layer
157: p-InGaN cladding layer
156: active layer
155: n-GaN cladding layer
154: n-AlGaN cladding layer
100: light-reflecting film
153: n contact/cladding layer
152: buffer layer
151: substrate

Nakamura teaches the features of the light-emitting semiconductor chip of claims 7 and 8 as follows:

> *7. A device as recited in claim 1 wherein said chip includes*
>
> *a substrate **151** on which epitaxial layers **151-200** are grown,*

Epitaxy is a method and therefore fails to have patentable weight beyond the implied structure (MPEP 2113). Because epitaxy is a method of growing crystal layers, the structure implied by the method is crystal layers. Nakamura teaches that the layers of the light-emitting devices are crystalline:

> The n-type contact layer **12** may be formed of a n-type nitride semiconductor. If it is formed of a binary or ternary mixed **crystal** such as GaN or AlGaN, a contact layer of excellent **crystallinity** can be obtained.

(Nakamura, col. 6, lines 64-67; emphasis added)

> The n-type clad layer **13** may be formed of a p-type nitride semiconductor. If it is formed of a binary or ternary mixed **crystal** such as GaN, AlGaN or InGaN, a clad layer of excellent **crystallinity** can be obtained.

(Nakamura, col. 7, lines 8-11; emphasis added)

See also, Nakamura, col. 8, lines 4-6, 63-65; col. 9, lines 23-25; col. 20, lines 19-22; col. 22, lines 46-56. Therefore, Nakamura discloses that the layers grown on the substrate are crystal layers, which is all that is required by the claim.

Nakamura's Fig. 12 shows

> *a buffer layer **152** located on said substrate **151**, said buffer layer **152** serving to mitigate differences in material properties between said substrate and other epitaxial layers,*

Application/Control Number: 90/012,957                                    Page 23

Art Unit: 3992

In this regard, Nakamura states,

> The light-emitting device shown in FIG. 11 comprises a substrate 151 on which a **buffer layer 152** for **alleviating a lattice mismatching** between the **substrate 151** and the nitride semiconductor …

(Nakamura, col. 19, lines 45-48; emphasis added)

Nakamura Fig. 12 shows

> *a first cladding layer **153** serving to confine electron movement within the chip, said first cladding layer being adjacent said buffer layer **152**,*

Nakamura's Figs. 11 and 12 show an n-GaN contact layer **153** which, serves as both a cladding layer and a contact layer.  Evidence of the dual function of the cladding/contact layer **153** comes from the '961 patent's Fig. 3b.  Fig. 3b labels layer **1203** of the LED as an "n-GaN cladding layer".  The associated description in the specification indicates that layer **1203** is also a contact layer:

> Then a **conductive layer 1203 is provided, such as n-GaN**.  This layer acts as a connector for a negative electrode.  Then a cladding layer **1204**, such as n-AlGaN, is provided.  **Cladding layers serve to confine the electrons** as they jump from a conduction band to valance and give up energy that converts to light.  An **active layer 1205 p-InGaN** is then provided where electrons jump from a conduction band to valance and emit energy which converts to light.

(the '961 patent, col. 4, lines 50-55; emphasis added)

Thus, it is held, absent evidence to the contrary, that Nakamura's n-GaN cladding layer **1203** inherently functions as both a cladding layer and contact layer.  (See *Best Fitzgerald* and MPEP 2112, *supra*.)

This is also consistent with the '961 patent's Fig. 3f, which shows layer **1223** functioning as both a cladding layer and contact layer, and this is corroborated in the description in the specification (the '961 patent, col. 5, line 35: "a cladding layer and contact layer **1223** such as n-GaN").

In addition, the excerpt from the '961 patent, above, admits that the function of cladding layers is to confine electrons.

Nakamura's Figs. 11 and 12 show an n-GaN contact layer **153** which, by comparison to layer **1203** of the '961 patent's Fig. 3b, simultaneously serves as both a cladding layer and a contact layer.  Therefore, it is held, absent evidence to the contrary that Nakamura's n-GaN layer **153** is a cladding layer *serving to confine electron movement within the chip*.  As shown in Nakamura's Figs. 11 and 12, the cladding layer **153** is also *adjacent said buffer layer **152***.

Nakamura's Fig. 12 shows

CAO_DE_004858

Application/Control Number: 90/012,957                                    Page 24

Art Unit: 3992

> *an active layer 156, said active layer 156 emitting light when electrons jump to a valance state,*
>
> *a second cladding layer 157, said second cladding layer positioned so that said active layer 156 lies between cladding layers 153, 157, and*
>
> *a contact layer 159 on which an electron [sic; electrode] may be mounted for powering said chip.*

In this regard, Nakamura states,

> FIG. 11 shows a cross-sectional view schematically illustrating a structure of a light-emitting device according to the **seventh embodiment** of the present invention.  The light-emitting device shown in FIG. 11 comprises a **substrate 151** on which a **buffer layer 152** for alleviating a lattice mismatching between the substrate **151** and the nitride semiconductor, an **n-type contact layer 153** for forming a negative electrode is thereon, a second **n-type clad layer 154**, a **first n-type clad layer 155**, an **active layer 156**, a **second p-type clad layer 158** and a **p-type contact layer 159** for forming a positive electrode thereon are superimposed in the mentioned order.

> (Nakamura, col. 19, lines 43-54; emphasis added)

Nakamura's Fig. 12 shows a "POSITIVE ELECTRODE" formed on the contact layer **159**.

Fig. 12 also shows reflective layers **100** and **200** on opposite sides of the active layer **156**, as required by claim 8:

> *8. A device as recited in claim 7 further comprising a first and a second reflective layers, each of said first and second reflective layers being located on opposite sides of said active layer, said reflective layers serving to reflect light emitted by said active layer.*

In this regard, Nakamura states,

> According to the seventh embodiment of the present invention, it is also possible to dispose as a **light-reflecting film a first multi-layered film 100** consisting of at least two kinds of nitride semiconductor layers, each differing in composition on the outer side of the first n-type clad layer **155**, **and**/or **a second multi-layered film 200** consisting of at least two kinds of nitride semiconductor layers, each differing in composition on the outer side of the second p-type clad layer **158**.

> **FIG. 12** schematically illustrates a sectional view of a light-emitting device provided with such **a light-reflecting film**, and FIG. 13 shows a perspective view of the light-emitting device shown in FIG. 12.  These Figures illustrate a structure of a **laser device** wherein the reference numeral **100** represents a first multi-layered film, and **200**, a second multi-layered film.  The first multi-

CAO_DE_004859

Application/Control Number: 90/012,957                                                   Page 25

Art Unit: 3992

> layered film **100** and the second multi-layered film **200** are each formed of nitride semiconductors differing in composition and in refractive index which are **alternately superimposed under the condition, for example, of λ/4 n (λ: wavelength; n: refractive index)** thereby forming a two or more-ply structure so as to **reflect** the emission wavelength of the active layer **156**.

(Nakamura, col. 21, lines 47 to col. 22, line 1; emphasis added)

It would have been obvious to one of ordinary skill in the art, at the time of the invention to use Nakamura's layer order of the GaN-based LED in the GaN-based LEDs of either of Bogner and Waitl that is used in Begemann, or to use Nakamura's GaN-based LED as the GaN-based LED of either of Bogner and Waitl that is used in Begemann, because each of Begemann, Bogner, and Waitl are silent to the structure of the LED, such that one of ordinary skill would use a known LED that serves the same purpose of emitting a primary monochromatic light for conversion.

This reason satisfies at least rationale B in MPEP 2143: simple substitution of one known element for another to obtain predictable results. This is simple substitution of Nakamura's GaN-based LED for either of Bogner's and Waitl's GaN-based LEDs because Bogner and Waitl do not provide the details of the GaN-based LED. The results are predictable because both GaN-based LEDs produce shorter wavelength light in the same region of the spectrum.

More generally, it would have been obvious to one of ordinary skill in the art, at the time of the invention to produce a white LED lamp, as taught by Begemann, using an appropriate combination of LEDs and conversion coatings appropriate for the monochromatic LED light, as taught by each of Bogner, Waitl, Abe, Matsubara, and Shimizu, wherein the order of layers in the LED can be as in Nakamura.

This is all of the features of claims 7 and 8.

> 2. Claim 9 is rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over Begemann in view of Nakamura, and any of Abe, Waitl, Bogner, Matsubara, and Shimizu, as applied to claim 8, above, and further in view of Karwacki, as evidenced by RP Photonics Encyclopedia.

Claim 9 reads,

> *9. A device as recited in claim 8 wherein said reflective layers include multiple quantum wells.*

The prior art of Begemann in view of Nakamura, and any of Abe, Waitl, Bogner, Matsubara, and Shimizu, as explained above, discloses each of the features of claim 8.

CAO_DE_004860

Application/Control Number: 90/012,957                                    Page 26

Art Unit: 3992

None of the references, Nakamura in particular, teaches the reflective layers are multiple quantum well layers.  However, the mirrors described in Nakamura, although not names, are descriptive of a distributed Bragg reflector (DBR), as evidenced by RP Photonics Encyclopedia.  In this regard, RP Photonics Encyclopedia explains what a DBR is:

> A Bragg mirror (also called **distributed Bragg reflector**) is a mirror structure which consists of an **alternating sequence of layers of two different optical materials**.  The most frequently used design is that of a **quarter-wave mirror**, where **each optical layer thickness corresponding to one quarter of the wavelength** for which the mirror is designed.  The latter condition holds for normal incidence; if the mirror is designed for larger angles of incidence, accordingly thicker layers are needed.

(RP Photonics Encyclopedia, 1st page, 1st ¶; emphasis added)

As just noted above in addressing claim 8, Nakamura similarly describes the reflector layers **100** and **200** as quarter-wave mirrors, i.e. "each optical layer thickness corresponding to one quarter of the wavelength for which the mirror is designed" (*id*.):

> The first multi-layered film **100** and the second multi-layered film **200** are each formed of nitride semiconductors differing in composition and in refractive index which are **alternately superimposed under the condition, for example, of λ/4 n (λ: wavelength; n: refractive index)** thereby forming a two or more-ply structure so as to **reflect** the emission wavelength of the active layer **156**.

(Nakamura, col. 21, line 62 to col. 22, line 1; emphasis added)

Thus, while Nakamura discloses the reflective layers **100** and **200** are DBRs, it does not indicate that they are multiple quantum well layers.

Karwacki teaches a light-emitting device having a reflective layer composed of multiple quantum wells, called a "Quantum Well Mirror" or QWM used to replace at least one of the DBRs.  In this regard, Karwacki states,

> The present invention relates to semiconductor lasers that emit light at visible wavelengths, and more particularly, to Vertical-Cavity Surface Emitting Lasers (VCSELs) that produce N-frequencies of visible light in a single cavity by altering the optical length of the cavity through the use of a **Quantum Well Mirror (QWM) replacing one of the Distributed Bragg Reflectors (DBRs)** typically found in a VCSEL.

(Karwacki, ¶ [0002]; emphasis added)

> It is a further object of the present invention to provide for a VCSEL device that may be fabricated of different semiconductor materials that provide a desired bandgap for fundamental light frequencies of interest.

(Karwacki, ¶ [0009]; emphasis added)

CAO_DE_004861

Application/Control Number: 90/012,957                                                          Page 27

Art Unit: 3992

> With reference to the drawing, FIG. 1 illustrates a schematic diagram of a tunable multi-frequency VCSEL device **10** of the present invention. **The VCSEL device 10 is tunable to N visible frequencies and comprises a QWM that replaces at least one of the DBRs commonly found in the prior art VCSEL devices.** As will be further described hereinafter, the QWM element in the VCSEL is tunable so as to develop one of the visible light frequencies, by applying a specific voltage to its electrode, making up the multiple visible light spectrum developed by the this device **10**.

(Karwacki, ¶ [0016]; emphasis added)

See also ¶¶ [0018]-[0020].

> With reference to FIG. 1, it is seen that a single **QWM device 18 is used to replace one of the DBR** of a typical VCSEL device, such as those disclosed in U.S. Pat. Nos. 5,557,627 and 5,719,892. The fundamental frequency within the cavity can be set by applying a DC voltage, having a possible value between 0 to 10 volts, across the electrodes **26** and **28** of the QWM device **18**. This will set a particular cavity length for the VCSEL device **10**. If modulation is required, an additional time varying signal can be applied across the electrodes **26** and **28**, in a manner to be described hereinafter with reference to FIG. 3.

(Karwacki, ¶ [0022]; emphasis added)

As stated in the Request in the paragraph bridging pages 50-51, it would have been obvious to one of ordinary skill in the art, at the time of the invention to replace the reflective layers **100** and **200** of Nakamura with the QWM described by Karwacki to fine tune a laser within a semiconductor light source to the optimum absorption wavelength of the phosphor coating that is used to make white light or, alternatively, to rapidly modulate the output wavelength of the laser in order to generate a broader spectrum white light, as taught by Karwacki.

### C. Begemann and Floyd

<u>1. Claim 8 is rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over Begemann in view of Floyd, and any of Abe, Waitl, Bogner, Matsubara, and Shimizu.</u>

The prior art of Begemann in view of any of Abe, Waitl, Bogner, Matsubara, and Shimizu, as explained in the previous rejection, discloses each of the features of claim 1.

Again, Begemann does not provide the details of the white LED and therefore does not teach the features of claims 7 and 8.

Application/Control Number: 90/012,957                                    Page 28
Art Unit: 3992

Floyd teaches the features of claims 7 and 8. Floyd's Fig. 2, (reproduced below) shows a GaN-based blue VCSEL having all of the features of claims 7 and 8, as set forth below (Floyd, abstract).



FIG. 2

Floyd teaches the features of claims 7 and 8 as follows:

> *7. A device as recited in claim 1 wherein said chip **200** includes*
>
> *a substrate **202** on which epitaxial layers are grown,*

The layers of the laser are epitaxially grown (Floyd, abstract: "The gallium nitride-based laser structure is grown by selective area epitaxy and lateral mask overgrowth.

Claim 7 continues,

> *a buffer layer **204, 206, 208, 210** located on said substrate **202**, said buffer layer serving to mitigate differences in material properties between said substrate and other epitaxial layers,*

Floyd indicates that Fig. 1 (reproduced below) shows the "substrate and buffer layer" of the LED:

CAO_DE_004863

Application/Control Number: 90/012,957                                   Page 29

Art Unit: 3992

> FIG. 1 is a cross-sectional side view of the semiconductor layers of the **substrate and buffer layer** of the semiconductor structure of the present invention.

(Floyd, col. 2, lines 12-14; emphasis added)

Because the "substrate" is element **102**, the remaining layers **104, 106, 108,** and **110** are taken to be the "buffer layer". Thus, the buffer layer in the associated Fig. 2 includes layer **210**.



# FIG. 1

The buffer layer *mitigates differences in material properties between said substrate and other epitaxial layers.* In this regard, Floyd states,

> As the layer **110** gets thicker, the layer starts to laterally overgrow the SiO$_2$ layer **106**. Since this laterally overgrown material is attached to the lower GaN layer **104** only on one side, it will **grow without strain** and, therefore, **without dislocations**.

(Floyd, col. 2, lines 53-57; emphasis added)

Because layer **110** grows without strain and without dislocations, it is shown to *mitigates differences in material properties between said substrate* **102** *and other epitaxial layers.*

Claim 7 continues,

> *a first cladding* **218** *layer serving to confine electron movement within the chip, said first cladding layer being adjacent said buffer layer [portion labeled* **210***],*

Application/Control Number: 90/012,957                                    Page 30

Art Unit: 3992

With regard to the cladding layer **218**, Floyd states,

> Using Organometallic Vapor Phase Epitaxy ("OMPVE"), a lower **n-$Al_{0.08}Ga_{0.92}N$ aluminum gallium nitride cladding layer 218** is deposited on the GaN layer **210**.

(Floyd, col. 3, lines 61-63; emphasis added)

Again, the '961 patent admits n-AlGaN cladding layers confine electrons:

> Then a **cladding layer 1204**, such as **n-AlGaN**, is provided. **Cladding layers serve to confine the electrons** as they jump from a conduction band to valance and give up energy that converts to light. An **active layer 1205 p-InGaN** is then provided where electrons jump from a conduction band to valance and emit energy which converts to light.

(the '961 patent, col. 4, lines 50-55; emphasis added)

Therefore, Floyd's n-AlGaN layer inherently confines electron movement within the chip.

The cladding layer **218** is shown adjacent to the portion of the buffer layer labeled **210**.

Claim 7 continues,

> *an active layer **222**, said active layer emitting light when electrons jump to a valance state,*

Floyd states,

> An $In_{0.15}Ga_{0.85}N$/GaN multiple quantum well **active layer 222** is deposited on the confinement layer **220**.

(Floyd, col. 4, lines 3-4; emphasis added)

Claim 7 continues,

> *a second cladding layer **226**, said second cladding layer positioned so that said active layer lies between cladding layers, and*

Floyd states,

> An upper p-$Al_{0.08}Ga_{0.92}N$ aluminum gallium nitride **cladding layer 226** is deposited on the confinement layer 224.

(Floyd, col. 4, lines 10-12; emphasis added)

Claim 7 ends,

CAO_DE_004865

Application/Control Number: 90/012,957                                    Page 31

Art Unit: 3992

> *a contact layer **228** on which an electron [sic] may be mounted for powering said chip.*

Floyd states,

> A third p-GaN **contact layer 228** is deposited on the upper cladding layer **226**.

> (Floyd, col. 4, lines 15-16; emphasis added)

Floyd's Fig. 2 also shows the first and second reflector layers of claim 8:

> *8. A device as recited in claim 7 further comprising a first **206** and a second **234** reflective layers, each of said first and second reflective layers being located on opposite sides of said active layer **222**, said reflective layers serving to reflect light emitted by said active layer.*

In this regard, Floyd states,

> A narrow bandwidth **distributed Bragg reflector ("DBR") 206** of approximately 8 to 12 alternating layers of dielectric film materials such as n-$SiO_2$ and n-$TiO_2$ is then deposited on the GaN base layer **204** by plasma-enhanced chemical vapor deposition ("PECVD") or by electron beam evaporation.

> (Floyd, col. 3, lines 23-28; emphasis added)

> Within the annular contact **232**, the **upper p-DBR 234** is formed on the surface of the contact layer **228**.

> (Floyd, col. 4, lines 46-47; emphasis added)

It would have been obvious to one of ordinary skill in the art, at the time of the invention to use Floyd's layer order of the GaN-based LED in the GaN-based LEDs of either of Bogner and Waitl that is used in Begemann, or to use Floyd's GaN-based LED as the GaN-based LED of either of Bogner and Waitl that is used in Begemann, because each of Begemann, Bogner, and Waitl are silent to the structure of the LED, such that one of ordinary skill would use a known LED that serves the same purpose of emitting a primary monochromatic light for conversion.

This reason satisfies at least rationale B in MPEP 2143: simple substitution of one known element for another to obtain predictable results.  This is simple substitution of Floyd's GaN-based LED for either of Bogner's and Waitl's GaN-based LEDs because Bogner and Waitl do not provide the details of the GaN-based LED.  The results are predictable because both GaN-based LEDs produce shorter wavelength light in the same region of the spectrum.

More generally, it would have been obvious to one of ordinary skill in the art, at the time of the invention to produce a white LED lamp, as taught by Begemann, using an appropriate combination of LEDs and conversion coatings appropriate for the

Application/Control Number: 90/012,957                                                  Page 32

Art Unit: 3992

monochromatic LED light, as taught by each of Bogner, Waitl, Abe, Matsubara, and Shimizu, wherein the order of layers in the LED can be as in Floyd.

This is all of the features of claims 7 and 8.


<u>2. Claim 9 is rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over Begemann in view of Floyd, and any of Abe, Waitl, Bogner, Matsubara, and Shimizu, as applied to claim 8, above, and further in view of Karwacki, as evidenced by RP Photonics Encyclopedia.</u>

Claim 9 reads,

> *9. A device as recited in claim 8 wherein said reflective layers include multiple quantum wells.*

The prior art of Begemann in view of Floyd, and any of Abe, Waitl, Bogner, Matsubara, and Shimizu, as explained above, discloses each of the features of claim 8.

None of the references, Floyd in particular, teaches the reflective layers are multiple quantum well layers. While Floyd discloses the reflective layers **206** and **234** are DBRs, it does not indicate that they are multiple quantum well layers.

Karwacki teaches a light-emitting device having a reflective layer composed of multiple quantum wells, called a "Quantum Well Mirror" or QWM used to replace at least one of the DBRs. In this regard, Karwacki states,

> The present invention relates to semiconductor lasers that emit light at visible wavelengths, and more particularly, to Vertical-Cavity Surface Emitting Lasers (VCSELs) that produce N-frequencies of visible light in a single cavity by altering the optical length of the cavity through the use of a **Quantum Well Mirror (QWM) replacing one of the Distributed Bragg Reflectors (DBRs)** typically found in a VCSEL.

(Karwacki, ¶ [0002]; emphasis added)

> It is a further object of the present invention to provide for a VCSEL device that may be fabricated of different semiconductor materials that provide a desired bandgap for fundamental light frequencies of interest.

(Karwacki, ¶ [0009]; emphasis added)

> With reference to the drawing, FIG. 1 illustrates a schematic diagram of a tunable multi-frequency VCSEL device **10** of the present invention. **The VCSEL device 10 is tunable to N visible frequencies and comprises a QWM that replaces at least one of the DBRs commonly found in the prior art VCSEL devices.** As will be further described hereinafter, the QWM element in the VCSEL is tunable so as to develop one of the visible light

CAO_DE_004867

Application/Control Number: 90/012,957                                         Page 33

Art Unit: 3992

> frequencies, by applying a specific voltage to its electrode, making up the multiple visible light spectrum developed by the this device **10**.

(Karwacki, ¶ [0016]; emphasis added)

See also ¶¶ [0018]-[0020].

> With reference to FIG. 1, it is seen that a single **QWM device 18 is used to replace one of the DBR** of a typical VCSEL device, such as those disclosed in U.S. Pat. Nos. 5,557,627 and 5,719,892. The fundamental frequency within the cavity can be set by applying a DC voltage, having a possible value between 0 to 10 volts, across the electrodes **26** and **28** of the QWM device **18**. This will set a particular cavity length for the VCSEL device **10**. If modulation is required, an additional time varying signal can be applied across the electrodes **26** and **28**, in a manner to be described hereinafter with reference to FIG. 3.

(Karwacki, ¶ [0022]; emphasis added)

As stated in the Request in the page 70, it would have been obvious to one of ordinary skill in the art, at the time of the invention to replace the reflective layers **206** and **234** of Floyd with the QWM described by Karwacki to fine tune a laser within a semiconductor light source to the optimum absorption wavelength of the phosphor coating that is used to make white light or, alternatively, to rapidly modulate the output wavelength of the laser in order to generate a broader spectrum white light, as taught by Karwacki.

## *Conclusion*

Extensions of time under 37 CFR 1.136(a) will not be permitted in these proceedings because the provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a reexamination proceeding. Additionally, 35 U.S.C. 305 requires that reexamination proceedings "will be conducted with special dispatch" (37 CFR 1.550(a)). Extension of time in reexamination proceedings are provided for in 37 CFR 1.550(c).

In order to ensure full consideration of any amendments, affidavits or declarations, or other documents as evidence of patentability, such documents must be submitted in response to this Office action. Submissions after the next Office action, which is intended to be a final action, will be governed by the requirements of 37 CFR 1.116, which will be strictly enforced.

Patent owner is notified that any proposed amendment to the specification and/or claims in this reexamination proceeding must comply with 37 CFR 1.530(d)-(j).

CAO_DE_004868

Application/Control Number: 90/012,957                                    Page 34
Art Unit: 3992

After the filing of a request for reexamination by a third party requester, any document filed by either the patent owner of the third party requester must be served on the other party (or parties where two or more third-party-requester proceedings are merged) in the reexamination proceeding in the manner provided in 37 CFR 1.248. See 37 CFR 1.550(f).

The patent owner is reminded of the continuing responsibility under 37 CFR 1.565(a) to apprise the Office of any litigation activity, or other prior or concurrent proceeding, throughout the course of this reexamination proceeding.  The third party requester is also reminded of the ability to similarly apprise the Office of any such activity or proceeding throughout the course of this reexamination proceeding. See MPEP §§ 2207, 2282 and 2286.

**All** correspondence relating to this *ex parte* reexamination proceeding should be directed as follows:

By **U.S. Postal Service Mail** to:

    Mail Stop *Ex Partes* Reexam
    ATTN:  Central Reexamination Unit
    Commissioner for Patents
    P.O. Box 1450
    Alexandria, VA  22313-1450


By FAX to:    (571) 273-9900
              Central Reexamination Unit


By hand to:  Customer Service Window
             Randolph Building
             401 Dulany St.
             Alexandria, VA  22314

By EFS-Web:

Registered users of EFS-Web may alternatively submit such correspondence via the electronic filing system EFS-Web, at

        https://efs.uspto.gov/efile/myportal/efs-registered

EFS-Web offers the benefit of quick submission to the particular area of the Office that needs to act on the correspondence.  Also, EFS-Web submissions are "soft scanned" (i.e., electronically uploaded) directly into the official file for the reexamination proceeding, which offers parties the opportunity to review the content of their submissions after the "soft scanning" process is complete.

CAO_DE_004869

Application/Control Number: 90/012,957                                              Page 35
Art Unit: 3992

Any inquiry concerning this communication should be directed to Erik Kielin at telephone number 571-272-1693.


Signed:

/Erik Kielin/
Primary Patent Examiner
Art Unit 3992



Conferees:

/Albert J Gagliardi/
Primary Examiner, Art Unit 3992

/JENNIFER MCNEIL/
Supervisory Patent Examiner, Art Unit 3992

CAO_DE_004870

# EXHIBIT 2

Control No. 90/012,957

Attorney Docket Number C1160.10003US04
Responsive to Office Action mailed January 23, 2014

## STATUS OF CLAIMS AND SUPPORT FOR CLAIM AMENDMENTS

### A.    Status of Claims

Claims 8 and 9 are the subject of reexamination. By this paper, claims 8 and 9 have been canceled and new claims 21-107 have been added. Thus, claims 21-107 are now pending in this reexamination.

### B.    Support for Claim Amendments

Support for the following new claim limitations is found *at least* in the following locations in the present patent. Other locations in the present patent may provide additional support for the following new claim limitation. To save space, each claim limitation is identified by claim number/limitation number, where each limitation ends in a comma and a hard return. For example, dependent claim 22 includes three (3) limitations (numbered below as limitations 22-1, 22-2, and 22-3). To further save space, columns and lines in the specification are identified by column:line numbers (e.g., column 3, lines 45-50 is identified as 3:45-50) or by column:line number-column:line number (e.g., column 3, line 45 to column 4, line 15 is identified as 3:45-4:15). Also, where support for a limitation can be found in a location already identified in connection with a previous limitation, the previous limitation will simply be identified (e.g., "*See* 40-4"). It is noted, however, that multiple limitations finding support in the same location does not mean that the limitations are identical, equivalent, or even related, as a single location or locations in the present patent can provide support for various distinct and unrelated claim limitations.

| Claim-Limitation | Support |
|---|---|
| 21-1 | Fig. 1, 3:38-46, Fig. 2, 4:4-15 – The semiconductor device 106 of Fig. 1 can be replaced with a high power LED chip, where "high power" is defined as "the light output ... is greater than 40 milliwatts." |
| 22-2 | Fig. 1, 3:38-46, 1:5-11 – The semiconductor device 106 of Fig. 1 can be configured to emit monochromatic visible light. |
| 22-1 | Fig. 1, 3:38-46, Fig. 4b, 6:22-29, 2:34 – The semiconductor devices 106 of Fig. 1 may each be an LED array chip (also referred to in the specification as an "LED array on a single chip," but referred to at 2:34 as a "single array chip.") |
| 22-2 | Fig. 4b, 6:22-29. |
| 22-3 | Fig. 4b, 6:22-29. |
| 23-1 | Fig. 1, 3:50-52. |
| 24-1 | Fig. 1, 3:50-52. |

CAO_DE_004982

Control No. 90/012,957

Attorney Docket Number C1160.10003US04

Responsive to Office Action mailed January 23, 2014

| | |
|---|---|
| 25-1 | Fig. 1, 3:15 – As disclosed in Fig. 1, the enclosure 101 is mounted to the support 105 of the base 103. |
| 25-2 | *See* 21-1 and 21-2 – One or more semiconductor devices 106 can be mounted on each of the panels of the heat sink 104 in Fig. 1. |
| 25-3 | Fig. 1, 3:22-30, 3:38-42, Fig. 2, 4:13-24 – As disclosed in Fig. 1, the semiconductor devices 106 are only mounted on multiple panels 104a-104i of the heat sink 104 which are substantially oriented in a 90-degree range of orientation angles with respect to a longitudinal axis of the semiconductor light source 100. This is consistent with the teaching in the specification that "The semiconductor device(s) 106 may be arranged in this embodiment of the invention to transmit light in all directions except through the base 103." *See* Supporting Illustration 25 below. |
| 25-4 | Fig. 1, 3:22-30, 3:38-42, Fig. 2, 4:13-24 – As disclosed in Fig. 1, the only panels 104a-104i of the heat sink 104 having semiconductor devices 106 mounted thereon are those panels having orientations that range from panels (e.g., panels 104g-104i) being parallel to the longitudinal axis of the semiconductor light source 100 to panels (e.g., panel 104a) that are both perpendicular to the longitudinal axis and face away from the base 103. *See* Supporting Illustration 25 below. |
| 25-5 | Fig. 1, 3:22-30, 3:38-42, Fig. 2, 4:13-24 – As disclosed in Fig. 1, the orientation of the panels 104a-104i in the 90-degree range of angles orient the faces of the LED chips 106 mounted thereon only in the same 90-degree range of angles. *See* Supporting Illustration 25 below. |
| 26-1 | Fig. 1, 3:22-30 – As disclosed in Fig. 1, the panel 104a has a different shape than the panel 104d. |
| 27-1 | Fig. 1, 3:22-30 – As disclosed in Fig. 1, the panel 104a has a different size than the panel 104d. |
| 28-1 | Fig. 1, 3:15. |
| 28-2 | Fig. 1, 2:52-55, Fig. 9, 8:33-37 – The enclosure 101 of Fig. 1 may have a "domed" shape. As disclosed in Fig. 9, the element 910 is described as a "dome," and substantially resembles a hollow half of a sphere and defines an opening at its base (where the dome 910 attaches to the heat sink 902). Thus, Fig. 9 provides support for the definition of a "dome" as a shape that "substantially resembles a hollow half of a sphere and that defines an opening." |

CAO_DE_004983

Control No. 90/012,957

Attorney Docket Number C1160.10003US04

Responsive to Office Action mailed January 23, 2014

| | |
|---|---|
| 28-3 | Fig. 1, 3:15. |
| 28-4 | Fig. 1, 2:52-55, Fig. 9, 8:33-37 – Where the enclosure 101 of Fig. 1 is dome shaped, the largest outer diameter of the dome-shaped enclosure 101 along a longitudinal axis of the semiconductor light source 100 will be proximate its base, where the opening is defined by the dome-shaped enclosure 101. In order for the base of the dome-shaped enclosure 101 to be attached to the support 105 of the base 103, at least the portion of the support 105 to which the dome-shaped enclosure 101 is mounted must inherently be larger in diameter than the opening defined by the dome-shaped enclosure 101 – otherwise the dome-shaped enclosure 101 could not be mounted to the support 105 of the base 103. |
| 29-1 | Fig. 1, 2:52-55, Fig. 9, 8:33-37 – Where the enclosure 101 of Fig. 1 is dome shaped, the opening proximate the base will be substantially the largest outer diameter of the dome-shaped enclosure 101 along a longitudinal axis of the semiconductor light source 100. Since the heat sink 104 in Fig. 1 fits inside the enclosure 101, and since a dome-shaped enclosure 101 will gradually taper smaller from its base, the heat sink 104 must be small enough that it can fit through the opening proximate the base of the dome-shaped enclosure 101. |
| 30-1 | Fig. 1, 2:52-61. |
| 30-2 | Fig. 1, 2:60-61. |
| 31-1 | *See* 30-1. |
| 31-2 | Fig. 1, 2:61-63. |
| 31-3 | Fig. 1, 2:63-64. |
| 32-1 | Fig. 1, 3:58-64. |
| 32-2 | Fig. 1, 3:17-21, 3:58-64, Fig. 11, 8:56-62. |
| 32-3 | Fig. 1, 3:63-64 – Where the AC/DC converter discussed at 3:58-64 is "located in the base 103" of Fig. 1, the AC/DC converter is positioned outside the interior volume 102 of Fig. 1. |
| 33-1 | *See* 25-1. |
| 33-2 | Fig. 1, 3:63-64. |
| 34-1 | Fig. 1, 3:48-50, Fig. 11, 8:62-66 – Where the electrical lead wires 108a and 108b of Fig. 1 are positive and negative lead wires that are configured to provide power from an AC/DC converter to the LED chip 106. As disclosed in Fig. 11, electrical lead wires 706a and 706b connect to the AC/DC converter 705 to provide power |

CAO_DE_004984

Control No. 90/012,957

Attorney Docket Number C1160.10003US04
Responsive to Office Action mailed January 23, 2014

| | |
|---|---|
| | from the AC/DC converter 705 to the LED chips of the semiconductor light source (such as the semiconductor light source 100 of Fig. 1) into which the AC/DC converter 705 is integrated. |
| 34-2 | Fig. 1, 3:48-50, Fig. 11, 8:62-66 – As disclosed in Fig. 11 and Fig. 1, the lead wires 706a and 706b run from the AC/DC converter 705, through an interior of the support 105 of the base 103, into the interior volume 102 (as lead wires 108a and 108b), and over an exterior of the heat sink 104 (as lead wires 108a and 108b). |
| 35-1 | Fig. 11, 8: 62-66 – As disclosed in Fig. 11, electrical lead wires 707a and 707b are a second positive lead wire and a second negative lead wire that are configured to provide power from the AC/DC converter 705 to a cooling fan of the semiconductor light source (such as the semiconductor light source 100 of Fig. 1) into which the AC/DC converter 705 is integrated. The cooling fan is a component of the semiconductor light source 100 other than the LED chip 106. |
| 36-1 | *See* 21-1, *see also* Fig. 8b, 8:3-14 – The LED chip 106 may be part of an LED package such as the LED chip package 6000 of Fig. 8b, which includes a coating 6004 applied to a face of the LED chip 6002. |
| 37-1 | Fig. 8b, 8:3-14 – As disclosed in Fig. 8b, a coating 6004 is not directly applied to any side of the LED chip 6002. |
| 38-1 | Fig. 8b, 8:3-14 – As disclosed in Fig. 8b, the coating 6004 is directly applied to a transparent filler material 6003 that is applied to the sides of the LED chip 6002. |
| 39-1 | Fig. 8b, 8:3-14 – As disclosed in Fig. 8b, the coating 6004 is positioned in the well 6005 formed in the heat sink 6001. |
| 40-1 | *See* 25-2. |
| 40-2 | Fig. 1, 3:22-30, 3:38-46, Fig. 3c – The heat sink 104 includes a "planar" panel 104a which defines a plane and which may host "an array of semiconductor devices." Since "The semiconductor device(s) 106 may be arranged ... in a manner to direct light in a specific direction," where multiple LED chips are hosted on the panel 104a, the faces of the multiple LED chips will direct light in only a single specific direction (e.g., up), as shown in the direction 214b of Fig. 3c, that is substantially perpendicular to the plane defined by the panel 104a. |
| 41-1 | Fig. 1, 2:51-55, Fig. 10, 8:41-43 – As disclosed at 2:51-55, the enclosure 101 of Fig. 1 can have one or more sides, and an enclosure can be "flat." Since the enclosure 101 of Fig. 1 is positioned over the panel 104a, where the enclosure 101 of Fig. 1 includes a substantially flat side positioned over the panel 104a, the |

CAO_DE_004985

Control No. 90/012,957

Attorney Docket Number C1160.10003US04
Responsive to Office Action mailed January 23, 2014

| | |
|---|---|
| | substantially flat side would be substantially parallel to the plane defined by the panel 104a. |
| 42-1 | *See* 21-1, *see also* Fig. 9, 8:15-24 – The LED chip 106 may be part of an LED package such as the LED chip package 901 of Fig. 9, which includes LED "chip(s) 903" surface mounted on a primary heat sink 902 that can then be mounted on one of the panels of the heat sink 104 of Fig. 1. |
| 42-2 | *See* 21-1 and 21-2, *see also* Fig. 9, 8:15-24 – The LED chip package 901 includes a single primary heat sink 902, which may have multiple LED "chip(s) 903" surface mounted thereon. |
| 42-3 | Fig. 1, 2:67-3:3, Fig. 9, 8:15-24 – Since the phosphor coating 907 of Fig. 9 may be included over the LED chips 903 "to convert light emitted by the chip(s) to white light," the multiple LED chips 903 would all be configured to emit the same color of monochromatic light. Also, the specification describes multiple blue LEDs in a single semiconductor light source. |
| 43-1 | Fig. 9, 8:33-37 – As disclosed in Fig. 9, the lens 910 is mounted on the primary heat sink 902 and is mounted over the LED chips 903. |
| 43-2 | Fig. 9, 8:21-23 – The coating 907 is positioned between the lens 910 and the LED chip 903. |
| 44-1 | Fig. 9, 8:34-37. |
| 45-1 | Fig. 9, 8:31-33. |
| 45-2 | Fig. 9, 8:31-37 – As disclosed in Fig. 9, the lens 910 of Fig. 9 is mounted over the connection blocks 909a and 909b. |
| 46-1 | Fig. 7b, 7:56-61 – As disclosed in Fig. 7b, an LED package may include multiple LED chips 523a-523c that are all positioned in separate wells 521a-521c formed in a single primary heat sink 522. |
| 47-1 | Fig. 1, 3:9-12, Abstract, 2:31-33, Fig. 6, 7:30-35, 9:30-36 – The heat sink 104 of Fig. 1 can be replaced with the heat sink 403 of Fig. 6, as both heat sinks have a similar shape, and the specification expressly states at 9:30-36 that "Any of the foregoing [heat sinks], including combinations thereof ... may be used in the invented light source being constructed." Fig. 6 depicts a cross-sectional view of an example "heat sink 403" configured to "circulate air and remove heat." It is clear from Fig. 6 that the air 408 being circulated is ambient ordinary air that surrounds the semiconductor light source of Fig. 6. It is also inherent that the "air" discussed |

CAO_DE_004986

Control No. 90/012,957

Attorney Docket Number C1160.10003US04
Responsive to Office Action mailed January 23, 2014

| | |
|---|---|
| | at 7:30-35, 2:31-33, and in the Abstract, is ambient ordinary air that surrounds the semiconductor light source. Where the heat sink 104 of Fig. 1 is replaced with the heat sink 403 of Fig. 6, it is inherent that the air entrance 406a and the air exit 406b of Fig. 6 would be positioned in the region of the support 105 of Fig. 1, beneath the enclosure 101 of Fig. 1 and above the threads 103b of the base 103 of Fig. 1, thus placing the air entrance 406a and the air exit 406b outside the enclosure 101 of Fig. 1, and thus exposing the air entrance 406a and the air exit 406b to the ambient ordinary air 408 that surrounds the semiconductor light source 100 of Fig. 1. *See* Supporting Illustration 47 below (illustrating how heat sink 104 of Fig. 1 may be replaced with the heat sink 403 of Fig. 6). Since the heat sink 104 of Fig. 1 is located in the interior volume 102 of Fig. 1, the replacement of the heat sink 104 of Fig. 1 with the heat sink 403 of Fig. 6 would locate the heat sink 403 of Fig. 6 in the interior volume 102 of Fig. 1. This location of the heat sink 403 of Fig. 6 in the interior volume 102 of Fig. 1 would allow the ambient ordinary air that surrounds the semiconductor light source 100 of Fig. 1 to flow through the air chamber 406 of the heat sink 403 of Fig. 6, and thus flow through the interior volume 102 of Fig. 1. Allowing ambient ordinary air to flow through the interior volume 102 of the enclosure 101 of Fig. 1 is consistent with the statement at 3:9-12 that "The enclosure 101 encloses an interior volume 102 which ... may contain a gas such as ordinary air." This mention of "ordinary air" suggests that the ordinary air that ambiently surrounds the semiconductor light source 100 of Fig. 1 may be allowed to enter and be expelled from the enclosure 101 of Fig. 1. |
| 47-2 | *See* 47-1. |
| 48-1 | *See* 25-1. |
| 48-2 | Fig. 1, 3:15-21 – As disclosed in Fig. 1, the base 105 includes an electrical connector 103a/103b. |
| 48-3 | *See* 47-1 – As discussed above at 47-1, where the heat sink 104 of Fig. 1 is replaced with the heat sink 403 of Fig. 6, it is inherent that the air entrance 406a and the air exit 406b of Fig. 6 would be positioned in the region of the support 105 of Fig. 1, between the threads 103b of the electrical connector 103a/103b and the enclosure 101 of Fig. 1. *See* Supporting Illustration 47. |
| 49-1 | *See* 47-1 – As discussed above at 47-1, where the heat sink 104 of Fig. 1 is replaced with the heat sink 403 of Fig. 6, it is inherent that the air entrance 406a and the air |

CAO_DE_004987

Control No. 90/012,957

Attorney Docket Number C1160.10003US04
Responsive to Office Action mailed January 23, 2014

| | |
|---|---|
| | exit 406b of Fig. 6 would be defined in the support 105 of Fig. 1, which is part of the base 103, between the threads 103b of the electrical connector 103a/103b and the enclosure 101 of Fig. 1. *See* Supporting Illustration 47. |
| 50-1 | *See* 47-1. |
| 50-2 | *See* 47-1. |
| 51-1 | *See* 47-1 – As disclosed in Fig. 6, the air chamber 406 runs inside the heat sink 403 and directly underneath the LED chip 402. |
| 52-1 | *See* 47-1 – As disclosed in Fig. 6, the air chamber 406 is at least partially U-shaped. |
| 53-1 | Fig. 1, 3:15-21 – As disclosed in Fig. 1, the base 103 includes an electrical connector 103a/103b. |
| 53-2 | Fig. 1, 3:15-21 – As disclosed in Fig. 1, the electrical connector 103a/103b is configured "for use in a desired light socket, such as a traditional light socket." |
| 53-3 | Fig. 1, 3:15-21 – As disclosed in Fig. 1, the electrical connector 103a/103b "include electrodes 103a and 103b for making electrical connection with a power source" through "a desired light socket, such as a traditional light socket." |
| 53-4 | Fig. 1, 3:15-21 – As disclosed in Fig. 1, the base 103 includes a support 105. |
| 53-5 | Fig. 1, 3:15-21 – As disclosed in Fig. 1, when the electrical connector 103a/103b is received within a light socket, the support 105 is configured to be substantially positioned outside the light socket. |
| 53-6 | Fig. 1, 3:15-21 – As disclosed in Fig. 1, the support 105 is substantially positioned outside the interior volume 102 and between the enclosure 101 and the electrical connector 103a/103b. |
| 53-7 | Fig. 1, 3:31-36 – As disclosed in Fig. 1, the heat sink 104, which is located in the interior volume 102, "may be mounted on" the support 105, which places the support 105 in thermal communication with the heat sink 104. |
| 53-8 | *See* 53-1, 53-4, and 53-7, *see also* 3:65-4:3 – Since the base 103 may include the electrical connector 103a/103b and the support 105, and since "the base may also serve as a heat sink," it is inherent that the support 105 portion of the base 103 may also serve as a second heat sink. Since the support 105 is in thermal communication with the heat sink 104 and since the support 105 may also serve as a second heat sink, the support 105 (the second heat sink) may be configured to draw heat generated by the LED chip 106 toward the support 105 (the second heat sink) to |

CAO_DE_004988

Control No. 90/012,957

Attorney Docket Number C1160.10003US04

Responsive to Office Action mailed January 23, 2014

| | |
|---|---|
| | dissipate the heat into ambient ordinary air surrounding the support 105 (the second heat sink). |
| 54-1 | *See* 53-1, 53-2, and 53-3 – The electrical connector 103a/103b includes a threaded electrode 103b, making the electrical connector 103a/103b a threaded electrical connector. |
| 54-2 | *See* 54-1 – Since the electrical connector 103a/103b is a threaded electrical connector, it is inherent that the threaded electrical connector 103a/103b is configured to be screwed into a light socket. |
| 55-1 | Fig. 1, 3:15-21 – As disclosed in Fig. 1, the support 105 may be "integral with" the threaded electrical connector 103a/103b. |
| 56-1 | Fig. 1, 3:15-21 – As disclosed in Fig. 1, the support 105 may be "a separate component" from the threaded electrical connector 103a/103b. |
| 57-1 | *See* 49-1. |
| 57-2 | *See* 49-1. |
| 58-1 | *See* 47-1. |
| 58-1 | *See* 47-1. |
| 59-1 | See 53-8, see also Fig. 1 - As disclosed in Fig. 1, the support 105 is illustrated with three concentric ribs on an external surface of the support 105 (the second heat sink). |
| 60-1 | *See* 25-2. |
| 60-2 | *See* 32-1. |
| 60-3 | *See* 32-2. |
| 60-4 | *See* 32-3. |
| 61-1 | *See* 22-1. |
| 61-2 | *See* 22-2. |
| 61-3 | *See* 22-3. |
| 62-1 | *See* 23-1. |
| 63-1 | *See* 24-1. |
| 64-1 | *See* 25-2. |
| 64-2 | *See* 25-3. |
| 64-3 | *See* 25-4. |
| 64-4 | *See* 25-5. |

Page **27** of **41**

CAO_DE_004989

Control No. 90/012,957

Attorney Docket Number C1160.10003US04

Responsive to Office Action mailed January 23, 2014

| 65-1 | *See* 26-1. |
|------|-------------|
| 66-1 | *See* 27-1. |
| 67-1 | *See* 28-2. |
| 67-2 | Fig. 1, 3:15. |
| 67-3 | *See* 28-4. |
| 68-1 | *See* 40-2. |
| 69-1 | *See* 29-1. |
| 70-1 | *See* 30-1. |
| 70-2 | *See* 30-2. |
| 71-1 | *See* 31-1. |
| 71-2 | *See* 31-2. |
| 71-3 | *See* 31-3. |
| 72-1 | *See* 33-2, see also Fig. 11, 8:56-62 – The AC/DC 705 converter of FIG. 11 is positioned in an electrical connector 702. |
| 73-1 | *See* 34-1. |
| 73-2 | *See* 34-2. |
| 74-1 | *See* 35-1. |
| 75-1 | *See* 36-1. |
| 76-1 | *See* 37-1. |
| 77-1 | *See* 38-1. |
| 78-1 | *See* 40-2. |
| 78-2 | *See* 41-1. |
| 78-3 | *See* 43-1 – When used in the semiconductor light source 100 of Fig. 1, the lens 910 of Fig. 9 would be positioned between the enclosure 101 and the plane on which the LED chips 903 are substantially positioned. |
| 79-1 | *See* 42-1. |
| 79-2 | *See* 42-2 – In claims 79-82, the term "other LED chips" is recited to distinguish from the "additional LED chips" recited in claim 60. However, the term "other LED chips" recited in claims 79-82 is equivalent to the "additional LED chips" recited in claims 42-46. |
| 79-3 | *See* 42-3. |
| 80-1 | *See* 43-1. |
| 80-2 | *See* 44-1. |

CAO_DE_004990

Control No. 90/012,957

Attorney Docket Number C1160.10003US04

Responsive to Office Action mailed January 23, 2014

| 81-1 | *See* 45-1. |
|------|-------------|
| 81-2 | *See* 45-2. |
| 82-1 | *See* 46-1. |
| 82-2 | Fig. 7a, 7:41-55 – The well 503 of Fig. 7a defines a planar bottom portion to which the LED chip 502 is mounted. |
| 82-3 | Fig. 7a, 7:41-55 – The well 503 of Fig. 7a defines angled side portions configured to reflect light 509c that is emitted from the sides of the LED chip 502. |
| 83-1 | *See* 47-1. |
| 83-2 | *See* 47-1. |
| 84-1 | *See* 48-3. |
| 85-1 | *See* 49-1. |
| 86-1 | *See* 47-1. |
| 86-2 | *See* 47-1. |
| 87-1 | *See* 51-1. |
| 88-1 | *See* 52-1. |
| 89-1 | *See* 40-2. |
| 89-2 | *See* 54-1. |
| 89-3 | *See* 54-2. |
| 90-1 | *See* 49-1. |
| 90-2 | *See* 49-1. |
| 91-1 | *See* 41-1. |
| 91-2 | *See* 78-3. |
| 92-1 | *See* 28-2. |
| 92-2 | *See* 67-2. |
| 92-3 | *See* 28-4. |
| 93-1 | *See* 29-1. |
| 94-1 | Fig. 3c, 5:2-5. |
| 95-1 | Fig. 3c, 5:2-5. |
| 96-1 | Fig. 3c, 4:64 – As disclosed in Fig. 3c, an LED chip may have an electrically conductive substrate 210. |
| 96-2 | 9:18-22. |
| 97-1 | *See* 96-1. |
| 97-2 | *See* 96-2. |
| 98-1 | *See* 96-1. |

CAO_DE_004991

Control No. 90/012,957

Attorney Docket Number C1160.10003US04
Responsive to Office Action mailed January 23, 2014

| | |
|---|---|
| 98-2 | *See* 96-2. |
| 99-1 | *See* 96-1. |
| 99-2 | *See* 96-2. |
| 100-1 | *See* 96-1. |
| 100-2 | *See* 96-2. |
| 101-1 | *See* 96-1. |
| 101-2 | Fig. 3c, 5:5-8. |
| 102-1 | *See* 101-2. |
| 103-1 | *See* 101-2. |
| 104-1 | Fig. 1, 3:38-46, Abstract, 2:31-33, Fig. 2, 4:4-15, Fig. 6, 7:15-19 – The heat sink 104 of Fig. 1 can be replaced with the heat sink 403 of Fig. 6, as both heat sinks have a similar shape, and the specification expressly states at 9:30-36 that "Any of the foregoing [heat sinks], including combinations thereof ... may be used in the invented light source being constructed." As disclosed in Fig. 6, the LED chip 402 can be surface mounted to one of the panels of the heat sink 403. |
| 105-1 | Fig. 6, 7:15-19 – As disclosed in Fig. 6, the LED chip 402 can be surface mounted in a well defined in one of the panels of the heat sink 403. |
| 106-1 | Fig. 6, 7:15-19; Fig. 7a, 7:41-55 – The wells disclosed in Fig. 6 can have the properties of the well 503 of Fig. 7a, in which |
| 107-1 | Fig. 6, 7:15-19; – The wells disclosed in Fig. 6 defined a planar bottom portion. |
| 107-2 | Fig. 6, 7:15-19; Fig. 7a, 7:41-55 – The wells disclosed in Fig. 6 define angled side portions. These angled side portions can have the properties of the well 503 of Fig. 7a, in which the angled side portions configured to reflect light 509c that is emitted from the sides of the LED chip 502. |

Patent Owner provides the following Supporting Illustrations to illustrate how the present patent supports various new claim limitations, as noted above.

CAO_DE_004992

Control No. 90/012,957

Attorney Docket Number C1160.10003US04
Responsive to Office Action mailed January 23, 2014



**Fig. 1**

**Supporting Illustration 25**

CAO_DE_004993

Control No. 90/012,957

Attorney Docket Number C1160.10003US04
Responsive to Office Action mailed January 23, 2014



**Supporting Illustration 47**

CAO_DE_004994

Control No. 90/012,957                               Attorney Docket Number C1160.10003US04
                                                     Responsive to Office Action mailed January 23, 2014

## REMARKS

This paper is responsive to the Non-Final Office Action mailed on January 24, 2014 (the "Office Action"). In the Office Action, claims 8 and 9 of U.S. Patent No. 6,465,961 (the "'961 Patent") are rejected.

With respect to the rejections of claims 8 and 9, Patent Owner does not necessarily agree with Examiner's statements regarding at least (1) whether the cited reference(s) disclose each and every element recited in the claims, (2) whether the cited reference(s) teach the combination presented in the claims, (3) whether the cited reference(s) disclose or inherently include the features that the Office Action asserts that the reference(s) include, and (4) whether the reference(s) or any other source provide a reason to combine the teachings of the reference(s). Nevertheless, in the interest of expediting prosecution, Patent Owner has herein cancelled claims 8 and 9, rendering the rejections of claims 8 and 9 moot.

To advance prosecution, Patent Owner has added new claims 21-107 herein. Each of new claims 21-107 depends from dependent claim 8. Dependent claim 8 was rejected in the Office Action based on WO 00/17569 (Begemann) as the primary reference and based on some combination of the following secondary references: US 6,015,979 (Sugiura), US 5,777,350 (Nakamura), 6,160,833 (Floyd), US 5,535,230 (Abe), CA 2 260 389 (Waitl), Bogner et al., "White LED" in Proceedings of the SPIE, pp. 143-150, 28 January 1999 (Bogner), EP 0 977 278 A2 (Matsubara), and US 5,998,925 (Shimizu). *See* Office Action, page 2, items III(A)(1), III(B)(1), and III(C)(1).

New claims 21-107 are allowable over these references used in the rejections of claim 8 in the Office Action (the "cited references") for at least the following reasons:

**Claims 21, 25, 20, 42, 60, and 79** each requires one or more LED chips "configured to *output light at greater than about 40 milliwatts*." (Emphasis added). Begemann teaches that the LEDs 4 of FIG. 1 and FIG. 2 are configured to have "a luminous flux of 5 [lumens] or more." Begemann, 2:1-3. However, a light output of "40 milliwatts" is roughly equal to a light output of about 15 lumens. Therefore, the single "LED chip" of claim 18 produces roughly *3 times* the light output as LEDs 4 of the LED lamps of Begemann. Therefore, Begemann does not teach or suggest one or more LED chips "configured to *output light at greater than about 40 milliwatts*." Further, it would not have been obvious to have modified Begemann to include one or more LED chips "configured to *output light at greater than about 40 milliwatts*" because the structure of Begemann is not equipped to handle the increase in heat generation that such a modification would necessarily entail. Begemann thus *teaches away from* any modification to include one or

CAO_DE_004995

Control No. 90/012,957

Attorney Docket Number C1160.10003US04
Responsive to Office Action mailed January 23, 2014

more LED chips "configured to *output light at greater than about 40 milliwatts*" as required by claims 18, 25, 20, 42, 60, and 79. (Emphasis added).

**Claims 22 and 61** require an "LED array chip" with certain dimensions and structural characteristics. None of the cited references appears to teach an "LED array chip" with the dimensions and structural characteristics as required by claims 22 and 61.

**Claims 23, 24, 62, and 63** require that "at least a portion of said heat sink is configured to serve as a [negative / positive] electrical connection for said LED chip." Begemann does not appear to teach or suggest that the substrate 3 would serve as a positive or a negative electrical connection as required by claims 23, 24, 62, or 63.

**Claims 25 and 64** require that "faces of *all* LED chips of the semiconductor light source are oriented *only* in [a] 90-degree range of angles," an example of which range being illustrated in Supporting Illustration 25. Begemann teaches that "The invention more particularly aims at providing a LED lamp ... which can be operated such that continuous, uniform lighting with a high luminous flux is obtained" and that "The use of a substrate which is composed of *a regular polyhedron of at least four faces enables* the intended uniform lighting to be achieved." Begemann, 1:20-23 and 2:8-9 (emphasis added). Therefore, Begemann specifically requires "a regular polyhedron *of at least four faces*" in order to "enable" the "intended uniform lighting to be achieved." Consequently, Begemann *teaches away* from an LED lamp where "faces of *all* LED chips of the semiconductor light source are oriented *only* in said 90-degree range of angles" as required by claims 25 and 64. (Emphasis added).

**Claims 26, 27, 65, and 66** require that "at least two of said panels of said heat sink are *shaped differently*" (claims 26 and 65) and that "at least two of said panels of said heat sink are *sized differently*" (claims 27 and 66). Begemann teaches that "The invention more particularly aims at providing a LED lamp ... which can be operated such that continuous, uniform lighting with a high luminous flux is obtained" and that "The use of a substrate which is composed of *a regular polyhedron of at least four faces enables* the intended uniform lighting to be achieved." Begemann, 1:20-23 and 2:8-9 (emphasis added). A regular polyhedron, by definition, is a polyhedron where each face is the *same size and shape*. Therefore, Begemann specifically requires "a regular polyhedron" having faces with the same size and shape in order to "enable" the "intended uniform lighting to be achieved." Consequently, Begemann *teaches away* from an LED lamp where "at least two of said panels of said heat sink are *shaped differently*" as required by claims 26 and 65 or "at least two of said panels of said heat sink are *sized differently*" as required by claims 27 and 66.

CAO_DE_004996

Control No. 90/012,957

Attorney Docket Number C1160.10003US04
Responsive to Office Action mailed January 23, 2014

**Claims 28, 67, and 92** require that "said enclosure is shaped as a dome that substantially resembles a hollow half of a sphere and that defines an opening" and "a largest outer diameter of said [support/second heat sink] along a longitudinal axis of the semiconductor light source is larger than said opening defined in said dome-shaped enclosure." Begemann teaches a traditional bulb-shaped envelope 5. The bulb-shaped envelope 5 does not "substantially [resemble] a hollow half of a sphere" as required by claims 28, 67, and 92. Further, the inclusion of the gear column 1 to support the substrate 3 in Begemann *teaches away from* modifying the bulb-shaped envelope 5 to a dome shape as required by claims 28, 67, and 92 because, due to the dramatic height of the gear column 1, such a modification would require an unreasonably large dome-shaped envelope, and a corresponding unreasonably large element to which the dome-shaped envelope could be mounted.

**Claims 29, 69, and 93** require that "said opening defined in said dome-shaped enclosure is large enough for said heat sink to pass through said opening." The substrate 3 of FIG. 1 or of FIG. 2 of Begemann is much too large to pass through the opening in the envelope 5 of FIG. 1 or of FIG. 2 of Begemann, contrary to the requirements of claims 29, 69, and 93.

**Claims 30 and 70** require that "said exterior surface [of said dome-shaped enclosure] has a matte-textured finish." The envelope 5 of Begemann does not appear to include a matte-textured finish, contrary to the requirements of claims 30 and 70.

**Claims 31 and 71** require that "said interior surface [of said dome-shaped enclosure] is coated with a first material" and "said exterior surface [of said dome-shaped enclosure] is coated with a second material." The envelope 5 of Begemann does not appear to be coated with any material, much less two materials as required by claims 31 and 71.

**Claims 32 and 60** require that "the semiconductor light source further comprises an AC/DC converter" and "said AC/DC converter is positioned outside said interior volume." Begemann does not specifically disclose an AC/DC converter, but does teach that "the space within the hollow gear column (1) accommodates the electronics necessary for controlling the LEDs (4)." Presumably any AC/DC converter in Begemann would be included in these "electronics" and would thus be positioned inside the gear column 1. However, the gear column 1 of Begemann is positioned inside the interior of the envelope 5. This is further evidence that the relatively low light-output LED lamps of Begemann were not intended for the relatively higher light-output "semiconductor light source" required by claim 32 as Begemann simply did not appreciate the need to move electronics, such as an AC/DC converter, outside the envelope 5, to keep the AC/DC converter away from the heat inside the envelope 5 and consequently as cool as

CAO_DE_004997

Control No. 90/012,957

Attorney Docket Number C1160.10003US04
Responsive to Office Action mailed January 23, 2014

possible for proper functioning of the electronics. Therefore, Begemann does not teach or suggest an AC/DC converted "positioned outside said interior volume" as required by claims 32 and 60.

**Claims 33 and 72** require that "said AC/DC converter is positioned in said [base / electrical connector]." However, as noted above in connection with claim 33, any AC/DC converter in Begemann would be included in the "electronics" positioned in the gear column 1, which is distinct from being "positioned in said [base / electrical connector]" as required by claims 33 and 72.

**Claims 34 and 73** require "a positive lead wire and a negative lead wire configured to provide power from said AC/DC converter to said LED chip" and "said positive lead wire and said negative lead wire run from said AC/DC converter, through an interior of said [base / second heat sink], into said interior volume, and over an exterior surface of said heat sink." Begemann does not teach or suggest any positive or negative lead wires, and certainly does not teach or suggest positive and negative lead wires that run "into" the interior volume of the envelope 5 and "over an exterior surface of" the substrate 3, contrary to the requirements of claims 34 and 73.

**Claims 35 and 74** require "a second positive lead wire and a second negative lead wire configured to provide power from said AC/DC converter to a component of the semiconductor light source other than said LED chip." Begemann does not teach or suggest any positive or negative lead wires, and certainly does not teach or suggest any positive and negative lead wires that are configured to power a component of the LED lamps of Begemann other than the LEDs 4, contrary to the requirements of claims 35 and 74.

**Claims 36-39, 43, 75-77, and 106** require various positions or applications for the "coating" recited in claim 1. Begemann does not teach or suggest any coating, much less the various positions or applications for a coating as required by claims 36-39, 43, 75-77, and 106.

**Claims 40, 68, 78, and 89** require "said LED chip and said additional LED chips are substantially positioned in a single plane to direct light generated by faces of *all* LED chips of the semiconductor light source in *only a single specific direction* that is substantially perpendicular to said plane." (Emphasis added). Begemann teaches that "The invention more particularly aims at providing a LED lamp ... which can be operated such that continuous, uniform lighting with a high luminous flux is obtained" and that "The use of a substrate which is composed of *a regular polyhedron of at least four faces enables* the intended uniform lighting to be achieved." Begemann, 1:20-23 and 2:8-9 (emphasis added). Therefore, Begemann specifically requires "a regular polyhedron *of at least four faces*" in order to "enable" the "intended uniform lighting to be achieved." Consequently, Begemann *teaches away from* an LED lamp where all LED chips 4 "are substantially positioned in a *single plane* to direct light generated by faces of *all* LED chips

Page **36** of 41

CAO_DE_004998

Control No. 90/012,957

Attorney Docket Number C1160.10003US04
Responsive to Office Action mailed January 23, 2014

of the semiconductor light source in *only a single specific direction* that is substantially perpendicular to said plane" as required by claims 40, 68, 78, and 89. (Emphasis added)

**Claims 41, 78, and 91** require that "said enclosure includes a substantially flat side positioned substantially parallel to said plane." Begemann teaches a traditional bulb-shaped envelope 5. The bulb-shaped envelope 5 does not include "a substantially flat side positioned substantially parallel to said plane," contrary to the requirements of claims 41, 78, and 91.

**Claims 42 and 79** require multiple LED chips mounted on a single primary heat sink and that the multiple LED chips are "all configured to emit a same color of monochromatic visible light." While Begemann teaches multiple "light points (11)" mounted on a single MC-PCB 12 in FIGS. 3-B and 3-C, Begemann teaches that these multiple "light points (11)" emit light that is "green, red and blue," respectively, that is then blended to produce white light. Begemann, 6:12-17. Therefore, Begemann does not teach or suggest multiple LED chips mounted on a single primary heat sink and "all configured to emit a same color of monochromatic visible light," contrary to the requirements of claims 42 and 79.

**Claims 44 and 80** require a "lens is configured to focus light emitted from said LED chip and from said [additional/other] LED chips to create a substantially coherent beam of usable light." The "primary optical system (13)" of Begemann is used for "blending" the "green, red and blue" light emitted by the "light points (11)" in FIGS. 3-B and 3-C, which appears to diffuse the light emitted by the "light points (11)" instead of focusing the light as required by claims 44 and 80.

**Claims 45 and 81** require that "said lens is mounted over said first connection block and over said second connection block." The "primary optical system (13)" of Begemann is not mounted over the "connections 14" in FIGS. 3-B and 3-C, contrary to the requirements of claims 45 and 81.

**Claims 46 and 82** require multiple LED chips that are "all positioned in separate wells formed in" a single primary heat sink. The "light points (11)" in FIGS. 3-B and 3-C are all positioned in the same well, instead of being "positioned in separate wells formed in" a single primary heat sink as required by claims 46 and 82.

**Claims 47, 57, and 83** require "an air entrance [...] configured to draw ambient ordinary air that surrounds the semiconductor light source into said interior volume" and "an air exit [...] configured to expel said ordinary air out of said interior volume." While Begemann does appear to teach the re-circulation of air *within* the envelope 5, using inlet holes 7 and outlet holes 6 formed in the gear column 1, Begemann does *not* appear to allow "ambient ordinary air that *surrounds*" the LED lamp of FIG. 1 or FIG. 2 to enter into the interior of the envelope 5, as the

Page 37 of 41

CAO_DE_004999

Control No. 90/012,957

Attorney Docket Number C1160.10003US04
Responsive to Office Action mailed January 23, 2014

inlet holes 7 and outlet holes 6 are positioned within what appears to be a sealed envelope 5. This is further evidence that the relatively low light-output LED lamps of Begemann were not intended for the relatively higher light-output "semiconductor light source" required by claim 32 as Begemann simply did not appreciate the need to circulate relatively cool ambient air from outside the envelope 5, and instead was content to simply re-circulate relatively hot air that was sealed inside the envelope 5. Therefore, Begemann does not teach or suggest "an air entrance [...] configured to draw ambient ordinary air that surrounds the semiconductor light source into said interior volume" and "an air exit [...] configured to expel said ordinary air out of said interior volume" as required by claims 47, 57, and 83.

**Claims 48 and 84** require that "said air entrance and air exit are positioned between said electrical connector and said enclosure." As noted above, the inlet holes 7 and outlet holes 6 formed in the gear column 1 of Begemann are positioned *inside* the interior of the envelope 5, instead of being positioned between the metal lamp cap 5 (which is an electrical connector) and the envelope 5 as required by claims 48 and 84.

**Claims 49 and 85** require that "said air entrance and air exit are defined in said [base/second heat sink]." As noted above, the inlet holes 7 and outlet holes 6 are defined in the gear column 1 of Begemann, which is distinct from being "defined in said [base/second heat sink]" as required by claims 49 and 85.

**Claims 50, 58, and 86** require that "said air entrance and air exit are configured to allow said ambient ordinary air that surrounds the semiconductor light source to travel through said air chamber." As noted above, while Begemann does appear to teach the re-circulation of air *within* the envelope 5, using inlet holes 7 and outlet holes 6 formed in the gear column 1, Begemann does *not* appear to allow "ambient ordinary air that *surrounds*" the LED lamp of FIG. 1 or FIG. 2 to travel through the interior of the envelope 5, as the inlet holes 7 and outlet holes 6 are positioned within what appears to be a sealed envelope 5. Therefore, Begemann does not teach or suggest "said air entrance and air exit are configured to allow said ambient ordinary air that surrounds the semiconductor light source to travel through said air chamber" as required by claims 50, 58, and 86.

**Claims 51 and 87** require that "said air chamber at least partially runs inside said heat sink and directly underneath said LED chip." The air chamber formed in the gear column 1 of Begemann does not run "inside" the substrate 3, and also does not run "directly underneath" any of the LEDs 4 as required by claims 51 and 87.

CAO_DE_005000

Control No. 90/012,957

Attorney Docket Number C1160.10003US04
Responsive to Office Action mailed January 23, 2014

**Claims 52 and 88** require that "said air chamber is at least partially U-shaped." The air chamber formed in the gear column 1 of Begemann appears to be shaped as a single cylinder, and does not appear to be "at least partially U-shaped" as required by claims 52 and 88.

**Claim 53** requires a "support" that is "substantially positioned outside said interior volume and between said enclosure and said electrical connector" and that is "configured to serve as a second heat sink by drawing heat generated by said LED chip toward said second heat sink to dissipate said heat into ambient ordinary air surrounding said second heat sink." The LED lamp of FIG. 1 of Begemann does *not* appear to teach any such support, as the envelope 5 is attached directly to the threaded lamp cap 2. The LED lamp of FIG. 2 of Begemann also does *not* appear to teach any such support. While the LED lamp of FIG. 2 of Begemann does include an element (not labeled) that is surrounded by the adjusting ring 8, this element is not disclosed to serve as a "heat sink" and Begemann appears to *teach away* from any modification to make this element serve as a heat sink as required by claim 53. In particular, if this element were modified to make this element serve as a heat sink, the element would very gradually heat up during operation, thus becoming a hazard for burning the bare fingers of a human hand. However, since the adjusting ring 8 is configured to be rotated by the bare fingers of a human hand during operation of the LED lamp of FIG. 2 of Begemann, there is a high risk that the bare fingers of the user's hand will make direct contact with this element. It is clear, therefore, that this element would need to remain cool and not be modified to heat up so that the bare fingers of the user's hand would not be burned while rotating the adjusting ring 8 during the operation of the LED lamp of FIG. 2 of Begemann.

**Claim 55** requires that "said support is integral with said threaded electrical connector." Begemann does not teach or suggest any "support" that is integral with the threaded lamp cap 2, contrary to the requirements of claim 55.

**Claim 59** requires that "said second heat sink defines ribs on an external surface of said second heat sink." As noted above, Begemann does not teach or suggest any "second heat sink" and certainly does not teach or suggest a "second heat sink [that] defines ribs on an external surface of said second heat sink" as required by claim 59.

**Claims 82 and 107** require "[each of said wells / said well] further defines reflective side portions that are angled with respect to said planar bottom portion and that are configured to reflect light that is emitted from sides of said LED chip." Begemann does not appear to teach or suggest any such "reflective side portions." Further, as noted above, Begemann does not appear to teach or suggest any capability of the "light points (11)" of FIGS. 3-A - 3-D to emit light from the sides. On the contrary, the use of the term "point" in the label "light point (11)" appears to

CAO_DE_005001

Control No. 90/012,957

Attorney Docket Number C1160.10003US04
Responsive to Office Action mailed January 23, 2014

indicate that light emits from only a single "point" on the "light point (11)," which appears to be from the top of the "light point (11)" instead of either of the sides of the "light point (11)." Therefore, it would not have been obvious to modify Begemann to teach or suggest "reflective side portions" since Begemann does not appear to teach emitting any light out the sides of the "light points (11)" to be reflected.

**Claim 90** requires "an air entrance defined in said second heat sink and configured to draw ambient ordinary air that surrounds the semiconductor light source into said second heat sink" and "an air exit defined in said second heat sink and configured to expel said ordinary air out of said second heat sink." As noted above, Begemann does not teach or suggest any "second heat sink" and certainly does not disclose a "second heat sink" have an "air entrance" and an "air exit" as required by claim 90.

**Claim 94** requires that "said LED chip is configured to emit said monochromatic visible light from a top of said LED chip and from sides of said LED chip." Begemann does not appear to teach or suggest any such light-emitting capability with respect to the "light points (11)" of FIGS. 3-A - 3-D. On the contrary, the use of the term "point" in the label "light point (11)" appears to indicate that light emits from only a single "point" on the "light point (11)," instead of emitting "from a top of said LED chip and from sides of said LED chip" as required by claim 94.

**Claim 95** requires that "said LED chip is further configured to emit said monochromatic visible light from a bottom of said LED chip." Begemann does not appear to teach or suggest any such light-emitting capability with respect to the "light points (11)" of FIGS. 3-A - 3-D. On the contrary, the use of the term "point" in the label "light point (11)" appears to indicate that light emits from only a single "point" on the "light point (11)," which appears to be from the top of the "light point (11)" instead of "from a bottom " of the "light point (11)" as required by claim 95.

**Claims 96-100** require various materials for the electrically conductive substrate, namely, "silicon (Si) without carbon (C)," "gallium nitride (GaN)," "indium phosphorous (InP)," "gallium antimony (GaSb)," and "indium arsenide (InAs)." None of the cited references appears to teach or suggest any of these substrate materials in connection with an electrically conductive substrate as required by claims 96-100.

**Claims 101-103** require that "said LED chip further comprises a conductive base layer underneath said electrically conductive substrate" (claim 101), that "said conductive base layer includes gold (Au)" (claim 102), and that "said conductive base layer includes gold/cerium (Au/Ce)" (claim 103). None of the cited references appears to teach this conductive base layer or these materials for this conductive base layer as required by claims 101-103.

CAO_DE_005002

Control No. 90/012,957

Attorney Docket Number C1160.10003US04
Responsive to Office Action mailed January 23, 2014

**Claim 104** requires that "said LED chip is surface mounted to said one of said panels of said heat sink." The LEDs 4 of FIGS. 1 and 2 of Begemann, as shown in greater detail in FIGS. 3A-3D of Begemann, employ an MC-PCB 12 between the light point 11 and the substrate 3, instead of surface mounting the light point 11 on one of the faces of the substrate 3 as required by claim 104.

**Claim 105** requires that "said LED chip is surface mounted in a well defined in said one of said panels of said heat sink." The LEDs 4 of FIGS. 1 and 2 of Begemann, as shown in greater detail in FIGS. 3A-3D of Begemann, employ an MC-PCB 12 between the light point 11 and the substrate 3, instead of surface mounting the light point 11 on one of the faces of the substrate 3. Further, the faces of the substrate 3 do not appear to define any wells as required by claim 105.

## CHARGE AUTHORIZATION

The Commissioner is hereby authorized to charge payment of any of the following fees that may be applicable to this communication, or credit any overpayment, to Deposit Account No. 50-5394: (1) any filing fees required under 37 C.F.R. § 1.16, (2) any patent application and reexamination processing fees under 37 C.F.R. § 1.17, and/or (3) any post issuance fees under 37 C.F.R. § 1.20.

## CONCLUSION

In view of the foregoing, Patent Owner submits that the pending claims are allowable. In the event that Examiner finds remaining impediment to a prompt allowance of this application that may be clarified through a telephone interview or overcome by an Examiner's Amendment, Examiner is requested to contact the undersigned attorney.

Dated this 24th day of March, 2014.

Respectfully submitted,

**/John T. Gadd, Reg. No. 52,928/**

JOHN T. GADD
Registration No. 52,928
Attorney for Patent Owner
Customer No. 109488
Telephone No. (435) 252-1360

CAO_DE_005003

# EXHIBIT 3

**EXCERPT OF AN EMAIL CHAIN WITH HIGHLIGHTING SUPPLIED**

**From:** Kaufmann, Adam <Adam.Kaufmann@btlaw.com>
**Sent:** Tuesday, April 26, 2022 5:58 PM
**To:** Reddy, Srikanth K <SReddy@goodwinlaw.com>; Drummond, Brian <BDrummond@goodwinlaw.com>; Garza, Cat <cat.garza@nortonrosefulbright.com>
**Cc:** Vare, Todd <Todd.Vare@btlaw.com>; Repicky, Heather <Heather.Repicky@btlaw.com>; Stover, Chad <Chad.Stover@btlaw.com>; Cahill, Ronald <RCahill@btlaw.com>; Tom W. Cunningham <tcunningham@brookskushman.com>; Lytle, Kathleen <Kathleen.Lytle@btlaw.com>; dsilver@mccarter.com; ajoyce@mccarter.com; Licygiewicz, Art <art.licygiewicz@nortonrosefulbright.com>; DeBrow, Stephanie <stephanie.debrow@nortonrosefulbright.com>; Kenneth Dorsney <kdorsney@morrisjames.com>; chitch@morrisjames.com; Frank A. Angileri <fangileri@brookskushman.com>; John P. Rondini <jrondini@brookskushman.com>; Ahmed ElDessouki <Ahmed.ElDessouki@shearman.com>; Patrick Colsher <Patrick.Colsher@Shearman.com>; Mark Hannemann <Mark.Hannemann@shearman.com>; Daniel Chozick <Daniel.Chozick@shearman.com>; kkeller@shawkeller.com; Andrew Russell <arussell@shawkeller.com>; Nathan Hoeschen <nhoeschen@shawkeller.com>; rsmith@mnat.com; Martin, Kevin P <KMartin@goodwinlaw.com>; Cooper, Monte <MCooper@goodwinlaw.com>; DG-LEDVANCE-CAO <DG-LEDVANCE-CAO@goodwinlaw.com>; Hunt, Paul <Paul.Hunt@btlaw.com>; Barron, Jeff <Jeff.Barron@btlaw.com>; Williams, Sahara <Sahara.Williams@btlaw.com>; Morgan, Jeffrey <Jeff.Morgan@btlaw.com>; Chard, Beth Ann <BChard@morrisnichols.com>; Burton, William <William.Burton@btlaw.com>
**Subject:** RE: Cao/expert-report scheduling

***EXTERNAL***
Srikanth,

As an initial matter, your email contains several inaccuracies.  For example, CAO is not "contesting the validity of cancelled claims."  Rather, CAO maintains that the asserted claims 21, 32, 36, 40, and 42 are valid.  Because the asserted claims are dependent claims that include claims 1, 7, and 8, the elements of those claims must be considered as part of the validity analysis of claim 21 and its dependents.  In addition, Defendants' refusal to meaningfully narrow the asserted combinations of prior art before expert depositions, despite having CAO's rebuttal expert reports and despite the fact that Defendants acknowledge that narrowing is needed for trial is prejudicial, including because it limits CAO's ability to focus limited deposition time on issues that will actually be presented at trial.  Defendants' refusal to commit to specific narrowing limits for trial and the timing of such narrowing is also prejudicial because it will waste CAO's resources and likely waste the Court's resources as the case progresses to trial.

Defendants' proposed "options" for narrowing of the asserted prior art combinations are also unreasonable and it is clear that the parties are at an impasse.  As such, we intend to call the Court's chambers this week to inquire how the Court wishes to address this issue.  If Plaintiffs would like to jointly call chambers, please let us know your availability on Thursday or Friday.  If Plaintiffs do not provide any availability, however, we will call the Court's chambers on Friday afternoon.

Regards,

**Adam Kaufmann** | Partner
Direct: (312) 214-8319 | Mobile: (312) 898-0151
Chicago, IL

1



**From:** Reddy, Srikanth K <SReddy@goodwinlaw.com>
**Sent:** Thursday, April 21, 2022 4:01 PM
**To:** Drummond, Brian <BDrummond@goodwinlaw.com>; Kaufmann, Adam <Adam.Kaufmann@btlaw.com>; Garza, Cat <cat.garza@nortonrosefulbright.com>
**Cc:** Vare, Todd <Todd.Vare@btlaw.com>; Repicky, Heather <Heather.Repicky@btlaw.com>; Stover, Chad <Chad.Stover@btlaw.com>; Cahill, Ronald <RCahill@btlaw.com>; Tom W. Cunningham <tcunningham@brookskushman.com>; Lytle, Kathleen <Kathleen.Lytle@btlaw.com>; dsilver@mccarter.com; ajoyce@mccarter.com; Licygiewicz, Art <art.licygiewicz@nortonrosefulbright.com>; DeBrow, Stephanie <stephanie.debrow@nortonrosefulbright.com>; Kenneth Dorsney <kdorsney@morrisjames.com>; chitch@morrisjames.com; Frank A. Angileri <fangileri@brookskushman.com>; John P. Rondini <jrondini@brookskushman.com>; Ahmed ElDessouki <Ahmed.ElDessouki@shearman.com>; Patrick Colsher <Patrick.Colsher@Shearman.com>; Mark Hannemann <Mark.Hannemann@shearman.com>; Daniel Chozick <Daniel.Chozick@shearman.com>; kkeller@shawkeller.com; Andrew Russell <arussell@shawkeller.com>; Nathan Hoeschen <nhoeschen@shawkeller.com>; rsmith@mnat.com; Martin, Kevin P <KMartin@goodwinlaw.com>; Cooper, Monte <MCooper@goodwinlaw.com>; DG-LEDVANCE-CAO <DG-LEDVANCE-CAO@goodwinlaw.com>; Hunt, Paul <Paul.Hunt@btlaw.com>; Barron, Jeff <Jeff.Barron@btlaw.com>; Williams, Sahara <Sahara.Williams@btlaw.com>; Morgan, Jeffrey <Jeff.Morgan@btlaw.com>; Chard, Beth Ann <BChard@morrisnichols.com>; Burton, William <William.Burton@btlaw.com>
**Subject:** [EXTERNAL]RE: Cao/expert-report scheduling


Dear Adam:

We write on behalf of Defendants in response to your April 5, 2022 letter, your April 11, 2022 e-mail, and in furtherance of the parties' meet and confer of April 14, 2022.  As we discussed on that meet and confer and/or in our correspondence, CAO's proposal to limit the total number of prior art references and/or prior art combinations while still contesting the validity of cancelled claims is untenable for at least two unique reasons.

First, ==during reexamination, the Examiner rejected originally issued claims 1, 7 and 8 on multiple grounds without identifying specific combinations==.  For example, on claim 8, the Examiner cited three "grounds" comprised of three groups of references which collectively included 10 prior art publications.  Rather than identify specific combinations of prior art which render any of claims 1, 7 and 8 obvious, the Examiner argued that such references as a group render the claims invalid.  CAO acquiesced to the Examiner's finding and cancelled the claims.  As a result, CAO is estopped from contesting that each element in claims 1, 7 and 8 was present in the prior art and that such claims are invalid as originally issued.  ==Nonetheless, it appears that CAO insists that Defendants must prove that each element in claims 1, 7 and 8 was in the prior art in order to establish invalidity of the Asserted Claims *and* that Defendants may not even use the full set of prior art references that the Examiner used to find claims 1, 7 and 8 invalid.==  None of the cases you have cited for the proposition that Defendants must significantly narrow the number of prior art combinations and/or primary references involve the unusual set of facts present here.  Further, we have asked you to explain how CAO is prejudiced in any

2

way by Defendants' reliance on the references that were presented during the reexamination proceedings and you have been unwilling or unable to do so.

Second, Defendants invalidity expert report includes only 6 additional references separate from those discussed during reexamination.  As you know, generally speaking, Defendants' invalidity theories are largely premised on combining the reexamination references with one of these 6 references.  Again, CAO has not articulated any specific prejudice arising from this quantity of references.

Notwithstanding the above, and in an effort to find compromise between the parties and to avoid burdening the Court, Defendants are willing to narrow their prior art invalidity defenses.   We understand based on the parties meet and confer that CAO is insisting that Defendants commit to narrowing their prior art arguments prior to expert depositions.  While Defendants believe this demand is unwarranted because Defendants have not seen CAO's rebuttal reports and do not have a claim construction ruling, Defendants are willing to narrow their prior art arguments before expert depositions.  We present two options below for CAO's consideration.

- Option 1: So long as CAO agrees not to challenge that each element in original claims 1, 7 and 8 was present in the prior art and that such claims are invalid, than Defendants agree to limit their obviousness arguments as follows:
    - o No later than 5 days before the Krames deposition, Defendants will reduce the number of prior art invalidity combinations to 20 combinations
    - o For the avoidance of doubt, a "prior art combination" under Defendants' proposal means a single combination of prior art references that is advanced to invalidate one or more claims.  We disagree that a single combination of prior art references advanced to invalidate multiple asserted claims should count as multiple "prior art combinations."  However, our proposal does include counting alternative potential combinations as separate "prior art combinations" (i.e., Combination A+B+C or D would count as two prior art combinations: A+B+C and A+B+D).

- Option 2: If CAO continues to contest that each element in original claims 1, 7 and 8 was present in the prior art and/or that such claims are invalid, than Defendants agree to limit their obviousness arguments as follows:
    - o No later than 5 days before the Krames deposition, Defendants will reduce the number of invalidity grounds (i.e., the lettered subsections in Section X of Dr. Krames' opening report) from 19 to 14 and reduce the number of prior art references not previously in the reexamination from 6 to 5.

Defendants agree to further narrow their prior art invalidity arguments on two additional occasions: (1) after the close of expert discovery on a mutually agreeable date; and (2) prior to the submission of the pre-trial order on a mutually agreeable date.  Considering Defendants have not yet seen CAO's rebuttal reports, the parties are still awaiting a claim construction order, and CAO's asserted claims depend from multiple claims that include over twenty limitations, Defendants believe this proposal is appropriate and reasonable.  Defendants reserve the right to rely on any references no longer relied on for primary invalidity argument as background references.

Please let us know if CAO is amenable to one of the options above and/or if you would like to discuss these proposals.

3

Regards,

Srikanth

**Srikanth K. Reddy**

 GOODWIN

Goodwin Procter LLP
100 Northern Avenue
Boston, MA 02210
o  +1 617 570 1465
f   +1 617 801 8784
SReddy@goodwinlaw.com



# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| EXELIXIS, INC., | |
| Plaintiff, | |
| v. | Civil Action No. 19-2017-RGA |
| MSN LABORATORIES PRIVATE LIMITED and MSN PHARMACEUTICALS, INC., | |
| Defendants. | |

<u>MEMORANDUM ORDER</u>

Plaintiff has filed a *Daubert* motion (D.I. 257) and a motion in limine (D.I. 269) concerning expected testimony of Dr. Lepore about the purported obviousness of the claim 5 of the '473 patent. (*See* D.I. 270 at 3 (describing issues for trial)). The main point of both motions is the assertion that Dr. Lepore has not identified specific combinations of prior art for his obviousness analysis. Defendants have referred to a portion of Dr. Lepore's report where he lists categories of references. (D.I. 269-1 ¶ 204). My view is that, in the usual case, an obviousness combination requires the identification of two or sometimes three references that disclose the requisite claim elements, and (usually) additional references, which can be multiple references to show the state of the art, that, considered as a whole, support a motivation to combine and a reasonable expectation of success in doing so. Here, the expert has one reference as the "lead compound." The expert has three additional categories of references: (1) four that show "c-Met's role in various Cancers," (2) six references "related to selecting a lead compound," and (3) fourteen references "related to modifying the lead compound." (*Id.*).

I do not think the identification of specific combinations is a *Daubert* issue, and, thus, I

**DENY** the *Daubert* motion.  (D.I. 257).[1]  The issue could be appropriate for a motion in limine,

although based on what is presented in the motion, I would not grant it.  Based on my present

understanding, I think that categories (1) and (2) do not need to be limited to a single reference.

I am less clear on the third category.

Thus, the parties should be prepared to address the motion in limine at the pretrial

conference.

IT IS SO ORDERED this 20th day of April 2022.


/s/ Richard G. Andrews
United States District Judge

---

[1]     I am not persuaded by Plaintiff's argument that Dr. Lepore's report fails to address motivation to combine and reasonable expectation of success with respect to the prior art disclosures. (D.I. 258 at 9-10). Dr. Lepore's discussion of a POSA's motivation and expectation of success in modifying what was disclosed in the prior art to form the claimed compound provides a sufficient basis for his obviousness opinion. (D.I. 259-1 Ex. A ¶¶ 234-299; *see In re Ethicon, Inc.*, 844 F.3d 1344, 1349-51 (Fed. Cir. 2017).

The other issues raised in the Daubert motion, particularly at D.I. 258 at 11-13, can be raised by objection at trial should Dr. Lepore offer irrelevant testimony.

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

EXELIXIS, INC.,                                     )
                                                    )
                    Plaintiff,                      )
                                                    )
          v.                                        )   C.A.  No. 19-2017 (RGA) (SRF)
                                                    )   **CONSOLIDATED**
MSN LABORATORIES PRIVATE LIMITED                    )
and MSN PHARMACEUTICALS, INC.,                      )
                                                    )
                    Defendants.                     )

## PLAINTIFF'S MOTION IN LIMINE #1

I.    **Plaintiff's MIL No. 1: To Preclude MSN From Relying On Undisclosed Combinations Of References To Support Its Invalidity Opinions.**

A.    **Plaintiff's Opening Brief**

MSN should be precluded from presenting any evidence or argument that the '473, the '284, or the '776 patents are invalid under 35 U.S.C. § 103 based on any specific combination of prior art references. As explained in Plaintiff's *Daubert* motion (*see* D.I. 258 [Mot. to Exclude], D.I. 265 [Reply in Support of Mot.]), Defendants' experts Salvatore Lepore and Jonathan Steed did not identify any specific combination of prior art references to support their opinions that the asserted patents are obvious. Instead, Dr. Lepore and Dr. Steed disclosed multiple "categories" of references and asserted that a skilled artisan could combine "one or more" references in each category. D.I. 258 at 6-8. Any belated attempt by MSN's experts to rely on specific combinations of references at trial would unduly prejudice Exelixis' ability to defend against MSN's obviousness challenges and should not be allowed. *See, e.g.*, *Amgen Inc. v. Amneal Pharms. LLC*, C.A. No. 16-853-MSG, 2018 WL 1885664, at *6-8 (D. Del. Apr. 19, 2018) (granting motion *in limine* to exclude a doctrine of equivalents theory not disclosed in plaintiff's expert report); *Chiesi USA, Inc. v. Aurobindo Pharma USA, Inc.*, C.A. No. 19-18756 (ZNQ) (LHG), 2022 WL 304574, at *5-6 (D.N.J. Jan. 9, 2022) (granting motion *in limine* to exclude opinions omitted from expert report).

The Third Circuit's *Pennypack* factors weigh in favor of precluding Drs. Steed and Lepore from presenting new prior art combinations at trial.[1] As to the first *Pennypack* factor,

---

[1] "To determine whether a failure to disclose was harmless [under Fed. R. Civ. P. 37(c)(1)], courts in the Third Circuit consider the *Pennypack* factors: (1) the prejudice or surprise to the party against whom the evidence is offered; (2) the possibility of curing the prejudice; (3) the potential disruption of an orderly and efficient trial; (4) the presence of bad faith or willfulness in failing to disclose the evidence; and (5) the importance of the information withheld." *Vectura Ltd. v. GlaxoSmithKline, LLC*, C.A. No. 16-638-RGA, 2019 WL 1436296, at *1 (D. Del. Apr. 1, 2019) (citing *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997)).

Exelixis would be substantially prejudiced if MSN's experts were permitted to ground their obviousness opinions on specific combinations not disclosed in their expert reports. Exelixis' experts were not able to consider and provide rebuttal opinions tied to specific combinations, including opinions on the most relevant disclosures in any specific combination of references, the alleged motivation to combine specific references, or the reasonable expectation of success in combining specific references. Exelixis was also deprived of the opportunity to depose MSN's experts on any specific combinations of prior art.

As to the second and third *Pennypack* factors, the prejudice to Exelixis of an eleventh-hour disclosure of specific combinations cannot be cured at this late phase in the case. It is too late for Exelixis and its experts to properly address any newly disclosed obviousness theories, and, in any event, Exelixis' experts and trial counsel should not be forced to divert their attention from trial preparation to respond to new expert opinions that MSN should have disclosed months ago. Fed. R. Civ. P. 26(a)(2)(B)(i); Fed. R. Civ. P. 37(c)(1).

As to the fourth and fifth *Pennypack* factors, MSN has known about the deficiencies in Dr. Steed's and Dr. Lepore's obviousness disclosures since at least early December 2021, when Exelixis' experts raised the issue in their rebuttal reports. D.I. 258 at 6-8, 11 n.3 (noting that MSN has asserted millions and billions of potential combinations). Drs. Steed and Lepore nevertheless failed to identify specific obviousness combinations in their reply reports served on January 6, 2022 and continued to rely on unspecified combinations from "categories" of prior art references. Any harm resulting to MSN from exclusion of specific prior art combinations is thus a problem of its own making. As this district has previously held, the fifth *Pennypack* factor is "at most neutral" in such circumstances. *AVM Techs., LLC v. Intel Corp.*, C.A. No. 10-610-RGA, 2013 WL 8422202, at *2 (D. Del. Mar. 29, 2013) (excluding expert testimony and leaving

– 3 –

the plaintiff "without evidence of damages").

For all of these reasons, MSN should be precluded from presenting argument or evidence based on any specific combination of prior art references.

## II.    Defendants' Response to Plaintiff's MIL No. 1:

Exelixis's latest attempt to try this case through motion practice should be denied. MSN's expert Salvatore Lepore, Ph.D., will not present at trial any opinions that were not disclosed in his expert reports, which alone should resolve Exelixis's misguided motion. Exelixis's motion with respect to Jonathan Steed, Ph.D., is moot because in an effort to streamline the issues for trial, MSN will not be presenting its invalidity defense to the '776 patent.

This motion is Exelixis's second unnecessary pretrial motion seeking the same relief. But it should fail for the same reasons set out in MSN's opposition to Exelixis's *Daubert* motion (D.I. 263), which is hereby incorporated by reference.  Indeed, Exelixis ignores that this will be a bench trial, during which the Court can hear the testimony and address any admissibility challenges in the context of the evidence that is offered. "[T]rial courts should be more reluctant to exclude evidence in a bench trial than a jury trial" as "the trial court is presumed to consider only the competent evidence." *Almirall LLC v. Taro Pharm. Indus. LTD*, 2019 WL 316742, at *2 (D. Del. Jan. 24, 2019).  In such cases, "the better course is to hear the testimony, and continue to sustain objections when appropriate." *Id.* (quotations omitted); *see also Leonard v. Stemtech Health Scis., Inc.* 273 F. Supp. 2d 273, 276 (D. Del. 2013) ("Evidentiary rulings, especially ones that encompass broad classes of evidence, should generally be deferred until trial to allow for the resolution of questions of foundations, relevancy and potential prejudice in proper context.").

Furthermore, "exclusion of critical evidence is an extreme sanction . . . not normally to be imposed absent a showing of willful deception or flagrant disregard of a court order by the proponent of the evidence." *Meyers v. Pennypack Woods Home Ownership Assn.*, 559 F.2d 894, 905 (3d. Cir. 1977) (quotations omitted).  Exelixis cannot meet this high standard to exclude Dr.

Lepore's opinions.

As to the first three *Pennypack* factors, Exelixis has not been prejudiced, and there will be no disruption to an orderly and efficient trial. Dr. Lepore's report identifies a single lead reference, WO '660, a limited number of motivation references demonstrating that a POSA would have been motivated to inhibit the tyrosine kinase c-MET, a limited number of references that would have motivated a POSA to select the lead compound identified in WO '660, and a limited number of references teaching a POSA to modify the lead compound. (Ex. A, Opening Expert Report of Dr. Salvatore Lepore Regarding Invalidity of U.S. Patent Nos. 7,579,473 and 8,497,284 at ¶ 204.) All of these opinions are fully detailed in Dr. Lepore's expert report and Dr. Lepore will not offer any "undisclosed combinations" at trial.

To the extent that Exelixis is suggesting that MSN should not be able to narrow its case to present a subset of the opinions contained in Dr. Lepore's report at trial, that makes no sense. Indeed, Exelixis's motion stands in stark contrast to both Exelixis's agreement to narrow the asserted patents and claims and MSN's agreement to narrow its defenses in just the last two weeks. Parties routinely narrow their trial presentation in order to focus the Court on the most relevant evidence and conserve judicial resources. But doing so is not presenting previously "undisclosed" opinions and Exelixis has provided no authority that supports such a view of the scope of trial presentation. MSN is willing to discuss narrowing the prior art references that it will present at trial with Exelixis, but Exelixis never requested that MSN do so and never asked to meet and confer to discuss narrowing prior art references. Indeed, Exelixis did not raise its concern with Dr. Lepore's obviousness combinations until March, 9, 2022, five months after Dr. Lepore submitted his expert report, and instead of offering to engage in good-faith case-narrowing, Exelixis filed both Daubert and *in limine* motions. Furthermore, Exelixis's experts

– 5 –

responded to all of the references and opinions in Dr. Lepore's report in extensive detail in their rebuttal reports, which spanned hundreds of pages.

With respect to the fourth and fifth *Pennypack* factors, Exelixis has not, and cannot, make any showing of bad faith, and Dr. Lepore's obviousness opinions go to the very heart of the case, both of which weigh in favor of MSN.

Exelixis cites to two cases, *Amgen Inc. v. Amneal Pharma. LLC*, 2018 WL 1885664 (D. Del. Apr. 19, 2018) and *Chiesi USA, Inv. V. Aurobindo Pharma USA, Inc.*, 2022 WL 304574 (D. N.J. Jan. 9, 2022). Neither supports Exelixis's motion. In the *Amgen* case, the court precluded Amgen from asserting a new theory of infringement under the doctrine of equivalents for the first time at trial after it had only asserted literal infringement previously. 2018 WL 1885664 at *6–8. In *Chiesi*, the court precluded Aurobindo's noninfringement expert from offering opinions with respect to obviousness and unenforceability, which it disclosed for the first time in the pretrial order. 2022 WL 304574 at *5–6. In this case, on the other hand, MSN has no intention to offer opinions that it has not already disclosed.

For these reasons, MSN respectfully requests that Exelixis's motion be denied.

### III.   Plaintiff's Reply in Support of MIL No. 1:

MSN does not dispute that Dr. Lepore[2] did not disclose any specific combination of prior art references to support his obviousness opinion, or that his opinion rests upon 28 references in various categories that could be combined in 15 million ways.  Instead, MSN argues that Dr. Lepore may testify to specific combinations not called out in his report, claiming that doing so would constitute routine case narrowing and would not prejudice Exelixis.  MSN is wrong.

*First*, MSN's attempt to characterize any forthcoming disclosure of a particular obviousness combination as routine "case narrowing" is incorrect.  Trial is four weeks away and Dr. Lepore has not advanced ***any*** specific combination.  Identification of a handful of specific combinations out of 15 million is not equivalent to focusing on one combination at trial instead of five disclosed in expert discovery.  It is not "case narrowing," but constitutes a new theory. *Second*, the disclosure of a new theory at this late stage would cause significant prejudice.  Exelixis has had no ability to develop a record for any specific combination—e.g., by offering expert opinion concerning a POSA's motivation to combine or reasonable expectation of success—before cross-examination at trial.  *Third*, MSN has been on notice of Dr. Lepore's failure to disclose specific combinations since early December when Dr. MacMillan raised the issue in his rebuttal report.  Thus, MSN's offer to "narrow its case" four months after it first learned of the issue and on the eve of trial cannot cure the prejudice to Exelixis.  *Finally*, just because MSN's invalidity challenge will be adjudicated by a judge, and not a jury, does not give MSN a license to unfairly surprise Exelixis with new theories at trial and MSN's case law does not suggest otherwise.  Indeed, the law is clear—new theories of invalidity, not disclosed during expert discovery, should be excluded.  *See, e.g.*, *Amgen Inc.*, 2018 WL 1885664, at *6-8.

---

[2] Because MSN dropped its validity challenge to the '776 patent, this reply does not address the deficiencies in Dr. Steed's obviousness analysis.

– 7 –

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Anthony D. Raucci*

Jack B. Blumenfeld (#1014)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
araucci@morrisnichols.com

*Attorneys for Plaintiff Exelixis, Inc.*

April 18, 2022

HEYMAN ENERIO GATTUSO & HIRZEL LLP

*/s/ Dominick T. Gattuso*

Dominick T. Gattuso (#3630)
300 Delaware Avenue, Suite 200
Wilmington, DE  19801
(302) 472-7300
dgattuso@hegh.law

*Attorneys for Defendants MSN Laboratories Private Limited and MSN Pharmaceuticals, Inc.*

– 8 –

# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

EXELIXIS, INC.,                          :
                                         :
            Plaintiff,                   :
                                         :
      v.                                 :        Civil Action No. 19-2017-RGA-SRF
                                         :
MSN LABORATORIES PRIVIATE                :
LIMITED, et al.,                         :
                                         :
            Defendants.                  :

**ORDER AFTER PRETRIAL CONFERENCE**

Now, this 6th day of May, 2022, after a pretrial conference, and upon consideration of the

proposed pretrial order (D.I. 270) and the discussion at the pretrial conference, IT IS HEREBY

ORDERED that:

1.  The Proposed Pretrial Order (D.I. 270) is **ADOPTED** as modified by any prior orders

(e.g., D.I. 271) and the discussion at the pretrial conference.

2.  A bench trial will begin on May 16, 2022, at 9:00 a.m.  Each party should be

prepared to present its case until 5:00 p.m. of each trial day, although the end of the trial day

may, in the discretion of the Court, be earlier than 5:00 p.m.

3.  The trial is timed.  Each side is allowed nine (9) hours for its opening statement and

its direct and cross-examination of witnesses.  Time during the trial day that does not neatly fit

into one of those categories will be attributed to one side or the other as the Court thinks most

appropriate.  The amount of time allowed for closing argument, scheduled for Thursday, May 19,

2022, at 2 p.m. will be decided during trial.

4.   Trial counsel are to be present and ready to proceed at 8:30 a.m. each and every day of trial.  **COUNSEL SHOULD UNDERSTAND THAT THERE MAY BE LONG LINES (PARTICULARLY WHEN A JURY IS BEING SELECTED) TO ENTER THE COURTHOUSE AND SHOULD PLAN ACCORDINGLY.**  Issues that need to be addressed before the day's testimony will be taken up at 8: 45 a.m. and the time will be charged to the parties.  There will be (up to) an hour for lunch and a fifteen-minute break in both the morning and the afternoon.

5.   Plaintiff's Motion in Limine #1 (D.I. 269) is **RESOLVED** as previously stated (D.I. 274) and as supplemented at the pretrial conference.  Defendant disclosed the identification of the six references it intends to rely upon in the "third bucket."

6.  Two copies of the experts' resumes should be provided to the Court no later than the COB the Thursday before trial.

7.  Any trial logistics should be coordinated through the Courtroom Deputy.

/s/ Richard G. Andrews____
United States District Judge

# EXHIBIT 7

| 04/06/2021 | | Oral Order: The transcript of the April 6, 2021, discovery dispute teleconference shall serve as the Order of the court. For the reasons stated on the record it is hereby ordered: (1) PureWick's Motion (D.I. 145 ) to preclude Sage from relying on an "omnibus" collection of certain prior art as one reference or, in the alternative, to compel Sage to supplement its invalidity contentions to identify the specific prior art device(s) it includes within its limit of 35 prior art references permitted by the court's "narrowing order" (D.I. 89) is DENIED. The parties fundamentally dispute whether the collective prior art devices contain substantially similar salient features such that they should be considered a single reference or separate references for purposes of meeting the court's narrowing order. As such, it is not a discovery dispute and cannot be resolved based on the record currently before the court; (2) Sage's Motion to Compel (D.I. 146 ) PureWick to further narrow its asserted claims is DENIED. To grant Sage's Motion would have the effect of incorporating limiting conditions on PureWick's selection of dependent claims, device claims and/or method claims that are not present in the court's narrowing order; (3) Sage's Motion to Compel (D.I. 146) PureWick to supplement its responses to Interrogatory Numbers 6 and 15 is DENIED. This is the third attempt by Sage to overcome the court's denial of its Motion to Compel PureWick to answer contention interrogatories. Sage has not provided the court with any new or changed circumstances that would alter the court's prior denial for the reasons stated in detail by the court at the hearings on August 4, 2020 (D.I. 72 at 28) and December 3, 2020 (D.I. 99 at 69); and (4) Sage's Motion to Compel (D.I. 146) PureWick to provide a more complete answer to Interrogatory Number 5 is DENIED. PureWick has fully responded to this Interrogatory based upon information presently available and in its possession, custody, or control. However, the court expects PureWick to comply with its obligation to supplement, as required, under Fed. R. Civ. P. 26(e). Ordered by Judge Sherry R. Fallon on 4/6/2021. (lih) (Entered: 04/06/2021) |

# EXHIBIT 8

Case 1:20-cv-00681-GBW   Document 324-1   Filed 08/17/22   Page 86 of 143 PageID #: 34775

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PUREWICK CORPORATION | ) | |
| | ) | |
| Plaintiff, | ) | **Redacted- Public Version** |
| | ) | |
| v. | ) | C.A. No. 19-1508-MN |
| | ) | |
| SAGE PRODUCTS, LLC, | ) | ███████████ |
| | ) | |
| Defendant. | ) | |

## LETTER TO THE HONORABLE SHERRY R. FALLON FROM JOHN W. SHAW

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Plaintiff*

OF COUNSEL:
Steven C. Cherny
Brian P Biddinger
Matthew A. Traupman
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Ave., 22nd Floor
New York, NY 10010
(212) 849-7000

Amanda K. Antons
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400

Dated: March 29, 2021

# SHAW KELLER

## LLP

John W. Shaw
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
(302) 298-0701 – Direct
jshaw@shawkeller.com

March 29, 2021

**BY CM/ECF & HAND DELIVERY**

**Redacted- Public Version**



The Honorable Sherry R. Fallon
United States District Court for the District of Delaware
844 North King Street
Wilmington, DE 19801

     Re:    *PureWick Corp. v. Sage Products LLC*, C.A. No. 19-1508-MN

Dear Judge Fallon,

In accordance with the Court's Oral Order (D.I. 144), Plaintiff PureWick Corp. ("PureWick") submits this opening letter setting forth the discovery dispute that it has been unable to resolve following reasonable efforts to avoid judicial intervention. The issue here is that PureWick generated a number of prototype devices as part of the process of designing its current commercial product. Those prototype devices were created at different times and have different structures. Defendant Sage Products LLC ("Sage") asserts, in general, that "versions" of PureWick's devices allegedly anticipate the asserted claims but refuses to identify the specific devices it contends are prior art, explain why they are prior art and point to where each element of any claim is found in any device it contends is prior art. Sage does so in the face of a Court Order mandating that it provide such information by December 18, 2020. The Court also limited Sage to no more than 35 references and it is clear Sage seeks to avoid that limit by generically referring to "versions" of the Purewick devices as a single "reference" without specifically identifying such devices so they can be counted against that limit. At this point, Sage's defiance of the Court's Orders merits Sage being precluded from relying on any "devices." Short of that, Sage should be ordered to immediately supplement its invalidity contentions to identify the specific devices upon which Sage is relying, but be limited to the bases provided in its December 18, 2020 contentions. Sage plainly feels those very limited bases sufficed to meet its discovery obligations and it should not now or in expert reports first provide more fulsome contentions. Sage's intransigence has been extremely prejudicial to Purewick. Fact discovery is nearly over and Sage has managed to avoid ever specifically identifying a category of prior art it contends anticipate the asserted claims. PureWick wrote to Sage concerning these deficiencies on December 30, 2020, January 20, 2021 and February 5, 2021, and the parties met and conferred on February 10, 2021, but the parties were unable to resolve the dispute.

## Background

PureWick asserts that Sage infringes U.S. Patent Nos. 8,287,508 (the "'508 patent"), 10,226,376 (the "'376 patent"), 10,390,989 (the "'989 patent"), and 10,376,407 (the "'407 patent"). Three of the asserted patents, the '508, '376 and '989 patents, relate to female external catheter devices and methods and cover PureWick's own PureWick Female External Catheter ("FEC") product. The fourth patent, the '407 patent, is directed to a male external catheter device.

SHAW KELLER LLP
Page 2

During the course of developing the PureWick FEC, PureWick developed various prototype devices. PureWick has provided extensive discovery to Sage throughout this case concerning those prototype devices. *See, e.g.*, Ex. 1 at pp. 18-24.

Pursuant to the Scheduling Order, PureWick served its Infringement Contentions on April 3, 2020 and Sage served its Invalidity Contentions on May 29, 2020. D.I. 24. Shortly thereafter PureWick was granted leave to file an Amended Complaint adding its claim for infringement of the '407 patent, and an amended Scheduling Order was entered on June 17, 2020. D.I. 56. PureWick thereafter served First Supplemental Infringement contentions addressing the '407 patent on July 17, 2020, and Sage served First Supplemental Invalidity Contentions that included contentions for the '407 patent on August 21, 2020.

In its Initial and First Supplemental Invalidity Contentions, Sage alleged that "[v]ersions of the PureWick device appear to have been offered for sale or disclosed to third parties prior to the earliest viable priority dates of the 376 and 989 Patents." *See, e.g.*, Ex. 2 at p. 187. ***Sage, however, did not identify any specific "[v]ersions of the PureWick device," or provide any contention as to how such devices disclosed any elements of the asserted claims***. *See, e.g.*, Ex. 2 at pp. 88-103.

On October 28, 2020, the Court issued an Order adopting PureWick's proposal for limiting the asserted claims and prior art. D.I. 89 ("Narrowing Order"). Pursuant to the Narrowing Order, Sage was required by December 18, 2020 to:

> ***narrow the number of prior art references to no more than 35 total references*** and shall identify those references to Plaintiff. In addition, on or before December 18, 2020, Defendant shall identify to Plaintiff no more than 130 prior art combinations that may be used for arguing obviousness. A "prior art combination" shall be understood to be a combination of two or more prior art references per claim. Thus, for example, if two prior art references are combined to argue obviousness for three different claim[s], this would count as three prior art combinations (even though each combination consists of the same two references). In addition, combinations that are listed as "and/or" alternatives (for example, "A and/or B and/or C") shall constitute as many combinations as can be formed based on what is stated.

D.I. 87-1 at ¶ 2 (emphasis added). The Court also ordered that "Defendant may add or change prior art references or combinations ***upon a showing of good cause***." D.I. 89 (emphasis added).

Rather than disclose its invalidity contentions for the PureWick devices that Sage alleges constitute prior art, Sage improperly sought to compel PureWick to provide ***validity*** contentions explaining why each of PureWick's numerous prototype devices and products do not meet the elements of the claims. D.I. 94, 96. At the hearing on that motion, the Court specifically asked Sage whether it had provided contentions for the devices "claim by claim, element by element." Ex. 6, Dec. 3 Hearing Tr. at 4:17-5:6. When Sage admitted it had not, the Court denied Sage's motion.

Notwithstanding the Court's comments at the December 3 hearing, Sage has refused to provide any contentions showing how any PureWick device allegedly meets the elements of any of the asserted claims, or why such device allegedly is prior art. Sage served Second Supplemental Invalidity Contentions on December 18, 2020 (Ex. 3) and Third Supplemental Invalidity Contentions

SHAW KELLER LLP

Page 3

on February 6, 2021 (Ex. 4).  In each of those contentions Sage included paragraphs that broadly referenced numerous PureWick prototype and commercial devices, labelling them collectively as "PureWick Prior Art Devices."  Ex. 3 at pp. 200-02; Ex. 4 at 202-04.  In the claim charts, included with those contentions, Sage simply inserted a bullet point for each element of the asserted claims of the '376, '989 and '407 patents that says "PureWick Prior Art Devices."  *See, e.g.*, Ex. 4 at pp. 106-284.[1]

**Argument**

Sage's invalidity contentions do not comply with the Court's Scheduling Order, which required disclosure of contentions for the '376 and '989 patents in May of 2020, or with the Court's October 28, 2020 Oral Order, which required Sage to identify no more than 35 references that Sage intended to rely on as prior art.  Despite having extensive discovery from PureWick concerning PureWick's prototypes and products for over nine months, Sage has refused to supplement its contentions to specifically identify any devices on which Sage relies as prior art, or explain how such devices allegedly disclose the elements of the asserted claims.

The Court's October 28, 2020 order required Sage to "narrow the number of prior art references to no more than 35 total references and [] identify those references to Plaintiff."  Pursuant to that Order, Sage identified a list of 33 "references," which included the so-called "PureWick Prior Art Devices," as well as something called "Omni Medical AMXD/DMax Devices."  Ex. 3 at 288. These so called "references" are actually multiple different products and prototypes.  For example, Sage defined "PureWick Prior Art Devices" to include devices described in PureWick's response to Sage Interrogatory No. 6, which identifies at least the following different devices:  (1) "a PureWick Female External Catheter wick product that used brown tape and a vinyl reservoir," (2) "a blue tape version of a PureWick FEC with a silicon reservoir," (3) a "version of the PureWick FEC that used a blue silicon shell instead of tape," (4) "prototypes of a urine collection device using PVC pipes with holes or slots cut into the pipe," (5) "prototypes of a urine collection device that used a curved 'wick,'" (6) "prototypes of a urine collection device that used an extruded wick with end caps," (7) "a urine collection device that used a tapered wick," and (8) "a urine collection device that used a spun-fiber material that was wrapped with a wicking material."  Ex. 1 at pp. 18-24.  PureWick has provided discovery for each of these categories of devices, including when they were made and tested, and has identified documents relating to the devices.  *Id.*  PureWick also produced photographs of the different devices and made physical samples available for inspection.  *See, e.g.*, Ex. 5.

PureWick disputes that any of the PureWick devices constitutes "prior art,"[2] but if Sage contends any are, then Judge Noreika's Order required Sage to identify which devices it contends are

---

[1]    In contrast to Sage's mere listing of "PureWick Prior Art Devices" for each claim element, without any explanation, PureWick has provided detailed infringement contentions that point to specific structures in the accused products and explain how those structures meet the claim elements. *See, e.g.*, Ex. 7.

[2]    PureWick's '376 and '989 patents have an effective filing date of March 19, 2014.  As set forth in PureWick's response to Sage Interrogatory No. 6, the first experimental testing of certain devices by someone other than the inventor, Camille Newton, took place beginning in July 2013.

SHAW KELLER LLP

Page 4

prior art, explain why, and treat each such device as a separate reference.  Sage itself clearly recognizes that the different PureWick devices constitute different "references."  For example, Sage argued to the Court in connection with its motion to compel that "PureWick's prior art **products** may be the most relevant **references** in this case."  D.I. 94 at 3.  Sage has violated the Court's case narrowing order and hidden its contentions by lumping all of these different devices together as a single "reference."

Sage's repeated listing of the phrase "PureWick's Prior Art Devices" for each claim element in its invalidity charts clearly fails to disclose Sage's contentions with respect to these different devices. *See, e.g.*, Ex. 4 at pp. 109, 112, 114, 116-17, 119-20, 122.  Nowhere in its contentions does Sage point to any specific PureWick device that Sage alleges is prior art and explain how the device allegedly meets the elements of any asserted claim.  Sage's "contentions" are a bare assertion that all of the claims are invalid based on the alleged prior use or sale of one or more unspecified devices, with no explanation at all as to how or why.  This would be no different than identifying generally 100 papers and asserting they invalidate without explaining why they are prior art or where the elements are allegedly disclosed in any or all of the papers.

Sage has long known about this collection of devices and has never identified which devices it intends to rely on as prior art, or why they allegedly disclose the elements of the claims.  And because Sage has known about the various devices for most of the fact discovery period it cannot show good cause for amending its contentions at this stage.  *See British Telecomm. PLC v. IAC/Interactive Corp.*, C.A. No. 18-366 (D. Del. June 8, 2020) (finding good cause did not exist to add references that were previously known to defendants).  Sage should not be permitted to simply hide the ball and then spring its invalidity theories on PureWick at the end of fact discovery or in expert discovery.  Sage should be precluded from relying on any of the "devices" as prior art.  Alternatively, Sage should be required to specify which of the "devices" it intends to rely on, but be precluded from making any new contentions about those devices beyond what was previously disclosed barring a showing of good cause as is specified already in the Court's Order.

Respectfully submitted,

*/s/ John W. Shaw*

John W. Shaw (No. 3362)

cc: Clerk of the Court (by Hand Delivery)
    All counsel of record (by CM/ECF)

# EXHIBIT 9

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NEXSTEP, INC., a Delaware Corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 19-1031-RGA-SRF |
| COMCAST CABLE COMMUNICATIONS, | ) | |
| LLC a Delaware Limited Liability Company | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

### [PROPOSED] AMENDED RULE 16 SCHEDULING ORDER

This 11th day of November 2019, the Court having conducted an initial Rule 16 scheduling

and planning conference pursuant to Federal Rule of Civil Procedure 16(b) and Local Rule 16.1

on **October 28, 2019**, and the parties having determined after discussion that the matter cannot

be resolved at this juncture by settlement, voluntary mediation, or binding arbitration;

IT IS ORDERED that:

1. **Joinder of Other Parties and Amendment of Pleadings**. All motions to join

other parties, and to amend or supplement the pleadings shall be filed on or before **February 28,**

**2020**.

2. **Discovery**. All fact discovery in this case shall be initiated so that it will be

completed on or before **December 4, 2020**. Unless otherwise ordered by the Court, the

limitations on discovery set forth in Local Rule 26.1 shall be strictly observed.

   a. Rule 26(a)(1) Initial Disclosures. The parties shall make their initial

disclosures pursuant to Federal Rule of Civil Procedure 26(a)(1) on **November 15, 2019**.

b.   E-Discovery. The parties reviewed the Default Standard for Discovery of Electronic Documents, and incorporate it herein by reference, with the following exceptions:

i. the categories of ESI identified in Schedule A shall also include persistent chat messages and file audit logs;

ii. the parties agree to limit the production of emails to five custodians each and a total of eight search terms per custodian per party, subject to approval by the producing party.  Indiscriminate terms, such as the producing company's name or its product name, shall not be used unless combined with narrowing search criteria.  A conjunctive combination of multiple words or phrases (e.g., "computer" and "system") shall count as a single search term.  A disjunctive combination of multiple words or phrases (e.g., "computer" or "system") shall count as separate search terms unless they are variants of the same word.  Email shall not be produced until March 2, 2020;

iii. to reduce the risk of overproduction, in addition to the limitations described in Section 5.b of the Default Standards, the parties agree that the producing party shall run a hit count on the requested search after agreeing that its search terms are compliant with Section 5.b.  The parties agree that, subject to their good-faith discussions, "overproduction" refers to a search terms yielding substantially more than 25,000 documents for a given custodian;

iv. to the extent the default deadlines conflict with the dates listed in Appendix A, attached hereto, Appendix A shall govern.

c.   Document Production. Document production shall be substantially completed by **July 22, 2020.**

d.   Interrogatories. A maximum of 25 interrogatories shall be served by each side.

e. Contention Interrogatories. In the absence of agreement among the parties, contention interrogatories, if filed, shall first be addressed by the party with the burden of proof no later than the date established for the completion of document production, with the responsive answers due within thirty (30) days thereof. The adequacy of all such interrogatory answers shall be judged by the level of detail each party provides; i.e., the more detail a party provides, the more detail a party shall receive.

f. Requests for Admission. A maximum of 25 requests for admission shall be served by each side. Requests for Admission that a document is authentic and a business record do not count against this total.

g. Depositions.

i. Timing. In the absence of agreement among the parties or by order of the court, no deposition (other than those noticed under Fed. R. Civ. P. 30(b)(6)) shall be scheduled prior to the completion of substantial document production.

ii. Limitation on Hours for Deposition Discovery. Each side is limited to a maximum of 70 hours for taking fact depositions. Defendant may take the Rule 30(b)(1) deposition of Mr. Stepanian, the named inventor of the Asserted Patents, for up to 14 hours, in his capacity as an individual witness under Rule 30(b)(1), with additional time to the extent he is designated on behalf of Plaintiff under Rule 30(b)(6), which will count against Defendant's 70 hour limit for taking fact depositions.

iii. Location of Depositions. Any party or representative (officer, director, or managing agent) of a party filing a civil action in this district court must ordinarily be required, upon request, to submit to a deposition at a place designated within this district. Exceptions to this general rule may be made by order of the Court. A defendant who becomes a

counterclaimant, cross-claimant, or third-party plaintiff shall be considered as having filed an action in this Court for the purpose of this provision.

      h.   Disclosure of Expert Testimony.

          i.   For the party who has the initial burden of proof on the subject matter, the initial Federal Rule 26(a)(2) disclosure of expert testimony is due on or before **January 21, 2021**.

          ii.   The supplemental disclosure to contradict or rebut evidence on the same matter identified by another party is due on or before **February 24, 2021**.

          iii.   Reply expert reports from the party with the initial burden of proof are due on or before **March 24, 2021**.

          iv.   No other expert reports will be permitted without either the consent of all parties or leave of the Court.  All expert discovery shall be completed by **April 28, 2021.** Along with the submissions of the expert reports, the parties shall advise of the dates and times of their experts' availability for deposition.

      i.   Objections to Expert Testimony. To the extent any objection to expert testimony is made pursuant to the principles announced in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), as incorporated in Federal Rule of Evidence 702, it shall be made by motion no later than and no more than ten days before the deadline for dispositive motions set forth herein, unless otherwise ordered by the Court.

      j.   Fact Witnesses to be Called at Trial.

          i.   Within one (1) month following the close of expert discovery, each party shall serve on the other party a list of each fact witness (including any expert witness who is also expected to give fact testimony), who has previously been disclosed during discovery and that it intends to call at trial.

- 4 -

ii.    Within one (1) month of receipt of such fact witness list, each party shall serve a list of each rebuttal fact witness that it intends to call at trial.

iii.    The parties shall have the right to depose any such fact witnesses who have not previously been deposed in this case.  Such deposition shall be held within one (1) month after service of the list of rebuttal fact witnesses and shall be limited to twenty (20) hours per side in the aggregate unless extended by agreement of the parties or upon order of the court upon good cause shown.

k.    Discovery Matters and Disputes Relating to Protective Orders.

i.    Should counsel find they are unable to resolve a discovery matter or those other matters covered by this paragraph,[1] the moving party (i.e., the party seeking relief from the Court) shall file a "[Joint] Motion for Teleconference To Resolve [Protective Order or Discovery] Dispute." The suggested text for this motion can be found in Magistrate Judge Fallon's section of the Court's website in the "Forms" tab, under the heading "Discovery Matters–Motion to Resolve Discovery Disputes."

ii.    The Court will thereafter order a discovery telephone conference and deadlines for submissions. On the date set by the Court, generally not less than seventy-two (72) hours prior to the conference, excluding weekends and holidays, the party seeking relief shall file with the Court a letter, not to exceed four (4) pages, in no less than 12-point font, outlining the issues in dispute and its position on those issues. This submission shall include a proposed order, attached as an exhibit, setting out the nature of the relief requested.

iii.    On the date set by the Court, generally not less than forty-eight (48) hours prior to the conference, excluding weekends and holidays, any party opposing the

---

[1] Counsel are expected to ***verbally*** discuss the issues/concerns before seeking the Court's intervention.

application for relief may file a letter, not to exceed four (4) pages, in no less than 12-point font, outlining that party's reason for its opposition.

         iv.     Two (2) courtesy copies of the letters are to be hand delivered to the Clerk's Office within one hour of e-filing. All courtesy copies shall be double-sided.

         v. Should the Court find further briefing necessary upon conclusion of the telephone conference, the Court will order it.

         vii.     Disputes or issues regarding protective orders, or motions for extension of time for briefing case dispositive motions which are related to discovery matters are to be addressed in accordance with this paragraph.

3.       **Narrowing of the Asserted Claims and Prior Art References**

    a.  By no later than **March 13, 2020**, Plaintiff shall serve a First Election of Asserted Claims, which shall identify no more than 50 claims total.[2]

    b.  By no later than **April 24, 2020**, Defendant shall serve a First Election of Prior Art, which shall be limited to 120 prior art references and no more than 250 prior art arguments.[3]

    c.  By no later than **November 20, 2020**, Plaintiff shall serve a Second Election of Asserted Claims, which shall identify no more than 25 claims total.

---

[2]The asserted claim election does not prevent Plaintiff from referring to other patents or claims solely for background purposes or to show the ongoing innovation that Plaintiff is continuing to develop.

[3] The prior art election requirements set forth herein do not require election or disclosure of references relied on solely for background purposes or to show the state of the art. The prior art election requirements set forth herein apply only to references that Defendant utilizes to show the existence of claim limitations in furtherance of Defendant's anticipation and/or obviousness analyses.

    d.   By no later than **December 21, 2020**, Defendant shall serve a Second

Election of Prior Art, which shall be limited to no more than 60 prior art

references, with no more than 100 prior art arguments.

    e.   On or before **July 23, 2021**, Plaintiff shall serve a Final Election of

Asserted Claims, which shall identify no more than 10 claims total.

    f.   **On or before August 6, 2021**, Defendant shall serve a Final Election of

Prior Art, which shall be limited to no more than 20 prior art references

and no more than 20 prior art arguments.

4.    **Application to Court for Protective Order**. Counsel agree it will be necessary

to apply to the Court for a protective order specifying terms and conditions for the disclosure of

confidential information. Counsel have conferred and attempted to reach an agreement on a

proposed form of order and will submit it to the Court **within fourteen (14) days of the entry of

this Order**. Should counsel be unable to reach an agreement on a proposed form of protective

order, counsel must follow the provisions of Paragraph 2(k) above.

Any proposed protective order should include the following paragraph:

> Other Proceedings. By entering this order and limiting the
> disclosure of information in this litigation, the Court does not
> intend to preclude another court from finding that information may
> be relevant and subject to disclosure in another case. Any person or
> party subject to this order who in other proceedings becomes
> subject to a motion to disclose another party's information
> designated "confidential" [the parties should list any other level of
> designation, such as "highly confidential," which may be provided
> for in the protective order] pursuant to this order shall promptly
> notify that party of the motion so that party may have an
> opportunity to appear and be heard in the other proceeding.

5.    **Papers Filed Under Seal**. When filing papers under seal, counsel should deliver

to the Clerk an original and one (1) copy of the papers. In accordance with section G of the

Administrative Procedures Governing Filing and Service by Electronic Means, a redacted

version of any sealed document shall be filed electronically within seven (7) days of the filing of

the sealed document.

6. **Courtesy Copies**. The parties shall provide to the Court two (2) courtesy copies

of all briefs and one (1) courtesy copy of any other document filed in support of any briefs (i.e.,

appendices, exhibits, declarations, affidavits, etc.). This provision also applies to papers filed

under seal.

7. **ADR Process**. This matter was discussed during the Rule 16 scheduling

conference. The call will be referred to a magistrate judge for ADR purposes.

8. **Interim Status Report**. On **March 5, 2020** and **March 26, 2021**, counsel shall

submit joint interim reports to the Court on the nature of the matters in issue and the progress of

discovery to date.

9. **Status Conferences**. On **March 12, 2020** at 11:00 A.M and **April 8, 2021** at

10:00 A.M., the Court will status conferences by telephone with counsel. Plaintiff's counsel

shall initiate the telephone call. At the time of this conference, counsel shall also be prepared to

discuss the progress, if any, of settlement discussions and shall be prepared to discuss the

possibility of setting up a settlement conference with the Court, counsel and their clients. If all

parties agree that there is nothing to report, nor anything to add to the interim status report or to

this order, they shall notify the Court in writing before the conference is scheduled to occur, and

the conference will be taken off of the Court's calendar.

10. **Claim Construction Issue Identification**. On or before **April 30, 2020**, the

parties shall exchange a list of those claim term(s)/phrase(s) that they believe need construction.

Two weeks after exchanging the lists of terms (**May 14, 2020)**, the parties shall exchange their

proposed claim constructions of the identified term(s)/phrase(s). These documents will not be filed with the Court. Subsequent to exchanging their constructions, the parties will meet and confer to prepare a Joint Claim Construction Chart to be filed no later than **May 21, 2020**. The parties' Joint Claim Construction Chart should identify for the Court the term(s)/phrase(s) of the claim(s) in issue, and should include each party's proposed construction of the disputed claim language with citation(s) only to the intrinsic evidence in support of their respective proposed constructions. A copy of the patent(s) in issue as well as those portions of the intrinsic record relied upon shall be submitted with this Joint Claim Construction Chart. In this joint submission, the parties shall not provide argument.

11.    **Claim Construction Briefing**[4]. The Plaintiff shall serve, but not file, its opening brief, not to exceed 5,000 words: **June 11, 2020**. The Defendant shall serve, but not file, its answering brief, not to exceed 7,500 words: **July 2, 2020**. The Plaintiff shall serve, but not file, its reply brief, not to exceed 5,000 words: **July 23, 2020**. The Defendant shall serve, but not file, its sur-reply brief, not to exceed 2,500 words, **August 7, 2020**. No later than **August 14, 2020**, the parties shall file a Joint Claim Construction Brief. The parties shall copy and paste their unfiled briefs into one brief, with their positions on each claim term in sequential order, in substantially the form below.

---

[4] As each brief is written and provided to the opposing party, the individual responsible for verifying the word count will represent to the other party that it has so verified and by what means. These verifications should not be provided to the Court unless a dispute arises about them. Pictures, Figures copied from the patent, and other illustrations do not count against the word limit. Plaintiff should include with its opening brief one or more representative claims with the disputed terms italicized. Should Defendant want to add additional representative claims, Defendant may do so. The representative claims and the agreed-upon claim constructions do not count against the word limits.

## JOINT CLAIM CONSTRUCTION BRIEF

I.      Representative Claims

II.     Agreed-upon Constructions

III.    Disputed Constructions

      A.      [TERM 1][5]

            1.      Plaintiff's Opening Position

            2.      Defendant's Answering Position

            3.      Plaintiff's Reply Position

            4.      Defendant's Sur-Reply Position

      B.      [TERM 2]

            1.      Plaintiff's Opening Position

            2.      Defendant's Answering Position

            3.      Plaintiff's Reply Position

            4.      Defendant's Sur-Reply Position

Etc. The parties need not include any general summaries of the law relating to claim construction.  If there are any materials that would be submitted in an appendix, the parties shall submit them in a Joint Appendix.

12.     Beginning at **10:00 AM on September 15, 2020**, the Court will hear evidence and argument on claim construction. The parties shall notify the Court, by joint letter submission, no later than the date on which Plaintiff's reply claim construction brief is due: (i)

---

[5] For each term in dispute, there should be a table or the like setting forth the term in dispute and the parties' competing constructions. The table does not count against the word limits.

whether they request leave to present testimony at the hearing; and (ii) the amount of time they would like to have allocated to them for the hearing.

13. The court shall issue its decision on claim construction by **October 30, 2020.**

14. **Case Dispositive Motions**. All case dispositive motions and *Daubert* motions, and opening briefs, and affidavits, if any, in support of the motion shall be served and filed on or before **May 14, 2021**. Briefing will be presented pursuant to the Court's Local Rules, except as modified during the scheduling conference. If the matter is scheduled for a bench trial, no case dispositive motions shall be filed without prior authorization of the Court. No case-dispositive motion under Rule 56 or Daubert motion may be filed more than ten (10) days before the above date without leave of the Court.

Any reference to exhibits in the briefs must refer to the specific pages of the exhibit proffered in support of a party's argument. If the exhibit is a deposition, both the page and line numbers must be specified.[6]

15. **Applications by Motion**. Except as otherwise specified herein, any application to the Court shall be by written motion filed with the Clerk. Any non-dispositive motion should contain the statement required by Local Rule 7.1.1.

16. **Pretrial Conference**. On **September 3, 2021**, the Court will hold a Rule 16(e) final pretrial conference in Court with counsel beginning at 9:00 AM. The parties shall file a joint proposed final pretrial order in compliance with Local Rule 16.3(c) no later than 5 p.m. on the fourth business day before the date of the final pretrial conference. Unless otherwise ordered

---

[6] For example, a reference to an exhibit that refers to the entire document will not be accepted and is not consistent with this provision.

by the Court, the parties shall comply with the timeframes set forth in Local Rule 16.3(d) for the preparation of the proposed joint final pretrial order.

17. **Motions *in Limine***. Motions *in limine* shall be separately filed, with each motion containing all the arguments described below in one filing for each motion. Any supporting documents in connection with a motion *in limine* shall be filed in one filing separate from the motion *in limine*. Each party shall be limited to three *in limine* requests, unless otherwise permitted by the Court. The *in limine* request and any response shall contain the authorities relied upon; each *in limine* request may be supported by a maximum of three pages of argument and may be opposed by a maximum of three pages of argument, and the party making the *in limine* request may add a maximum of one additional page in reply in support of its request. If more than one party is supporting or opposing an *in limine* request, such support or opposition shall be combined in a single three page submission (and, if the moving party, a single one page reply). No separate briefing shall be submitted on *in limine* requests, unless otherwise permitted by the Court.

18. **Jury Instructions, *Voir Dire*, and Special Verdict Forms**. Where a case is to be tried to a jury, pursuant to Local Rules 47.1(a)(2) and 51.1, the parties should file (i) proposed voir dire, (ii) preliminary jury instructions, (iii) final jury instructions, and (iv) special verdict forms no later than 6 p.m. on the fourth business day before the date of the final pretrial conference. Areas of dispute shall be identified as narrowly as possible and in a manner that makes it readily apparent what the dispute is. The parties shall submit simultaneously with filing each of the foregoing four documents in Word format to rga_civil@ded.uscourts.gov.

19. **Trial**. This matter is scheduled for a five (5) day jury trial beginning at 9:30 a.m. on **September 20, 2021** with the subsequent trial days beginning at 9:30 a.m. Until the case is

submitted to the jury for deliberations, the jury will be excused each day at 5:00 p.m. The trial will be timed, as counsel will be allocated a total number of hours in which to present their respective cases.

/s/ _____

UNITED STATES MAGISTRATE JUDGE

Case 1:19-cv-01031-RGA Document 35-4 Filed 12/09/17 Page 14 of 17 Page #: 914D
#: 34794
Case 1:19-cv-01031-RGA-SRF Document 35 Filed 12/09/19 Page 14 of 17 PageID #: 897

### Appendix A: Proposed Schedule

| EVENT | PROPOSED DEADLINES |
|---|---|
| Rule 16 Conference | 10/28/2019 (11:00 AM) |
| Initial Disclosures | 11/15/2019 |
| Application to Court for Protective Order | Within fourteen (14) days of the entry of this Order |
| ESI Initial Disclosures pursuant to the Delaware Default Standard for Discovery of Electronic Documents, Section 3 | 11/27/2019 |
| Disclosure of Asserted Patents, Accused Products, and File Histories pursuant to Default Standard for Discovery, Section 4.a | 12/11/2019 |
| Core Technical Document Production, pursuant to Default Standard for Discovery, Section 4.b | 1/24/2020 |
| Joinder of Other Parties and Amendment of Pleadings | 2/28/2020 |
| Interim Status Report on Discovery | 3/5/2020 |
| Status Conference (Telephonic) | 3/12/2020 (11:00 a.m.) |
| Initial Infringement Contentions, pursuant to Default Standard for Discovery, Section 4.c, and First Election of Asserted Claims | 3/13/2020 |

| EVENT | PROPOSED DEADLINES |
|---|---|
| Initial Invalidity Contentions, pursuant to Default Standard for Discovery, Section 4.d, and First Election of Prior Art | 4/24/2020 |
| Exchange list of claim terms/phrases for construction | 4/30/2020 |
| Exchange proposed claim constructions | 5/14/2020 |
| Joint Claim Construction Chart | 5/21/2020 |
| Opening Claim Construction Brief (Plaintiff) | 6/11/2020 |
| Answering Claim Construction Brief (Defendant) | 7/2/2020 |
| Substantial Completion of Document Production | 7/22/2020 |
| Reply Claim Construction Brief (Plaintiff) | 7/23/2020 |
| Sur-Reply Claim Construction Brief (Defendant) | 8/7/2020 |
| Joint Claim Construction Brief | 8/14/2020 |
| Claim Construction Hearing | 9/15/2020 (10:00 AM) |
| Second Election of Asserted Claims | 11/20/2020 |
| Fact Discovery Cutoff | 12/4/2020 |

| EVENT | PROPOSED DEADLINES |
|---|---|
| Second Election of Prior Art | 12/21/2020 |
| Opening/Burden of Proof Expert Reports | 1/21/2021 |
| Rebuttal Expert Reports | 2/24/2021 |
| Reply Expert Reports | 3/24/2021 |
| Interim Status Report on Discovery | 3/26/2021 |
| Status Conference (Telephonic) | 4/8/2021 (10:00 a.m.) |
| Close of expert discovery | 4/28/2021 |
| Case Dispositive Motions and Daubert Motions – Opening Briefs | 5/14/2021 |
| Serve list of each fact witness to be called at trial | 5/28/2021 |
| Case Dispositive Motions and Daubert Motions – Opposition Briefs | 6/11/2021 |
| Serve list of rebuttal fact witnesses to be called at trial | 6/28/2021 |
| Case Dispositive Motions and Daubert Motions – Reply Briefs | 7/6/2021 |
| Final Election of Asserted Claims | 7/23/21 |
| Last day to depose fact witnesses on the trial list | 7/28/2021 |

| EVENT | PROPOSED DEADLINES |
|---|---|
| Final Election of Prior Art | 8/6/2021 |
| Joint proposed final pretrial order | 8/27/2021 |
| Pre-trial Conference | 9/3/2021 (9:00 AM) |
| Trial | 9/20/2021 (9:30 AM) |

# EXHIBIT 10

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CAO LIGHTING, INC.,<br><br>Plaintiff,<br><br>v.<br><br>GENERAL ELECTRIC COMPANY, CONSUMER LIGHTING (U.S.), LLC d/b/a GE LIGHTING, and CURRENT LIGHTING SOLUTIONS, LLC,<br><br>Defendants. | C.A. No. 1:20-681-MN |
| CAO LIGHTING, INC.,<br><br>Plaintiff,<br><br>v.<br><br>OSRAM SYLVANIA, INC. and LEDVANCE LLC,<br><br>Defendants. | C.A. No. 1:20-690-MN |

**<u>REBUTTAL EXPERT REPORT OF JAMES BENYA</u>**

### 9.    A POSA Would Not Be Motivated To Combine These References

148.    In considering Dr. Krames' proposed combinations of references, it is important to note that Dr. Krames' assertions that "Begemann WO'7569 in view of the Reexamination References of Record I also discloses and renders obvious all elements of claims 21, 32, 36,40, and 42 of the '961 patent" lacks specificity.[29] Dr. Krames does not clearly identify the specific combinations of these references that he asserts are obvious or how these various references would be combined in a device that meets the requirements of claims 21, 32, 36, 40, and 42. As such, my ability to respond to Dr. Krames' assertions are limited, and I reserve the right to further respond should he later identify his proposed combinations with greater specificity.

149.    Dr. Krames asserts that a POSA would be motivated to combine Begemann with references disclosing "a coating (e.g., a phosphor coating) for converting monochromatic light emitted by an LED chip (e.g., an LED chip that produces blue light) to white light," i.e., Abe, Waitl, Bogner, Shimizu, and Matsubara.[30] This is incorrect for several reasons.

150.    First, as I explained above, Begemann produces white light by using a combination of red, green, and blue or red, green, yellow, and blue LEDs. For example, Begemann explains that "[b]y using one or more LED combinations in colors green, red and blue or green, red, yellow and blue for each substrate face, a LED lamp can be obtained which emits white light."[31] As such, there is no need for a coating to convert monochromatic visible light to white light because Begemann creates white light without such a coating.

---

[29] *See* 3/18/22 Krames Report at ¶ 244.

[30] *See* 3/18/22 Krames Report at ¶ 290.

[31] Begemann at 3:19-21, *see also* 5:24-26, 6:13-14.

151.    Second, Dr. Krames asserts that a POSA would be motivated to replace Begemann's "white LEDs" with blue LEDs with a coating for converting the blue light to white light as disclosed by other references.[32] This is incorrect. Again, there is no reason for such a substitution because Begemann already discloses producing white light using a combination of red, green, and blue or red, green, yellow, and blue LEDs.

152.    In addition, replacing Begemann's LEDs with LEDs from another reference is not a "simple substitution" as Dr. Krames asserts.[33] Different LEDs have many different characteristics such as different sizes and power requirements, different spectral emissions, different optical distribution of light, and they generate different amounts of heat per device. As such, changing LEDs in a lamp such as Begemann's would impact several aspects of the design. For example, in a general lighting application where high output powers and many LEDs are needed, it would be common to use both parallel and series interconnections between various LEDs. Therefore, if the LEDs are replaced with different LEDs this would likely require a redesign of the AC/DC converter, wiring and/or interconnect scheme to ensure the LEDs have proper turn on voltages such that they turn on at the same time and adequate current such that they are bright enough. In addition, the location and spacing of the LEDs and the heat dissipation capabilities of the lamp would need to be reevaluated and would likely require a redesign of the lamp to deal with the specific characteristics of the particular LEDs. As such, a POSA would not have a reasonable

---

[32] *See, e.g.*, 3/18/22 Krames Report at ¶ 295 (asserting it would be obvious to replace Begemann's LEDs with "Bogner's white LEDs including the GaN-based LEDs having the phosphor-containing conversion coating"), ¶ 296 (asserting it would be obvious to replace "Begemann's white LEDs with a blue semiconductor light source (such as Sugiura's) of a single wavelength and a coating as described by either Matsubara, or Shimizu"), ¶ 307 (asserting substitution of Waitl's LEDs and phosphor coating for Begemann's LEDs is a "simple substitution").

[33] *See, e.g.*, 3/18/22 Krames Report at ¶ 248-249.

35

expectation of success that Begemann's LEDs could be replaced with those of another reference (such as Sugiura, Waitl, Bogner, Matsubara, or Shimizu) and result in a functional and reasonably efficacious light to illuminate a space used by humans consistent with the requirements of the asserted claims.

153.    A POSA also would not be motivated to replace Begemann's LEDs with laser semiconductor devices such as those disclosed by Abe[34] or Sugiura[35] because Begemann is designed to be used with LEDs not lasers and the two are not interchangeable. For example, LEDs can use relatively simple power supplies whereas laser diodes require more complicated and highly regulated power supplies, so a POSA would not look to use a laser semiconductor device with an LED device because that would require using a more sophisticated power supply that would most likely be larger and more expensive. In addition, laser diodes emit a focused, coherent beam of light, so if they are used to illuminate a space used by humans, the light must be diffused (dispersed). The optical efficiency of diffusing laser light (and either blending the monochromatic light with other colors to create white light or using a fluorescent coating to convert the monochromatic light to white light) further reduces the overall efficiency of the lamp or luminaire resulting in a device that would likely be much less efficacious[36] than an LED device. For this reason too a POSA would not be motivated to use a laser semiconductor device with or instead of an LED.

---

[34] *See, e.g.*, Abe at Abstract, 4:25-30, 5:19-22.

[35] *See, e.g.*, Sugiura at 15:50-52, Fig. 9.

[36] Efficacy describes the "wall plug" efficiency, i.e. lumens of light per watt.  Any efficacy advantage that a laser diode might have over an LED would be lost in diffusing the light. The lone exception to this rule is when the intended lighting effect is a pinspot beam of light, but these effects are generally limited to special effects lighting in nightclubs and theatrical productions.

154.    It is also not a "simple substitution" to replace LEDs with laser diodes and the two would have many different characteristics such as different sizes and power requirements and they generate different amounts of heat per device. For example, the focused emission from a laser diode raises safety issues for a light to illuminate a space used by humans given the potential for exposure to human eyes. Therefore, a POSA would want to completely diffuse the laser diode's emission, likely using a phosphor coating to convert the laser's monochromatic light to white light, but this would change the resulting color of the lamp because when using a conversion coating with a blue LED some of the blue light is not converted. Laser diodes are also typically pulsed at high current whereas LEDs have to have a continuous flow of current to mitigate flicker. The size and circuit design of the power supplies are also different, so a POSA would not have a reasonable expectation of success that a power supply, including an AC/DC converter, for a laser device could be used with an LED device without significant modification to the device and/or power supply. But even if Begemann's LEDs were replaced with laser semiconductor devices, the resulting device would not meet the requirements of the asserted claims because claim 21 requires that "at least one semiconductor chip is a light emitting diode (LED) chip." And a POSA would certainly not be motivated to replace only some of Begemann's LEDs with laser semiconductor devices and Dr. Krames does not assert that a POSA would be so motivated.

155.    Similarly, a POSA would not be motivated to use an AC/DC converter for a "semiconductor laser element" as disclosed in Abe with Begemann's LEDs or any other LEDs.[37] As explained above, semiconductor lasers are different than LEDs and have different power requirements. If a POSA was motivated to use an AC/DC converter for a LED he or she would use an AC/DC converter intended for an LED not a laser because an AC/DC converter for a laser

---

[37] *See, e.g.,* Abe at 2:44-49, 5:56-65.

device is generally much larger than for an LED, so it can cause space constraint issues. An AC/DC converter for a laser device is also typically more sophisticated and expensive. But even if an AC/DC converter for a laser semiconductor device was used with Begemann's LEDs or any other LEDs, it would not result in a device where the "AC/DC converter is configured to convert AC power into DC power that is usable by said LED chip" as required by claim 32 of the '961 patent.

156.    In my opinion, neither Dr. Krames nor the references provide any reason why a POSA would have been motivated to make any of the First Set of Begemann Combinations other than improper hindsight.

**B.    Claims 21, 32, 36, 40, and 42 of the '961 Patent Are Nonobvious Over Begemann WO '7569 in Combination with the Reexamination References of Record II**

157.    I disagree with Dr. Krames' opinion that the combination of Begemann with Nakamura and any of Abe, Waitl, Bogner, Matsubara, and Shimizu (which he calls the "Reexamination References of Record II") discloses and renders obvious all elements of each of claims 21, 32, 36, 40, and 42 of the '961 patent. As I explain more fully below, these references do not disclose several elements of each of claims 21, 32, 36, 40, and 42 of the '961 patent, the combination of these references also do not meet several elements of these claims, and a POSA would not find it obvious or be motivated to combine these references as Dr. Krames proposes. Therefore, in my opinion claims 21, 32, 36, 40, and 42 of the '961 patent are not obvious based on the combination(s) of Begemann with Nakamura and any of Abe, Waitl, Bogner, Matsubara, and Shimizu (which I refer to as Dr. Krames' "Second Set of Begemann Combinations").

158.    In addition, as also explained more fully below, in my opinion none of the references included in the Second Set of Begemann Combinations anticipate any of the asserted claims. As such, I understand that this is undisputed because Dr. Krames does not assert that any of these references anticipate any of the asserted claims.

38

### (c)    Claim 40

187.    For at least the reasons discussed above in Section  VII.A.7(c) and VII.A.1(a), Shimizu does not teach or disclose all elements of claim 40 of the '961 patent.

### 8.    A POSA Would Not Be Motivated To Combine These References

188.    In considering Dr. Krames' proposed combinations of references, it is important to note that Dr. Krames' assertions that "Begemann WO'7569 in view of the Reexamination References of Record II also discloses and renders obvious all elements of claims 21, 32, 36,40, and 42 of the '961 patent" lacks specificity.[47] Dr. Krames does not clearly identify the specific combinations of these references that he asserts are obvious or how these various references would be combined in a device that meets the requirements of claims 21, 32, 36, 40, and 42. As such, my ability to respond to Dr. Krames' assertions are limited, and I reserve the right to further respond should he later identify his proposed combinations with greater specificity.

189.    For at least the reasons discussed above in Sections VII.A.9 and VII.A.1(a), a POSA would not be motivated to make any of the Second Set of Begemann Combinations.

190.    Additionally, a POSA would not have a reasonable expectation of success that Begemann's LEDs could be replaced with those of another reference (such as Nakamura, Waitl, Bogner, Matsubara, or Shimizu) and result in a functional and reasonably efficacious light to illuminate a space used by humans consistent with the requirements of the asserted claims.

191.    A POSA also would not be motivated to replace Begemann's LEDs with the laser semiconductor devices such as those disclosed by Abe[48] or Nakamura[49] because Begemann is

---

[47] *See* 3/18/22 Krames Report at ¶ 519.

[48] *See, e.g.*, Abe at Abstract, 4:25-30, 5:19-22.

[49] *See, e.g.*, Nakamura at 21:56-60, Figs. 12-13.

designed to be used with LEDs not lasers and the two are not interchangeable. For example, LEDs can use relatively simple power supplies whereas laser diodes require more complicated and highly regulated power supplies, so a POSA would not look to use a laser semiconductor device with an LED device because that would require using a more sophisticated power supply that would most likely be larger and more expensive. In addition, laser diodes emit a focused, coherent beam of light, so if they are used to illuminate a space used by humans, the light must be diffused (dispersed). The optical efficiency of diffusing laser light (and either blending the monochromatic light with other colors to create white light or using a fluorescent coating to convert the monochromatic light to white light) further reduces the overall efficiency of the lamp or luminaire resulting in a device that would likely be much less efficacious than an LED device. For this reason too a POSA would not be motivated to use a laser semiconductor device with or instead of an LED.

192.    It is also not a "simple substitution" to replace LEDs with laser diodes and the two would have many different characteristics such as different sizes and power requirements and they generate different amounts of heat per device. For example, the focused emission from a laser diode raises safety issues for a light to illuminate a space used by humans given the potential for exposure to human eyes. Therefore, a POSA would want to completely diffuse the laser diode's emission, likely using a phosphor coating to convert the laser's monochromatic light to white light, but this would change the resulting color of the lamp because when using a conversion coating with a blue LED some of the blue light is not converted. Laser diodes are also typically pulsed at high current whereas LEDs have to have a continuous flow of current to mitigate flicker. The size and circuit design of the power supplies are also different, so a POSA would not have a reasonable expectation of success that a power supply, including an AC/DC converter, for a laser device could

be used with an LED device without significant modification to the device and/or power supply. But even if Begemann's LEDs were replaced with laser semiconductor devices, the resulting device would not meet the requirements of the asserted claims because claim 21 requires that "at least one semiconductor chip is a light emitting diode (LED) chip." And a POSA would certainly not be motivated to replace only some of Begemann's LEDs with laser semiconductor devices and Dr. Krames does not assert that a POSA would be so motivated.

193.    In my opinion, neither Dr. Krames nor the references provide any reason why a POSA would have been motivated to make any of the Second Set of Begemann Combinations other than improper hindsight.

**C.    Claims 21, 32, 36, 40, and 42 of the '961 Patent Are Nonobvious Over Begemann WO '7569 in Combination with the Reexamination References of Record III**

194.    I disagree with Dr. Krames' opinion that the combination of Begemann with Floyd and any of Abe, Waitl, Bogner, Matsubara, and Shimizu (which he calls the "Reexamination References of Record III") discloses and renders obvious all elements of each of claims 21, 32, 36, 40, and 42 of the '961 patent. As I explain more fully below, these references do not disclose several elements of each of claims 21, 32, 36, 40, and 42 of the '961 patent, the combination of these references also do not meet several elements of these claims, and a POSA would not find it obvious or be motivated to combine these references as Dr. Krames proposes. Therefore, in my opinion claims 21, 32, 36, 40, and 42 of the '961 patent are not obvious based on the combination(s) of Begemann with Floyd and any of Abe, Waitl, Bogner, Matsubara, and Shimizu (which I refer to as Dr. Krames' "Third Set of Begemann Combinations").

195.    In addition, as also explained more fully below, in my opinion none of the references included in the Third Set of Begemann Combinations anticipate any of the asserted

46

223.    It is also my understanding that Dr. Krames agrees that Shimizu does not disclose any elements of claims 32 and 42 as he does not identify any portions of Shimizu as disclosing any of these elements.[57]

### (c)    Claim 40

224.    For at least the reasons discussed above in Sections VII.A.7(c) and VII.A.1(a), Shimizu does not teach or disclose all elements of claim 40 of the '961 patent.

### 8.    A POSA Would Not Be Motivated To Combine These References

225.    In considering Dr. Krames' proposed combinations of references, it is important to note that Dr. Krames' assertions that "Begemann WO'7569 in view of the Reexamination References of Record III also discloses and renders obvious all elements of claims 21, 32, 36, 40, and 42 of the '961 patent" lacks specificity.[58] Dr. Krames does not clearly identify the specific combinations of these references that he asserts are obvious or how these various references would be combined in a device that meets the requirements of claims 21, 32, 36, 40, and 42. As such, my ability to respond to Dr. Krames' assertions are limited, and I reserve the right to further respond should he later identify his proposed combinations with greater specificity.

226.    For at least the reasons discussed above in Sections VII.A.9 and VII.A.1(a), a POSA would not be motivated to make any of the Third Set of Begemann Combinations.

227.    In paragraphs 591-596, Dr. Krames discusses the reasons why it would be obvious to combine Sugiura (NOT Floyd) with any of the LEDs disclosed in Begemann, Bogner, Waitl, Abe, Matsubara, and Shimizu.[59] As such, Dr. Krames completely fails to provide any reasoning

---

[57] *See* 3/18/22 Krames Report at ¶¶ 687-708 and 742-757.

[58] *See* 3/18/22 Krames Report at ¶ 591.

[59] *See* 3/18/22 Krames Report at ¶¶ 591-596.

in this section why it would be obvious to combine Floyd with any of the LEDs disclosed in Begemann, Bogner, Waitl, Abe, Matsubara, and Shimizu.  As Dr. Krames has failed to provide any motivation to combine these references, this combination of references fails on its face to render obvious any of the asserted claims of the '961 patent.

228.    Additionally, a POSA would not have a reasonable expectation of success that Begemann's LEDs could be replaced with those of another reference (such as Floyd, Waitl, Bogner, Matsubara, or Shimizu) and result in a functional and reasonably efficacious light to illuminate a space used by humans consistent with the requirements of the asserted claims.

229.    A POSA also would not be motivated to replace Begemann's LEDs with the laser semiconductor devices such as those disclosed by Abe[60] or Floyd[61] because Begemann is designed to be used with LEDs not lasers and the two are not interchangeable. For example, LEDs can use relatively simple power supplies whereas laser diodes require more complicated and highly regulated power supplies, so a POSA would not look to use a laser semiconductor device with an LED device because that would require using a more sophisticated power supply that would most likely be larger and more expensive. In addition, laser diodes emit a focused, coherent beam of light, so if they are used to illuminate a space used by humans, the light must be diffused (dispersed). The optical efficiency of diffusing laser light (and either blending the monochromatic light with other colors to create white light or using a fluorescent coating to convert the monochromatic light to white light) further reduces the overall efficiency of the lamp or luminaire resulting in a device that would likely be much less efficacious than an LED device.

---

[60] *See, e.g.*, Abe at Abstract, 4:25-30, 5:19-22.

[61] *See, e.g.*, Floyd at Abstract.

230.    It is also not a "simple substitution" to replace LEDs with laser diodes and the two would have many different characteristics such as different sizes and power requirements and they generate different amounts of heat per device. For example, the focused emission from a laser diode raises safety issues for a light to illuminate a space used by humans given the potential for exposure to human eyes. Therefore, a POSA would want to completely diffuse the laser diode's emission, likely using a phosphor coating to convert the laser's monochromatic light to white light, but this would change the resulting color of the lamp because when using a conversion coating with a blue LED some of the blue light is not converted. Laser diodes are also typically pulsed at high current whereas LEDs have to have a continuous flow of current to mitigate flicker. The size and circuit design of the power supplies are also different, so a POSA would not have a reasonable expectation of success that a power supply, including an AC/DC converter, for a laser device could be used with an LED device without significant modification to the device and/or power supply. But even if Begemann's LEDs were replaced with laser semiconductor devices, the resulting device would not meet the requirements of the asserted claims because claim 21 requires that "at least one semiconductor chip is a light emitting diode (LED) chip." And a POSA would certainly not be motivated to replace only some of Begemann's LEDs with laser semiconductor devices and Dr. Krames does not assert that a POSA would be so motivated.

231.    In my opinion, neither Dr. Krames nor the references provide any reason why a POSA would have been motivated to make any of the Third Set of Begemann Combinations other than improper hindsight.

obviousness discussed in my opening report support my opinions explained in this report. I also reserve the reserve the right to respond to any opinions offered by Dr. Krames or any other of Defendants' experts regarding secondary consideration of non-obviousness.



Dated: April 22, 2022

JAMES BENYA

# EXHIBIT 11

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CAO LIGHTING, INC.,<br><br>      Plaintiff,<br><br>v.<br><br>GENERAL ELECTRIC COMPANY, CONSUMER LIGHTING (U.S.), LLC d/b/a GE LIGHTING, and CURRENT LIGHTING SOLUTIONS, LLC,<br><br>      Defendants. | C.A. No. 1:20-681-MN |
| CAO LIGHTING, INC.,<br><br>      Plaintiff,<br><br>v.<br><br>OSRAM SYLVANIA, INC. and LEDVANCE LLC,<br><br>      Defendants. | C.A. No. 1:20-690-MN |

**REBUTTAL REPORT OF JAMES RICHARD SHEALY, PH.D. REGARDING VALIDITY**

Similarly, regarding claim 8, Dr. Krames references Shimizu but does not identify any portion of Shimizu as disclosing the elements of claim.[50]

148.    I also understand that Mr. Benya has analyzed the other elements of claims 1, 21, 32, 36, 40, and 42 and has responded to Dr. Krames opinions regarding these elements. I understand Mr. Benya's analysis and opinions regarding the elements, but I have not performed my own analysis. From Mr. Benya's analysis, however, I understand that Shimizu does not disclose all the elements of claims 1, 21, 32, 36, 40, and 42 of the '961 patent.

### 8.    All Elements of the Asserted Claims Are Not Disclosed By Scholl

149.    It is my opinion that Scholl does not teach or disclose any elements of claims 1, 7, 8, 21, 32, 36, 40, and 42 of the '961 patent.

150.    Dr. Krames does not cite to Scholl as teaching or disclosing any elements of any of the asserted claims. Dr. Krames only relies on Scholl for his assertion that "Scholl provides evidence that optical guide layers are inherently reflective."[51] Labeling a layer as an optical guide layer does not make it "inherently" reflective and optical guide layers are structures that are used in lasers, not LEDs.

### 9.    There Is No Motivation to Combine These References

151.    Although Dr. Krames asserts that "Begemann WO'7569 in view of the Reexamination References of Record I also discloses and renders obvious all elements of claims 21, 32, 36,40, and 42 of the '961 patent," his First Set of Begemann Combinations are vague.[52]

---

[50] *See* 3/18/22 Krames Report at ¶ 336.

[51] *See* 3/18/22 Krames Report at ¶ 250, *see also* ¶ 332.

[52] *See* 3/18/22 Krames Report at ¶ 244.

For example, Dr. Krames does not identify the specific combinations of these references that he asserts are obvious and he does not identify how these various references would be combined in a device or way that meets the requirements of claims 21, 32, 36, 40, and 42 of the '961 patent. Therefore, I am limited in the extent to which I can respond to Dr. Krames' asserted combinations, and I reserve the right to supplement my opinions if Dr. Krames provides additional detail, explanation, or specificity regarding his proposed combinations in the future.

152.    Dr. Krames opines that it would be obvious to use the layer structure disclosed in Sugiura with any of the LEDs disclosed in Begemann, Bogner, Waitl, Abe, Matsubara, and Shimizu. For example, Dr. Krames states that "it would have been obvious to a POSA, at the time of the invention, to produce a white LED lamp, as taught by Begemann WO'7569, using an appropriate combination of LEDs and conversion coatings appropriate for the monochromatic LED light, as taught by each of Bogner, Waitl, Abe, Matsubara, and Shimizu, wherein the order of layers in the LED can be as in Sugiura."[53] Similarly, Dr. Krames states that "it would have been obvious to a POSA, at the time of the invention to use Sugiura's layer order of the GaN-based LED in the GaN-based LEDs of either of Bogner and Waitl that is used in Begemann WO'7569, or to use Sugiura's GaN based LED as the GaN-based LED of either of Bogner and Waitl that is used in Begemann WO'7569."[54] I disagree. It would not be obvious that the Sugiura semiconductor layer structure could be used with LEDs disclosed in other references.

---

[53] 3/18/22 Krames Report at ¶ 327.

[54] 3/18/22 Krames Report at ¶ 325.

153.    Dr. Krames asserts that the "surface emitting laser" structure in Sugiura's Figure 9 "discloses the requisite elements of claim 7 (as well as claim 8)"[55] but one skilled in the art would know that using a current confining layer (element 57 in Sugiura's Figure 9) results in a reduction of current spreading which is required for uniform light emission from a large area LED, and would not be motivated to use such a structure. Dr. Krames also asserts that Sugiura's Figure 15 "teaches each of the features of claim 7 (as well as claim 8)",[56] but cladding layers in lasers function differently than cladding layers in LEDs. This would reduce the objective or carrier confinement to the active region. Also, one skilled in the art in 2001 would not apply electrodes to an AlGaN layer as Sugiura's Figure 15 teaches (element 519) as the ohmic contact would suffer, reducing the device's efficiency. Accordingly, a POSA would not be motivated to use Sugiura's Figure 15 layer structure in a light source for emitting light to illuminate a space used by humans.

154.    In addition, as I explained above, although Sugiura describes Figure 15 as having first and second cladding layers (i.e., "n-type AlGaN clad layer 513" and "p-type AlGaN clad layer 517"), Figure 15 shows additional GaN cladding layers, which are referred to as optical guide layers (i.e., "undoped GaN optical guide layer 514" and "p-type optical guide layer 516"), on either side of the active layer (i.e., quantum well layer 515").[57] Note that these layers do serve to confine electrons and holes to the active region which is the normal function of a cladding layer in a LED. It seems that Sugiura is using the optical waveguide layers for an edge emitting layer, but this structure is not a common feature of a LED but rather a laser diode. In addition, the first cladding

---

[55] 3/18/22 Krames Report at ¶ 317.

[56] 3/18/22 Krames Report at ¶ 316.

[57] Sugiura at 23:67-24:6.

is not adjacent to the buffer layer as the buffer layer is structured with an intervening "mask layer." This is required for lateral epitaxial overgrowth. This description of the laser diode layer structure (achieved with epitaxial overgrowth) prevents Sugiura from being used in any obviousness combination concerning claim 21; a POSA in 2001 would not find a reason to use this construct in combination with the other references to create a semiconductor light source for emitting light to illuminate a space used by humans.

155.    One skilled in the art would not look to either of Sugiura's layer structures of its edge emitting laser as it would be counterproductive. It is my opinion that there is no motivation to combine the First Set of Begemann Combinations simply because they allegedly "relate to semiconductor based light sources for general illumination."[58] First, one of skill in the art would understand that Sugiura's laser would not be considered a semiconductor based light source for "general illumination." As such, even if there was a theoretical motivation to combine references because they allegedly "relate to semiconductor based light sources for general illumination" – which does not exist – this rationale would not support combining Sugiura's laser with other references from the First Set of Begemann Combination.

156.    Additionally, a POSA would not be motivated to combine or substitute LED based chips of Begemann or other references with non-analogous laser based chips (*e.g.,* that are disclosed in Abe or Sugiura) to create a semiconductor light source for emitting light to illuminate a space used by humans for a number of reasons, which include differing: (i) radiation pattern, (ii) the spectrum emissions, (iii) light conversion efficiencies, and (iv) other differences that are known to a person of skill in the art.

---

[58] 3/18/22 Krames Report at ¶ 249.

157.    There is no "simple substitution of one known element for another to obtain predictable results" of LEDs that are disclosed in other references with Sugiura's laser as Dr. Krames suggests.[59] It was also known by POSA in 2001 that the LED layer structure was optimized for a particular MOCVD process resulting in different active region constructs, different buffer layers optimized for a given substrate material, and different cladding layer materials. It was also known that the LED chip is a product of a lengthy fabrication process making each manufacturer's chip unique. As such, the layer structure of Sugiura's laser cannot be simply plugged into the LEDs of references contained in the First Set of Begemann Combination. Additionally, even if there was a simple substitution of a LED with Sugiura's laser – which does not exist – there is also no motivation to use Sugiura's laser structure in LEDs used for lighting because both of his layer structures require epitaxial regrowth, which compromises device performance and greatly reduces manufacturability. Accordingly, a POSA would not be motivated to use the layer structure of Sugiura's laser in a light source for emitting light to illuminate a space used by humans.

158.    The only reference in the First Set of Begemann Combinations that Dr. Krames asserts discloses the requirement for the "light emitting diode (LED) chip configured to output light at greater than about 40 milliwatts" in claim 21 of the '961 patent is Begemann.[60] Dr. Krames also asserts that it would be obvious to replace Begemann's LEDs with those disclosed in other references, or it would be obvious to use the semiconductor structure disclosed in Sugiura with Begemann's LEDs. I disagree. It was also known by POSA in 2001 that the package of each LED was also optimized by each manufacturer for a given chip with its unique radiation pattern. The

---

[59] *See, e.g.*, 3/18/22 Krames Report at ¶ 335; *see also* ¶ 249.

[60] *See* 3/18/22 Krames Report at ¶¶ 339-343.

47

LED die size would be adjusted for a given intensity requirement, but each LED from a different vendor has a different performance based on the layer structure, the fabrication process, and the packaging techniques used. Exchanging the LED, even of a similar die size, would in no way ensure that the end resulting combination would produce the same light output.  Thus, although I disagree that Begemann discloses a light emitting diode (LED) chip configured to output light at greater than about 40 milliwatts that can be used in a semiconductor light source for emitting light to illuminate a space used by humans, even if it did, a POSA would not have a reasonable expectation that using Sugiura's layer structure of its laser with Begemann would result in the same output power that is disclosed in Begemann and relied upon by Dr. Krames. Likewise, a POSA would not have a reasonable expectation of success that using Sugiura's layer structure with LEDs disclosed in the other references in the First Set of Begemann Combinations and using those LEDs with Begemann would result in the same output power.

159.    Even assuming that components or structures from one reference could be substituted or plugged into a device from another reference – which they cannot – this mere fact does not provide a motivation to make this substitution. Instead, substituting or swapping components from the disclosure contained in the First Set of Begemann Combination just because they allegedly could be substituted or swapped simply creates a combination that is purely based on improper hindsight reconstruction.

160.    Finally, Dr. Krames alleges that "CAO acquiesced to the rationale provided by the Examiner for why a POSA would be motivated to make all these combinations of Begemann WO'7569 with the Reexamination References of Record I, and claim 8 (which depends upon

claims 1 and 7) was voluntarily cancelled."[61] CAO Lighting did not acquiesce to the rationale provided by the Examiner for why a POSA would be motivated to combine Begemann WO'7569 with the Reexamination References of Record I by canceling claim 8. Instead, CAO Lighting stated in its response during the '957 Reexamination that it "does not necessarily agree with the Examiner's statements … Nevertheless, in the interest of expediting prosecution, [CAO Lighting] cancelled claim 8…" As such, the mere fact that CAO Lighting canceled claim 8 does not mean in any way that it acquiesced to the rationale provided by the Examiner.

**B.      Claims 21, 32, 36, 40, and 42 of the '961 Patent Are Not Obvious Over Begemann WO '7569 in Combination with the Reexamination References of Record II**

161.    Dr. Krames opines that each of claims 21, 32, 36, 40, and 42 of the '961 patent are obvious based on the combination of Begemann with Nakamura and any of Abe, Waitl, Bogner, Matsubara, and Shimizu (which he refers to as the "Reexamination References of Record II"). I disagree. As explained in more detail below, these references individually and in combination do not disclose many elements of each of the asserted claims, and a POSA would not be motivated or find it obvious to combine these references. As such, it is my opinion that claims 21, 32, 36, 40, and 42 of the '961 patent are not obvious based on the combination of Begemann with Nakamura and any of Abe, Waitl, Bogner, Matsubara, and Shimizu (which I will refer to as Dr. Krames' "Second Set of Begemann Combinations").

162.    Because none of these references in the Second Set of Begemann Combinations disclose all elements of any of the asserted claims, it is also my opinion that none of these references individually anticipate any of the asserted claims. I also understand that this is

---

[61] *See* 3/18/22 Krames Report at ¶ 250.

understand Mr. Benya's analysis and opinions regarding the elements, but I have not performed my own analysis. From Mr. Benya's analysis, however, I understand that Matsubara does not disclose all the elements of claims 1, 21, 32, 36, 40, and 42 of the '961 patent.

### 7.    All Elements of the Asserted Claims Are Not Disclosed By Shimizu

189.    As explained above, I have been asked to focus on the claim elements that appear in claims 7, 8, and 21 (but not the elements in claim 1) as well as the elements of claims 40 and 42 that require light output "at greater than about 40 milliwatts." As discussed above in at least Section VIII.A.7, it is my opinion that Shimizu does not disclose any of these elements.

190.    I also understand that Mr. Benya has analyzed the other elements of claims 1, 21, 32, 36, 40, and 42 and has responded to Dr. Krames opinions regarding these elements. I understand Mr. Benya's analysis and opinions regarding the elements, but I have not performed my own analysis. From Mr. Benya's analysis, however, I understand that Shimizu does not disclose all the elements of claims 1, 21, 32, 36, 40, and 42 of the '961 patent.

### 8.    There is No Motivation to Combine these References

191.    Although Dr. Krames asserts that "Begemann WO'7569 in view of the Reexamination References of Record II also discloses and renders obvious all elements of claims 21, 32, 36,40, and 42 of the '961 patent," his Second Set of Begemann Combinations are vague.[78] For example, Dr. Krames does not identify the specific combinations of these references that he asserts are obvious and he does not identify how these various references would be combined in a device or way that meets the requirements of claims 21, 32, 36, 40, and 42 of the '961 patent. Therefore, I am limited in the extent to which I can respond to Dr. Krames' asserted combinations,

---

[78] *See* 3/18/22 Krames Report at ¶ 416.

and I reserve the right to supplement my opinions if Dr. Krames provides additional detail, explanation, or specificity regarding his proposed combinations in the future.

192.    Dr. Krames opines that it would be obvious to use the layer structure disclosed in Nakamura with any of the LEDs disclosed in Begemann, Bogner, Waitl, Abe, Matsubara, and Shimizu. For example, Dr. Krames states that "it would have been obvious to a POSA, at the time of the invention, to produce a white LED lamp, as taught by Begemann WO'7569, using an appropriate combination of LEDs and conversion coatings appropriate for the monochromatic LED light, as taught by each of Bogner, Waitl, Abe, Matsubara, and Shimizu, wherein the order of layers in the LED can be as in Nakamura."[79] Similarly, Dr. Krames states that "it would have been obvious to a POSA, at the time of the invention to use Nakamura's layer order of the GaN-based LED in the GaN-based LEDs of either of Bogner and Waitl that is used in Begemann WO'7569, or to use Nakamura's GaN based LED as the GaN-based LED of either of Bogner and Waitl that is used in Begemann WO'7569."[80] I disagree. It would not be obvious that the layer structure of Nakamura's laser could be used with LEDs disclosed in other references.

193.    While Dr. Krames continues to allege there is a motivation to combine "Nakamura's layer order of the GaN-based LED" with other references, Dr. Krames fails to identify where Nakamura discloses a GaN-based LED that includes the layer structure that is required by claims

---

[79] 3/18/22 Krames Report at ¶ 420; *see also* ¶¶ 496, 504, 508.

[80] 3/18/22 Krames Report at ¶ 502.

7 and 8.[81]  Instead, Dr. Krames only refers to the laser that is discussed in connection with Figure 12.[82] As such, Dr. Krames alleged motivation cannot be relied upon because it focuses on a device that Dr. Krames has failed to explain how it includes the limitations of claims 7 and 8.

194.    One skilled in the art would not look to either of Nakamura's layer structures of its laser as it would be counterproductive. It is my opinion that there is no motivation to combine the Second Set of Begemann Combinations simply because they allegedly "relate to semiconductor based light sources for general illumination."[83] First, one of skill in the art would understand that Nakamura's laser would not be considered a semiconductor based light source for "general illumination." As such, even if there was a theoretical motivation to combine references because they allegedly "relate to semiconductor based light sources for general illumination" – which does not exist – this rationale would not support combining Nakamura's laser with other references from the Second Set of Begemann Combination.

195.    Additionally, a POSA would not be motivated to combine or substitute LED based chips of Begemann or other references with non-analogous laser based chips (*e.g.,* that are disclosed in Abe or Nakamura) to create a semiconductor light source for emitting light to illuminate a space used by humans for a number of reasons, which include differing: (i) radiation

---

[81] *Compare* 3/18/22 Krames Report at ¶ 495 *with* 3/18/22 Krames Report at ¶¶ 487, 490-491, and 500.

[82] Nakamura at 21:56-62.

[83] 3/18/22 Krames Report at ¶ 417.

pattern, (ii) the spectrum emissions, and (iii) light conversion efficiencies, and (iv) other differences that are known to a person of skill in the art.

196.    There is no "simple substitution of one known element for another to obtain predictable results" of LEDs that are disclosed in other references with Nakamura's laser as Dr. Krames suggests.[84] It was also known by POSA in 2001 that the LED layer structure was optimized for a particular MOCVD process resulting in different active region constructs, different buffer layers optimized for a given substrate material, and different cladding layer materials. It was also known that the LED chip is a product of a lengthy fabrication process making each manufacturer's chip unique. As such, the layer structure of Nakamura's laser cannot be simply plugged into the LEDs of references contained in the Second Set of Begemann Combination. Additionally, even if there was a simple substitution of a LED with Nakamura's laser – which does not exist – there is also no motivation to use Nakamura's laser structure in LEDs used for lighting because top reflector layer 200 could interfere with light extraction from the device. Accordingly, a POSA would not be motivated to use the layer structure of Nakamura's laser of Figure 12 in a light source for emitting light to illuminate a space used by humans.

197.    The only reference in the Second Set of Begemann Combinations that Dr. Krames asserts discloses the requirement for the "light emitting diode (LED) chip configured to output light at greater than about 40 milliwatts" in claim 21 of the '961 patent is Begemann.[85] But Dr. Krames also asserts that it would be obvious to replace Begemann's LEDs with those disclosed in other references or it would be obvious to use the semiconductor structure disclosed in Nakamura

---

[84] *See, e.g.*, 3/18/22 Krames Report at ¶ 495; *see also* ¶¶ 503, 507

[85] *See* 3/18/22 Krames Report at ¶¶ 511-515.

with Begemann's LEDs. I disagree. It was also known by POSA in 2001 that the package of each LED was also optimized by each manufacturer for a given chip with its unique radiation pattern. The LED die size would be adjusted for a given intensity requirement, but each LED from a different vendor has a different performance based on the layer structure, the fabrication process, and the packaging techniques used. Exchanging the LED, even of a similar die size, would in no way ensure that the end resulting combination would produce the same light output. Thus, although I disagree that Begemann discloses a light emitting diode (LED) chip configured to output light at greater than about 40 milliwatts that can be used in a semiconductor light source for emitting light to illuminate a space used by humans, even if it did, a POSA would not have a reasonable expectation that using Nakamura's layer structure of its laser with Begemann would result in the same output power that is disclosed in Begemann and relied upon by Dr. Krames. Likewise, a POSA would not have a reasonable expectation of success that using Nakamura's layer structure with LEDs disclosed in the other references in the Second Set of Begemann Combinations and using those LEDs with Begemann would result in the same output power.

198. Even assuming that components or structures from one reference could be substituted or plugged into a device from another reference – which they cannot – this mere fact does not provide a motivation to make this substitution. Instead, substituting or swapping components from the disclosure contained in the Second Set of Begemann Combination just because they allegedly could be substituted or swapped simply creates a combination that is purely based on improper hindsight reconstruction.

199. Finally, Dr. Krames alleges that "CAO acquiesced to the rationale provided by the Examiner for why a POSA would be motivated to make all these combinations of Begemann WO'7569 with the Reexamination References of Record II, and claim 8 (which depends upon

claims 1 and 7) was voluntarily cancelled."[86] CAO Lighting did not acquiesce to the rationale provided by the Examiner for why a POSA would be motivated to combine Begemann WO'7569 with the Reexamination References of Record II by cancelling claim 8. Instead, CAO Lighting stated in its response during the '957 Reexamination that it "does not necessarily agree with the Examiner's statements … Nevertheless, in the interest of expediting prosecution, [CAO Lighting] cancelled claim 8…" As such, the mere fact that CAO Lighting cancelled claim 8 does not mean in any way that it acquiesced to the rationale provided by the Examiner.

C.    **Claims 21, 32, 36, 40, and 42 of the '961 Patent Are Not Obvious Over Begemann WO '7569 in Combination with the Reexamination References of Record III**

200.    Dr. Krames opines that each of claims 21, 32, 36, 40, and 42 of the '961 patent are obvious based on the combination of Begemann with Floyd and any of Abe, Waitl, Bogner, Matsubara, and Shimizu (which he refers to as the "Reexamination References of Record III"). I disagree. As explained in more detail below, these references individually and in combination do not disclose many elements of each of the asserted claims, and a POSA would not be motivated or find it obvious to combine these references. As such, it is my opinion that claims 21, 32, 36, 40, and 42 of the '961 patent are not obvious based on the combination of Begemann with Floyd and any of Abe, Waitl, Bogner, Matsubara, and Shimizu (which I will refer to as Dr. Krames' "Third Set of Begemann Combinations").

201.    Because none of these references in the Third Set of Begemann Combinations disclose all elements of any of the asserted claims, it is also my opinion that none of these references individually anticipate any of the asserted claims. I also understand that this is

---

[86] *See* 3/18/22 Krames Report at ¶ 421.

225.    I also understand that Mr. Benya has analyzed the other elements of claims 1, 21, 32, 36, 40, and 42 and has responded to Dr. Krames opinions regarding these elements. I understand Mr. Benya's analysis and opinions regarding the elements, but I have not performed my own analysis. From Mr. Benya's analysis, however, I understand that Shimizu does not disclose all the elements of claims 1, 21, 32, 36, 40, and 42 of the '961 patent.

### 8.    There is No Motivation to Combine these References

226.    Although Dr. Krames asserts that "Begemann WO'7569 in view of the Reexamination References of Record III also discloses and renders obvious all elements of claims 21, 32, 36,40, and 42 of the '961 patent," his Third Set of Begemann Combinations are vague.[92] For example, Dr. Krames does not identify the specific combinations of these references that he asserts are obvious and he does not identify how these various references would be combined in a device or way that meets the requirements of claims 21, 32, 36, 40, and 42 of the '961 patent. Therefore, I am limited in the extent to which I can respond to Dr. Krames' asserted combinations, and I reserve the right to supplement my opinions if Dr. Krames provides additional detail, explanation, or specificity regarding his proposed combinations in the future.

227.    In paragraphs 591-596, Dr. Krames discusses the reasons why it would be obvious to combine Sugiura (NOT Floyd) with any of the LEDs disclosed in Begemann, Bogner, Waitl, Abe, Matsubara, and Shimizu.[93]  As such, Dr. Krames completely fails to provide any reasoning in this section as to why it would be obvious to combine Floyd with any of the LEDs disclosed in Begemann, Bogner, Waitl, Abe, Matsubara, and Shimizu.  As Dr. Krames has failed to provide

---

[92] *See* 3/18/22 Krames Report at ¶ 590.

[93] *See* 3/18/22 Krames Report at ¶¶ 591-596.

any motivation to combine these references, this combination of references fails on its face to render obvious any of the Asserted claims of the '961 patent.

228.    Later in his Report, Dr. Krames states that "it would have been obvious to a POSA, at the time of the invention to use Floyd's layer order of the GaN-based LED in the GaN-based LEDs of either of Bogner and Waitl that is used in Begemann WO'7569, or to use Floyd's GaN based LED as the GaN-based LED of either of Bogner and Waitl that is used in Begemann WO'7569."[94] I disagree. Dr. Krames fails to identify where Floyd discloses a GaN-based LED that includes the layer structure that is required by claims 7 and 8.[95]  Instead, Dr. Krames only refers to the vertical cavity surface emitting laser that is discussed in connection with Figures 1-2.[96] As such, Dr. Krames alleged motivation cannot be relied upon because it focuses on a device that Dr. Krames has failed to explain how it includes the limitations of claims 7 and 8.

229.    One skilled in the art would not look to either of Floyd's layer structures of its vertical cavity surface emitting laser as it would be counterproductive. It is my opinion that there is no motivation to combine the Third Set of Begemann Combinations simply because they allegedly relate to semiconductor based light sources for general illumination. First, one of skill in the art would understand that Floyd's laser would not be considered a semiconductor based light sources for general illumination. As such, even if there was a theoretical motivation to combine references because they allegedly relate to semiconductor based light sources for general

---

[94] 3/18/22 Krames Report at ¶ 674.

[95] *See* 3/18/22 Krames Report at ¶¶ 656-673.

[96] Nakamura at 21:56-62.

illumination – which does not exist – this rationale would not support combining Floyd's laser with other references from the Third Set of Begemann Combination.

230.    Additionally, a POSA would not be motivated to combine or substitute LED based chips of Begemann or other references with non-analogous laser based chips (*e.g.,* that are disclosed in Abe or Floyd) to create a semiconductor light source for emitting light to illuminate a space used by humans for a number of reasons, which include differing: (i) radiation pattern, (ii) the spectrum emissions, and (iii) light conversion efficiencies, and (iv) other differences that are known to a person of skill in the art.

231.    There is no "simple substitution of one known element for another to obtain predictable results" of LEDs that are disclosed in other references with Floyd's laser as Dr. Krames suggests.[97] It was also known by POSA in 2001 that the LED layer structure was optimized for a particular MOCVD process resulting in different active region constructs, different buffer layers optimized for a given substrate material, and different cladding layer materials. It was also known that the LED chip is a product of a lengthy fabrication process making each manufacturer's chip unique. As such, the layer structure of Floyd's laser cannot be simply plugged into the LEDs of references contained in the Third Set of Begemann Combination. Additionally, even if there was a simple substitution of a LED with Floyd's laser – which does not exist – there is also no motivation to use Floyd's laser structure in LEDs used for lighting because both of his layer structures require epitaxial regrowth, which compromises device performance and greatly reduces manufacturability. Accordingly, a POSA would not be motivated to use the layer structure of Floyd's laser in a light source for emitting light to illuminate a space used by humans.

---

[97] *See, e.g.*, 3/18/22 Krames Report at ¶ 675.

232.     The only reference in the Third Set of Begemann Combinations that Dr. Krames asserts discloses the requirement for the "light emitting diode (LED) chip configured to output light at greater than about 40 milliwatts" in claim 21 of the '961 patent is Begemann.[98] Dr. Krames also asserts that it would be obvious to replace Begemann's LEDs with those disclosed in other references or it would be obvious to use the semiconductor structure disclosed in Floyd with Begemann's LEDs. I disagree. It was also known by POSA in 2001 that the package of each LED was also optimized by each manufacturer for a given chip with its unique radiation pattern. The LED die size would be adjusted for a given intensity requirement, but each LED from a different vendor has a different performance based on the layer structure, the fabrication process, and the packaging techniques used. Exchanging the LED, even of a similar die size, would in no way ensure that the end resulting combination would produce the same light output.  Thus, although I disagree that Begemann discloses a light emitting diode (LED) chip configured to output light at greater than about 40 milliwatts that can be used in a semiconductor light source for emitting light to illuminate a space used by humans, even if it did, a POSA would not have a reasonable expectation that using Floyd's layer structure of its laser with Begemann would result in the same output power that is disclosed in Begemann and relied upon by Dr. Krames. Likewise, a POSA would not have a reasonable expectation of success that using Floyd's layer structure with LEDs disclosed in the other references in the Third Set of Begemann Combinations and using those LEDs with Begemann would result in the same output power.

233.     Even assuming that components or structures from one reference could be substituted or plugged into a device from another reference – which they cannot – this mere fact

---

[98] *See* 3/18/22 Krames Report at ¶¶ 678-686.

does not provide a motivation to make this substitution. Instead, substituting or swapping components from the disclosure contained in the Third Set of Begemann Combination just because they allegedly could be substituted or swapped simply creates a combination that is purely based on improper hindsight reconstruction.

234.   Finally, Dr. Krames alleges that "CAO acquiesced to the rationale provided by the Examiner for why a POSA would be motivated to make all these combinations of Begemann WO'7569 with the Reexamination References of Record III, and claim 8 (which depends upon claims 1 and 7) was voluntarily cancelled."[99] CAO Lighting did not acquiesce to the rationale provided by the Examiner for why a POSA would be motivated to combine Begemann WO'7569 with the Reexamination References of Record III by cancelling claim 8. Instead, CAO Lighting stated in its response during the '957 Reexamination that it "does not necessarily agree with the Examiner's statements … Nevertheless, in the interest of expediting prosecution, [CAO Lighting] cancelled claim 8…" As such, the mere fact that CAO Lighting cancelled claim 8 does not mean in any way that it acquiesced to the rationale provided by the Examiner.

**D.     Claims 21, 32, 36, 40 and 42 of the '961 Patent Are Not Obvious Over Begemann WO '7569 in Combination with the Reexamination References of Record I, the Reexamination References of Record II, or the Reexamination References of Record III, further in view of Krames 2000**

235.   Dr. Krames opines that each of claims 21, 32, 36, 40, and 42 of the '961 patent are obvious based on the combination of Begemann with any of the First Set of Begemann Combinations (*i.e.,* Sugiura and any of Abe, Waitl, Bogner, Matsubara, and Shimizu), Second Set

---

[99] *See* 3/18/22 Krames Report at ¶ 596.

I declare under penalties of perjury that the foregoing opinions and statements within this report are true and correct to the best of my knowledge.

Dated: April 22, 2022

_____
James Richard Shealy, Ph.D.