## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CAO LIGHTING, INC., | |
|               Plaintiff, | |
| v. | C.A. No. 20-681-GBW |
| GENERAL ELECTRIC COMPANY, CONSUMER LIGHTING (U.S.), LLC d/b/a GE LIGHTING, and CURRENT LIGHTING SOLUTIONS, LLC, | **UNSEALED ON** 2/8/23 |
|               Defendants. | |
| CAO LIGHTING, INC., | |
|               Plaintiff, | C.A. No. 20-690-GBW |
| v. | |
| OSRAM SYLVANIA, INC., and LEDVANCE LLC, | |
|               Defendants. | |

## <u>MEMORANDUM ORDER</u>

Plaintiff CAO Lighting, Inc. ("Plaintiff" or "CAO") initiated patent infringement lawsuits against Defendants General Electric Company, Consumer Lighting (U.S.), LLC d/b/a/ GE Lighting, Current Lighting Solutions, LLC, Osram Sylvania, Inc., and LEDVANCE, LLC

(collectively, the "Defendants").[1]  Plaintiff alleges that Defendants infringe U.S. Patent No. 6,465,961 ("the '961 patent").  The '961 patent discloses the use of semiconductor light sources incorporating a semiconductor chip to provide visible light for general illumination of indoor and outdoor spaces used by humans.  D.I. 246-1, Ex. 1 at 1:6-12.[2]

Pending before the Court is Plaintiff's motion to exclude portions of the testimony of Dr. Robert Karlicek, Dr. J. Gary Eden, Dr. Michael Krames, and Mr. Richard Lettiere.  D.I. 243.  Also pending is Defendants' motion to exclude portions of the testimony of Dr. James Shealy, Dr. James Benya, and Ms. Lauren Kindler.  D.I. 248.  For the following reasons, the motions are granted-in-part and denied-in-part.

## I.    LEGAL STANDARD

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993), the Supreme Court held that Federal Rule of Evidence 702 creates "a gatekeeping role for the [trial] judge" in order to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  As the Third Circuit has explained,

> Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit.  Qualification refers to the requirement that the witness possess specialized expertise.  We have . . . [held] that a broad range of knowledge, skills, and training qualify an expert.  Secondly, the testimony must be reliable; it must be based on the methods and procedures of science rather

---

[1] The Court writes for the benefit of the parties and assumes their familiarity with these actions.

[2] Docket numbers identified herein refer to C.A. No. 20-681 unless otherwise noted.

> than on subjective belief or unsupported speculation; the expert must have good grounds for his o[r] her belief. In sum, *Daubert* holds that an inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity. Finally, Rule 702 requires that the expert testimony . . . must be relevant for the purposes of the case and must assist the trier of fact.

*Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404-05 (3d Cir. 2003) (cleaned up);

*Kuhar v. Petzl Co.*, No. 19-3900, 2022 WL 1101580, at *7 (3d Cir. Apr. 13, 2022) (noting the

same trilogy).

Rule 702 "'has a liberal policy of admissibility[,]'" *Pineda v. Ford Motor Co.*, 520 F.3d

237, 243 (3d Cir. 2008) (citation omitted); *see also United States v. Scripps*, 599 F. App'x 443,

447 (3d Cir. 2015) (same), as "the question of whether the expert is credible or the opinion is

correct is generally a question for the fact finder, not the court[,]" *Summit 6, LLC v. Samsung*

*Elecs. Co., Ltd.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015). "Vigorous cross-examination, presentation

of contrary evidence, and careful instruction on the burden of proof are the traditional and

appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *see*

*Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 83 (3d Cir. 2017) (quoting *Daubert*, 509 U.S.

at 596).

## II.    DISCUSSION

### a.    Dr. Robert Karlicek's Opinion

CAO argues that Dr. Karlicek's opinions should be excluded, because he "proposes new

constructions, applies constructions that the Court ruled against, and makes prosecution history

estoppel arguments in favor of noninfringement." D.I. 244 at 23. The Court will take up these

issues in turn, while setting out the relevant law, where appropriate.

### i. "heat sink"

CAO argues that Dr. Karlicek's non-infringement opinions regarding the meaning of "heat sink" should be excluded because they "are inconsistent with the Court's claim construction or constitute new claim construction arguments [that] should be excluded." D.I. 244 at 23. For the reasons stated below, the Court grants CAO's *Daubert* motion to exclude Dr. Karlicek's opinions regarding "heat sink."

Dr. Karlicek opines that a person of ordinary skill in the art would understand a "heat sink" to mean "a material in contact with other materials from which heat would be expelled from the device, and where the heat would not be expected to return (e.g., air and water being common coolants for LED heat sinks)." D.I. 246-1, Ex. 29 (Dr. Karlicek Rebuttal Report) ¶¶ 114, 117; *see also id.* ¶¶ 144, 154, 163, 172, 181, 187, 194, 204, 214, 224, 234, 244, 254, & 262. Dr. Karlicek relies on his definition of "heat sink" to conclude that the printed circuit board (the "PCB") is not a heat sink. *See, e.g., id.* ¶ 118 ("Because neither the lead frame (or substitute components), nor the PCB, identified by Mr. Benya is anything more than a part of a path for heat to be conducted to a heat sink where thermal energy is expelled away from the Accused Products, the Accused Products do not include the claimed 'heat sink' cited by Mr. Benya and it is my opinion that the Accused Products do not have a 'heat sink having a plurality of panels,' as required by claim 21 and its dependents."); *see also id.* ¶ 115.

During claim construction, the Court construed "a heat sink located in said interior volume" to have "its plain and ordinary meaning, which is 'a heat sink is a substance or device that absorbs or draws heat from another object and is in the interior volume of the enclosure, but does not need to be entirely within the interior volume.'" D.I. 230 at 2; *id.* at 8-9. "Once a district court has construed the relevant claim terms, and unless altered by the district court, then that legal

4

determination governs for purposes of trial." *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1321 (Fed. Cir. 2009); *see also Minerva Surgical, Inc. v. Hologic, Inc.*, No. 18-217-JFB-SRF, 2021 WL 3048447, at *6 (D. Del. July 20, 2021) (citations omitted) ("No party may contradict the court's construction to a jury."). "The opinions of a patent infringement expert who applies an erroneous claim construction are inadmissible." *Minerva*, 2021 WL 3048447, at *6 (citations omitted); *see also Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1224 n.2 (Fed. Cir. 2006) (affirming exclusion of expert testimony as "irrelevant because it was based on an impermissible claim construction" and "could prejudice and confuse the jury"); *Sprint Commc'ns Co. L.P. v. Cox Commc'ns Inc.*, 302 F. Supp. 3d 597, 619-21, 624 (D. Del. 2017) (excluding expert testimony "contrary to the court's claim constructions" and "likely to mislead and confuse a jury"). "[E]xpert testimony that is inconsistent with the Court's claim construction is unreliable and unhelpful to the finder of fact." *Kraft Foods Grp. Brands LLC v. TC Heartland, LLC*, 232 F. Supp. 3d 632, 635 (D. Del. 2017).

Defendants argue that "[t]he Court did not consider or adopt any claim construction of the term 'heat sink'" and "[n]either party asked for a construction of 'heat sink.'" D.I. 286 at 26. Thus, according to Defendants, Dr. Karlicek's opinions regarding "heat sink" merely explain how a person of ordinary skill in the art would understand the claim term. *Id.* The Court disagrees with Defendants that the Court did not consider or adopt any claim construction of the term "heat sink." In the Court's construction of the claim term "a heat sink located in said interior volume," the Court held "a heat sink *is* a substance or device that absorbs or draws heat from another object." D.I. 230 at 2 (emphasis added).

The Court also finds that Dr. Karlicek's non-infringement opinions regarding "heat sink" are based on a construction of the claim term that is contrary to the Court's claim construction

ruling. There is no requirement under the Court's claim construction that the heat sink must dissipate heat into the environment outside of the light, as Dr. Karlicek opines. *See* D.I. 246-1, Ex. 29 (Dr. Karlicek Rebuttal Report) ¶¶ 114, 117; *see also id.* at Ex. 25 (Dr. Karlicek Dep.) at 63:2-67:10. In fact, during the *Markman* hearing, Defendants argued that "the way that the Plaintiff has defined a heat sink is any substance or device that absorbs or draws heat . . . When the Plaintiffs are allowed to use the term heat sink that broadly, it has to be inside the enclosure, *it can't be a path or beginning of a path for heat transfer*." *Id.* at Ex. 28 (Mar. 24, 2022 Hr'g. Tr.) at 18:13-22 (emphasis added). The Court rejected Defendants' argument. *See generally* D.I. 230. Yet, Dr. Karlicek opines that:

> Because neither the lead frame (or substitute components), nor the PCB, identified by Mr. Benya is anything more than a part of a path for heat to be conducted to a heat sink where thermal energy is expelled away from the Accused Products, the Accused Products do not include the claimed 'heat sink' cited by Mr. Benya and it is my opinion that the Accused Products do not have a 'heat sink having a plurality of panels,' as required by claim 21 and its dependents.

D.I. 246-1, Ex. 29 (Dr. Karlicek Rebuttal Report) ¶ 118 (emphasis added).

For the reasons stated above, the Court grants CAO's *Daubert* motion to exclude Dr. Karlicek's non-infringement opinions regarding "heat sink."

### ii. "Plurality of Panels Suitable for Mounting Semiconductor Devices Thereon"

CAO argues that Dr. Karlicek fails to apply the Court's claim construction of a "plurality of panels suitable for mounting semiconductor devices thereon." D.I. 244 at 25. For the reasons stated below, the Court grants CAO's *Daubert* motion to exclude Dr. Karlicek's opinions regarding a "plurality of panels suitable for mounting semiconductor devices thereon."

The Court agrees with CAO that, with respect to the claim term a "plurality of panels suitable for mounting semiconductor devices thereon," "Dr. Karlicek does not apply the Court's

claim construction but instead applies Defendants' rejected positions." D.I. 244 at 25; *see also* D.I. 295 at 15. During claim construction, Defendants argued that the panel be suitable for having a semiconductor device be mounted *directly* to its surface. D.I. 230 at 14-15; *see also* D.I. 210 at 3-4. CAO disagreed, "noting that many embodiments as well as dependent claim 42 described a chip mounted within a LED package, which in turn is mounted on a 'panel.'" D.I. 295 at 15; *see also* D.I. 210 at 1-2. The Court rejected Defendants' proposed construction, adopted CAO's construction, and held a "plurality of panels suitable for mounting semiconductor devices thereon" "has its plain and ordinary meaning, which is 'two or more panels on the heat sink, with each panel being suitable for mounting semiconductor devices thereon.'" D.I. 230 at 2. In its ruling, the Court cited to dependent claim 42 and agreed with CAO's arguments: "the notion that the panel be suitable for having a semiconductor device be mounted directly to its surface is contradicted by claim 42 . . . .'" *Id.* at 15 (footnote omitted).

Notwithstanding the Court's claim construction, Dr. Karlicek opines the following:

> But the solder pads, and all other portions of the PCB, are not suitable for mounting an unpackaged semiconductor device thereon. Semiconductor devices, like LED chips, must be encapsulated in a package so that they could be used in an operating environment such as a light bulb. The package shields the LED chips from the environment, offers chips protection from contaminants, provides thermal and electrical interfaces, and allows for an encapsulation of the LED chip with a phosphor to enable conversion of the emitted light to white light. Without a package, an LED chip would not be useable or useful. Thus, the solder pads of the PCB are not "suitable for mounting semiconductor devices thereon," as required by claim 1 and its dependents.

D.I. 246-1, Ex. 29 (Dr. Karlicek Rebuttal Report) ¶ 124. In other words, Dr. Karlicek opines that because semiconductor devices, like LED chips, are encapsulated in packages, they cannot be directly mounted to the PCB panels and, thus, Dr. Karlicek concludes the Accused Products do not infringe. Dr. Karlicek's opinion is the same argument that Defendants argued during claim

construction and this Court rejected.  The Court previously held during claim construction that there is no requirement that the semiconductor device be mounted directly to the panel.  Defendants respond that Dr. Karlicek's opinions "do not rest on new or amended claim construction but are grounded in the language of the claims as construed by the Court. Such opinions will allow the jury to decide, as a matter of fact, whether the semiconductor devices of the Accused Products are 'suitable for mounting' onto a 'plurality of panels.'"  D.I. 286 at 27.  The Court disagrees.  As noted by CAO, "[t]his is the very argument Defendants lost on claim construction and Dr. Karlicek should not be allowed to revive it before the jury."  D.I. 295 at 15.

For the reasons stated above, the Court grants CAO's *Daubert* motion to exclude Dr. Karlicek's opinions regarding the claim term "plurality of panels suitable for mounting semiconductor devices thereon."

### iii.  "Enclosure," "Interior Volume," and "In" Limitations

CAO's *Daubert* motion seeks to exclude Dr. Karlicek's opinions regarding the following terms because they contradict the Court's claim constructions: "said enclosure being fabricated from a material substantially transparent to white light," "an interior volume within said enclosure," and a "heat sink located in said interior volume."  D.I. 244 at 26-30.  For the reasons stated below, the Court denies CAO's *Daubert* motion to exclude Dr. Karlicek's opinions regarding claim terms related to the "enclosure," "interior volume," and "in."

The Court construed the following terms during claim construction:

- "'said enclosure being fabricated from a material substantially transparent to white light' has its plain and ordinary meaning, which is 'the enclosure is fabricated from a material that is substantially transparent to white light.'"  D.I. 230 at 2.

- "'an interior volume within said enclosure' means 'the interior volume is contained inside the enclosure[.]'"  *Id.*

- "'a heat sink located in said interior volume' has its plain and ordinary meaning, which is 'a heat sink is a substance or device that absorbs or draws heat from another object and is in the interior volume of the enclosure, but does not need to be entirely within the interior volume[.]'" *Id.*

The crux of CAO's *Daubert* motion is that Dr. Karlicek's "noninfringement position rests on the importation of additional limitations into these terms—namely, a requirement for percentages and compositions to prove infringement." D.I. 295 at 16. The Court disagrees. The Court construed the "enclosure" term to mean "the enclosure is fabricated from a material that is *substantially* transparent to white light." D.I. 230 at 2 (emphasis added). The Court agrees with Defendants' argument that "'[s]ubstantially' is a term of degree, and Dr. Karlicek is opining that CAO and [its technical expert] have not offered evidence that what they argue is an enclosure is, in fact, an enclosure under the Court's construction, let alone that it is substantially transparent to light (or why)." D.I. 286 at 31. CAO's arguments go to the credibility and weight of the testimony. *See Masimo Corp. v. Philips Elec. N. Am. Corp.*, 62 F. Supp. 3d 368, 387-88 (D. Del. 2014) ("Where there is a logical basis for an expert's opinion testimony, the credibility and weight of that testimony is to be determined by the jury, not the trial judge") (citation omitted); *see also Daubert*, 509 U.S. at 595 ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.").

For the reasons stated above, the Court denies CAO's *Daubert* motion to exclude Dr. Karlicek's opinions regarding the "enclosure," "interior volume," and "in" claim terms.[3]

---

[3] The Court's ruling regarding this *Daubert* motion does not impact the Court's holding to exclude Dr. Karlicek's opinions regarding the "heat sink." *See supra* Section II.A.i.

### iv. "First and Second Reflective Layers"

CAO's *Daubert* motion seeks to exclude portions of Dr. Karlicek's opinions that are contrary to the Court's construction of "first and second reflective layers" in claims 21 of the '961 patent. D.I. 244 at 30. For the reasons below, CAO's *Daubert* motion is granted-in-part and denied-in-part.

First, CAO argues:

> Defendants argued that the reflective layers were "distinct layers;" the Court disagreed and ordered that they were merely distinct from each other. [D.I. 217 at 45-55; D.I. 230 at 13.][4] Now Dr. Karlicek argues that the reflective layers must be distinct from other features in the accused devices—that is, a layer may not perform two functions. [Ex. 29 (Karlicek Rebuttal Rpt.) at ¶¶ 279, 287.]

D.I. 244 at 31. Dr. Karlicek supports his opinion by relying on the file history of the '961 patent. Dr. Karlicek notes that the examiner during reexamination of the '961 patent disagreed with the statement that the sapphire layer in the "Suguira patent" (a prior art reference) was a reflective layer. D.I. 246-1, Ex. 29 (Dr. Karlicek Rebuttal Report) ¶¶ 281, 306-19. Dr. Karlicek relies on the examiner's statement to conclude the patterned sapphire substrate of the LED chips in the Accused Products cannot be a reflective layer. *Id.*; *see, e.g., id.* ¶ 312 ("That analysis by the examiner establishes that there can be no infringement of claim 8 or the asserted claims by the Accused Devices, because the sapphire substrate in the Accused Devices is necessary separate requirement of claim 7, and notwithstanding Dr. Shealy's assumption to the contrary, cannot also function as either the separately-claimed first and second reflective layers of claim 8.").

---

[4] The Court construed the "first and second reflective layers" to mean "the first and second reflective layers are distinct from each other and reflect light emitted by the active layer." D.I. 230 at 2.

The Court finds that Dr. Karlicek's opinion that the reflective layer must serve a singular purpose is improper. "[U]se of the prosecution history raises issues solely for the court, not the jury. Thus testimony grounded in the prosecution history to discern the meaning of a claim is properly excluded from presentation to the jury, especially where, as here, a fair reading of the expert report reveals an intention to argue claim construction." *MediaTek Inc. v. Freescale Semiconductor, Inc.*, No. 11-CV-5341-YGR, 2014 WL 971765, at *5 (N.D. Cal. Mar. 5, 2014).. "It is improper to argue claim construction to the jury because the 'risk of confusing the jury is high when experts opine on claim construction.'" *Cordis Corp. v. Boston Scientific Corp.*, 561 F.3d 1319, 1337 (Fed. Cir. 2009) (citation omitted). Dr. Karlicek improperly relies on the '961 patent's file history to import a limitation that the reflective layers must serve a singular purpose. Thus, Dr. Karlicek's opinions that the reflective layers must be distinct from other features in the accused devices is excluded.

Second, CAO argues that:

> Defendants argued that "serving to" required that reflective layers be formed from a material specifically intended to reflect light; the Court disagreed. [D.I. 217 at 45-55; D.I. 230 at 13.] Now Dr. Karlicek argues that even if material reflects light, it cannot be a "reflective layer" within the meaning of claim 21 if it was added for its structural, electrical, or optical properties and not "intended to be reflective." [Ex. 29 (Karlicek Rebuttal Rpt.) at ¶¶ 298, 279, 287.]

D.I. 244 at 30-31. Defendants failed to rebut CAO's argument. *See* D.I. 286 at 31-33; *see also* D.I. 295 at 18 n.12. Thus, CAO's *Daubert* motion regarding this flaw in Dr. Karlicek's opinion is unopposed and paragraphs 298, 279, and 287 of Dr. Karlicek's Rebuttal Report is excluded.

Third, CAO argues that:

> Defendants argued that to be "reflective layers," the layers had to reflect more light than is absorbed or transmitted through the layer; the Court disagreed and stated that the reflective layers must reflect more than a negligible amount of light. [D.I. 217 at 45-55; D.I. 230 at 13.] Now Dr. Karlicek argues that laser chip embodiments in the specification and the prosecution history show

reflective layers that reflect light at up to a 90% rate, and that rate is the yard stick used to measure nonnegligible. [Ex. 29 (Karlicek Rebuttal Rpt.) at ¶¶ 289-295.]

D.I. 244 at 31.  The Court agrees with Defendants that Dr. Karlicek "properly offers opinions as to the quantum of light that a person skilled in the art would consider to be 'non-negligible' in the context of the '961 patent." D.I. 286 at 33.  Thus, Dr. Karlicek's opinions regarding the reflectivity rate will not be excluded.

For the reasons stated above, CAO's *Daubert* motion regarding Dr. Karlicek's opinions related to the reflective layers are granted-in-part and denied-in-part.

### b.  Dr. J. Gary Eden's Opinion

#### i.  "Panels"

CAO's *Daubert* motion seeks to exclude portions of Dr. Eden's noninfringement opinions on "a newly-manufactured" construction of the term "panels." D.I. 244 at 32.  For the reasons stated below, the Court grants CAO's *Daubert* with respect to Dr. Eden's opinions that a "pad" cannot be a "panel" on a heat sink.

Dr. Eden opines that the connection points on the PCB cannot constitute a "panel" on a heat sink because such a conclusion would be "inconsistent with the language of the '961 Patent itself." D.I. 247-1, Ex. 34 (Dr. Eden Non-Infringement Report) ¶ 216; *see also id.* ¶¶ 210-15.  Dr. Eden cites to the '961 patent's specification and the prosecution history to support his conclusion that the patent draws a distinction between what the patent refers to as a pad and a panel.  *Id.* ¶ 216-21; *see also id.* at Ex. 35 at 158:9-161:3.  Defendants argue that Dr. Eden is not engaging in claim construction.  D.I. 286 at 33.  Instead, Defendants argue that Dr. Eden's reliance on the specification and the prosecution history "confirm the plain-and-ordinary meaning of the claim terms." D.I. 286 at 34.  The Court disagrees.  "At trial, parties may introduce evidence as to the

plain and ordinary meaning of terms not construed by the Court to one skilled in the art, so long as the evidence does not amount to arguing claim construction." *Ferring Pharms. Inc. v. PAR Pharm., Inc.*, No. 15- 00173-RGA, 2016 WL 6471246, at *1 (D. Del. Oct. 28, 2016) (internal quotation and citation omitted). "Expert testimony about the plain and ordinary meaning of claim terms supported by reference to specification and prosecution history would constitute impermissible claim construction." *Id.* (citation omitted); *see also Cordis Corp*, 561 F.3d at 1337 (affirming district court's exclusion of arguments on claim construction based on expert's reliance on the prosecution history of the asserted patent). The Court has reviewed Dr. Eden's expert report and concludes that his reliance on the specification and the prosecution history of the '961 patent to support his noninfringement opinions amounts to arguing claim construction. "[I]t is improper to argue claim construction to the jury because the 'risk of confusing the jury is high when experts opine on claim construction.'" *Id.* (quoting *CytoLogix Corp. v. Ventana Med. Sys., Inc.*, 424 F.3d 1168, 1172-73 (Fed. Cir. 2005).

For the reasons stated above, the Court grants CAO's *Daubert* motion and Dr. Eden's argument that a "pad" cannot be a "panel" on a heat sink should be excluded.

### ii. "Reflective Layers"

CAO argues that Dr. Eden's opinions import three new limitations into the "reflective layer" term in claim 21 of the '961 patent. D.I. 244 at 34-37. First, CAO argues that Dr. Eden improperly opines that for a reflective layer to be "a reflective layer" it must "be a layer separate from all the other layers in the LED chip and serve the sole purpose of being reflective." D.I. 244 at 35. Like Dr. Karlicek's opinion, Dr. Eden relies on statements made in the file history to support his analysis. Defendants argue that Dr. Eden's reliance on the file history is to "confirm" his opinion "about the 'plain English or meaning of the words.'" D.I. 286 at 36 (citation omitted).

The Court disagrees with Defendants' argument.  Like Dr. Eden's opinions regarding "panels," Dr. Eden impermissibly seeks to instruct the jury on claim meaning, which is improper. *See Cordis Corp*, 561 F.3d at 1337.  Thus, Dr. Eden's opinion that a reflective layer must be a layer separate from all the other layers in the LED chip and serve the sole purpose of being reflective is excluded.

Second, CAO argues the Dr. Eden improperly opines that for a reflective layer to be "a reflective layer" it must have been "intentionally included in the LED chip to function as a reflective layer." D.I. 244 at 34.  The Court agrees with Defendants that CAO mischaracterized Dr. Eden's opinion regarding this limitation.  D.I. 286 at 36.  Dr. Eden opined that "the lack of evidence of intent to create a reflective layer is *one factor* that indicates the amount of light reflected by a layer is insubstantial and/or negligible."  D.I. 286 at 36 (citing D.I. 258, Ex. 34 ¶¶ 129-32) (emphasis in original).  The Court does not find that Defendants are attempting to tell the jury that the reflective layer must have been intentionally included in the LED chip to function as a reflective layer, as CAO contends. D.I. 295 at 19.  Thus, the Court denies CAO's *Daubert* motion to exclude Dr. Eden's opinion regarding the intent to create a reflective layer.

Third, CAO argues that Dr. Eden improperly opines that for a reflective layer to be "a reflective layer" it must have "reflectivity of at least eighty percent." D.I. 244 at 34-35.  The Court agrees with Defendants that Dr. Eden is not opining that eighty percent reflection is required to meet the reflective layer.  Instead, Dr. Eden compared the "0.3%-3.0% reflection estimated by Dr. Shealy at the layers Dr. Shealy said were reflective layers (which layers are known to be transparent compounds) with other, common reflective layers known by a POSITA to be reflective, such as those disclosed in the '961 patent, and concluded that 0.3%-3.0% reflectivity is insubstantial and negligible."  D.I. 286 at 37 (citing D.I. 258, Ex. 34 ¶¶ 129-58).  The Court does

14

not find any flaws with Dr. Eden's methodology. Additionally, Dr. Eden's argument is not contrary to this Court's construction. The Court held that the reflective layers must reflect more than a negligible amount of light. D.I. 230 at 13. Dr. Eden uses percentages to determine what is "negligible." CAO appears to be dissatisfied with Dr. Eden's conclusion regarding reflectivity, which is not an appropriate ground for a *Daubert* motion. *See Daubert*, 509 U.S. at 595 ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."). Thus, the Court finds Dr. Eden properly applied the Court's construction that the amount of reflection cannot be insubstantial or negligible and, thus, denies CAO's *Daubert* motion regarding this point.

For the reasons stated above, CAO's *Daubert* motion regarding Dr. Eden's opinions related to the reflective layers are granted-in-part and denied-in-part.

### iii. Flip Chips as Non-Infringing Alternatives[5]

CAO's *Daubert* motion seeks to exclude Dr. Eden's opinion on flip chips as non-infringing alternatives because they are unreliable and not relevant. *See* D.I. 244 at 37-40; D.I. 295 at 19-21. For the reasons stated below, the Court denies CAO's *Daubert* motion to exclude Dr. Eden's opinions on flip chips as non-infringing alternatives.

CAO challenges Dr. Eden's opinion regarding thin-film flip chips ("TTFC") as non-infringing alternatives should be excluded because (1) Dr. Eden's opinion is *ipse dixit*, and (2) "Dr. Eden concludes that the Luxeon Rebel is a non-infringing TFFC even though he never analyzed it." D.I. 244 at 38-39. Dr. Eden has set forth adequate evidence for *Daubert* purposes. As noted by Defendants, "Dr. Eden opined that because GE utilized these well-known LED chips in its post-top category of products, it had the capacity to incorporate them into its other products."

---

[5] Applicable to C.A. No. 20-681 only.

D.I. 286 at 38 (citations omitted). Dr. Eden's opinions are not *ipse dixit* because they are based on adequate facts and Dr. Eden's experience. The Court agrees with Defendants that "CAO's attack on the sufficiency of this evidence goes to the weight of the evidence, not its admissibility." D.I. 286 at 38 (citations omitted). CAO's concerns would be better addressed through "vigorous cross examination" of Dr. Eden. *See Daubert*, 509 U.S. at 596.

For the reasons stated above, the Court denies CAO's *Daubert* motion to exclude Dr. Eden's opinions on flip chips as non-infringing alternatives.

### iv. Dr. Eden's Allegedly New Non-Infringement Arguments[6]

CAO's *Daubert* motion seeks to exclude Dr. Eden's non-infringement opinions that it alleges were not disclosed during discovery. *See* D.I. 244 at 40-41; D.I. 295 at 21-22. For the reasons stated below, the Court grants CAO's *Daubert* motion to exclude Dr. Eden's opinions that exceed the scope of GE Defendants and Current's final non-infringement contentions.

The Court ordered the parties to serve final infringement and invalidity contentions before the close of fact discovery so that the parties were on notice of each other's arguments. *See* D.I. 246-1, Ex. 26 (No. 11, 2021 H'rg Tr.) at 7:17-23 ("[W]hat I need on your final contentions [is that they] are locked in so essentially we know what your experts are going to say, though your experts will say it perhaps with some additional evidence or opinions."). CAO argues that Defendants "never presented any contentions that the Nichia E21 CSP—one particular make and model of LED chip among the hundreds of LED chips purportedly used by Current—does not infringe the '961 patent because it did not have a sapphire substrate or the claimed reflective layers." D.I. 244 at 40.

---

[6] Applicable to C.A. No. 20-681 only.

The Court has reviewed Defendants Final Noninfringement Contentions and agrees with CAO. *See generally* D.I. 247-1, Exs. 32 & 33. Defendants Final Noninfringement Contentions merely state that the Nichia E21 CSP chip was one of the chips used in certain Accused products. *See, e.g.*, D.I. 247-1, Ex. 33 at 75 (post top luminaires), 89 (roadway luminaires), 103 (garage and canopy lights), 111 (high bay and low bay products), 129 (flood and area lights). Dr. Eden now opines in his expert report non-infringement positions with respect to the Nichia E21 CSP, none of which were outlined in Defendants' Final Noninfringement Contentions. D.I. 247-1, Ex. 34 (Dr. Eden Noninfringement Report) ¶¶ 115–18; ¶¶ 156–57.

Thus, Dr. Eden's opinions on products that use the Nichia E21 CSP chip are excluded.

### c. Dr. Michael Krames' Opinion

CAO's *Daubert* motion seeks to exclude Dr. Krames' invalidity analysis because he "fails to analyze the asserted claims of the '961 patent as a whole." D.I. 244 at 42. For the reasons stated below, the Court denies CAO's *Daubert* motion to exclude Dr. Krames' invalidity analysis.

CAO argues Dr. Krames' opinion is unreliable because he fails to consider the asserted claims in their totality for his obviousness review. *Id.*; *see also* D.I. 295 at 22-23. CAO stated in its brief that "Dr. Krames effectively cuts up the elements within the asserted claims and concludes that various constituent parts are invalid as obviousness. He then builds on these obviousness conclusions like building blocks to opine that asserted claims 21, 32, 36, 40 and 42 are all obvious." D.I. 244 at 42. The Court disagrees. Dr. Krames' invalidity opinions are not "piecemeal," as alleged by CAO. *Id.* at 42-43. Dr. Krames' expert report provides thorough explanations about the level of skill in the art, information about the state of the art, overview of the prior art, and why the prior art references disclose each limitation of the asserted claims and how the prior art reference could be combined to render the asserted claims obvious. D.I. 286 at 41-44.

For the reasons stated above, the Court denies CAO's *Daubert* motion to exclude Dr. Krames' invalidity analysis.

### d. Mr. Richard Lettiere's Opinion[7]

CAO's *Daubert* motion seeks to exclude Mr. Lettiere's reasonable royalty opinion. CAO argues that Mr. Lettiere's reasonable royalty opinion relies on patent licenses that are not comparable to the hypothetical negotiation that would have occurred in this action between CAO Group and OSRAM in September 2014. D.I. 244 at 44-48. For the reasons stated below, the Court denies CAO's *Daubert* motion to exclude Mr. Lettiere's reasonable royalty opinion.

"Assessing the comparability of licenses requires a consideration of whether the license at issue involves comparable technology, is economically comparable, and arises under comparable circumstances as the hypothetical negotiation." *Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1372-73 (Fed. Cir. 2020) (citation omitted). "When relying on licenses to prove a reasonable royalty, alleging a loose or vague comparability between different technologies or licenses does not suffice." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012).

In Mr. Lettiere's reasonable royalty analysis, he relies on three license agreements: (1) a 2016 cross license between Cree, Inc. and LEDVANCE GmbH and LEDVANCE LLC (the "Cree-LEDVANCE agreement"); (2) a 2018 license between Phillips Lighting Holdings, B.V. and LEDVANCE Gmbh (the "Philips-LEDVANCE agreement"); and (3) a 2019 license between signify Holdings B.V. and LEDVANCE Gmbh (the "Signify-LEDVANCE agreement"). D.I. 244 at 46. CAO argues that Mr. Lettiere improperly relies on license agreements that were executed after the hypothetical negotiation date, and Mr. Lettiere fails to account for the difference in the

---

[7] Applicable to C.A. No. 20-690 only.

LED lighting market in September 2014—the hypothetical negotiation date—and in 2016 through 2019—the dates when the three license agreements were executed. D.I. 244 at 46. The Court disagrees. Courts in both this District and others have held that damages experts are permitted to rely on license agreements entered years after the hypothetical negotiation date so long as the "expert[] detail[s] the facts and circumstances that led [the expert] to conclude that the [] license [agreement] is technically and economically comparable to the hypothetical license in this case." *Contour IP Holding, LLC v. GoPro, Inc.*, No. 17-4738, 2020 WL 5106845, at \*9-10 (N.D. Cal. Aug. 31, 2020); *M2M Sols. LLC v. Sierra Wireless America Inc.*, No. 14-1102, 2020 WL 7767639, at \*17 (D. Del. Dec. 4, 2020) (denying exclusion of damages expert's opinion that was based on a license agreement executed four years after hypothetical negotiation date).

Here, Mr. Lettiere detailed the facts and circumstances that led him to conclude the three license agreements are comparable to the hypothetical negotiation. *See* C.A. No. 20-690, D.I. 298-1, Ex. 90 (Mr. Lettiere Report.) at 42, 48. For example, in his expert report, he writes:

> [E]ven though additional competitors have entered into the LED lamp and luminaire markets (which would have been anticipated in 2014) and prices have been generally decreased, LEDVANCE's lamp and luminaire standard profit margins have actually increased since 2014. Therefore, any negative impact resulting from lower prices has, at least in LEDVANCE's case, been offset by manufacturing efficiencies.

*Id.* at 42. CAO argues that there are three additional faults in Mr. Lettiere's comparability analysis. First, Mr. Lettiere "fails to identify any products subject to the [three license agreements] that actually practice any purportedly comparable technology." D.I. 244 at 46. Second, all three license agreements include LEDVANCE Gmbh, a German multinational, that did not exist in September 2014. *Id.* at 47. "There is no analysis in Mr. Lettiere's report that the same people who negotiated these portfolio licenses would have been involved in the hypothetical negotiation in 2014 and no citation to the record that suggests that parties to the negotiations in 2016, 2018, and

2019 had the same interests as very different parties to the hypothetical negotiation in 2014." *Id.* Third, there are material differences between the three license agreements and the hypothetical negotiation in this case. *Id.* at 47-48. For example, some of the agreements would cover "narrower coverage than the '961 patent." *Id.* at 47.

CAO's arguments goes to the weight and credibility of Mr. Lettiere's opinion, as opposed to its admissibility. "[T]he issue of comparability is often one of sufficiency of the evidence, not admissibility." *Bio-Rad Lab'ys, Inc.*, 967 F.3d at 1373 (citation omitted); *see also Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014) ("[T]he fact that a license is not perfectly analogous generally goes to the weight of the evidence, not its admissibility." (citation omitted)).

For the above reasons, the Court denies CAO's *Daubert* motion to exclude Mr. Lettiere's reasonable royalty opinion.

### e. Dr. James Shealy's Opinion

#### i. Representativeness

Defendants argue that Dr. Shealy's representative opinions as to "what constitutes the second reflective layer in the LEDs contained in the Accused Products for purposes of infringement" should be excluded because they are not based on a reliable methodology. D.I. 249 at 38. This Court disagrees.

Defendants claim that Dr. Shealy "was simply spoon-feed [sic] results for a statistically insignificant fraction (<0.2%) of the 31,000+ Accused Products", that Mr. Benya (rather than Dr. Shealy) selected the representative products to be tested, that Dr. Shealy did not determine the identity of the LEDs in the tested and untested products, that Dr. Shealy did not know what, if any, tested LEDs were included in products offered for sale or sold before August 24, 2021, that Dr. Shealy did not account for changes made in the Accused Products over time, and finally, that he

offers "no opinion or analysis why certain untested categories of products nonetheless infringe based on representativeness." *Id.* at 39-41.    As Defendants do not challenge Dr. Shealy's knowledge, training or expertise, but rather dispute the factual predicate underlying his opinions, Defendants' objections go to the weight, not the admissibility of Dr. Shealy's opinions. *f'real Foods, LLC v. Hamilton Beach Brands, Inc.*, C.A. No. 16-41-CFC, 2019 WL 1578259, at *1 (D. Del. Apr. 11, 2019). "Defendants are free to challenge those opinions on cross-examination of Dr. [Shealy] at trial." *Id.* (citing *Daubert*, 509 U.S. at 596); *see TiVo, Inc. v. EchoStar Commc'ns Corp.*, 516 F.3d 1290, 1308 (Fed. Cir. 2008) ("[T]here is nothing improper about an expert testifying in detail about a particular device and then stating that the same analysis applies to other allegedly infringing devices that operate similarly.").[8]    While Defendants further argue that the "flaws in Dr. Shealy's representativeness methodology are material to whether Defendants' products infringe the second reflective layer limitation," rendering his conclusions not reliable and subject to exclusion, D.I. 249 at 42, *see also* D.I. 298 at 18, those conclusions may be challenged at trial.[9]

---

[8] While CAO emphasizes that Dr. Shealy only tested 50 or so LEDs of 31,000 Accused Products, *see, e.g.*, D.I. 249 at 39, CAO cites to no authority "for the proposition that a small sample size warrants exclusion by law." *Accord Am. Tech. Ceramics Corp. v. Presidio Components, Inc.*, No. 14-CV-6544(KAM)(GRB), 2020 WL 5658779, at *4 (E.D.N.Y. Sept. 23, 2020) (quotations omitted).

[9] However, although Dr. Shealy ultimately renders a conclusion on representativeness, D.I. 255-1, Ex. 41 at 315:15-24; 307:20-308:20 ("[W]hen you see a hundred out of a hundred, you kind of are led to th[e] conclusion" that they are representative and would "be shocked" to find materially different LEDs in the Accused Products), and CAO faults Defendants for coming "forward with no testing and no contemporaneous documents that show Dr. Shealy to be wrong," D.I. 280 at 38, it remains CAO's burden to establish infringement as to each Accused Product. *See L & W, Inc. v. Shertech, Inc.*, 471 F.3d 1311, 1318 (Fed. Cir. 2006) (explaining that patentee "cannot simply 'assume' that all of [the accused products] are like the one [the expert] tested and thereby shift to [the alleged infringer] the burden to show that is not the case." (citation omitted)); *Mobile Telecommunications Techs., LLC v. Samsung Telecommunications Am., LLC*, C.A. No. 2:13-CV-259, 2014 WL 7146971, at *2 (E.D. Tex. Dec. 12, 2014) (explaining that patentee "must prove

Therefore, the Court denies Defendants' motion to exclude Dr. Shealy's representative opinions on the second reflective layer.

### ii. 40 Milliwatts Limitation

Defendants argue that Dr. Shealy "did not apply a reliable methodology for determining the drive current to be used to determine whether the LED chip emitted light greater than 40 milliwatts." D.I. 249 at 45. This Court agrees in part and will exclude Dr. Shealy's opinions to the extent they depend on drive current measurements supplied by Dr. Cao.

Claim 21 requires that the claimed "semiconductor light source" include "a light emitting diode chip configured to output light at greater than about 40 milliwatts," '961 patent at cl. 21, which the Court construed to mean "at least one LED chip is capable of emitting light greater than about 40 milliwatts." D.I. 230 at 3.

To test the LEDs in the Accused Products, CAO explains that Dr. Shealy "designed a procedure for making measurements on a light" by "rel[ying] on Dr. Cao's laboratory to perform certain 'drive current' measurements." D.I. 280 at 42. Those drive current measurements were provided to Dr. Shealy via multiple spreadsheets. *Id.* In other instances, Dr. Shealy appears to have calculated drive currents himself. D.I. 261-2, Ex. 39 (Dr. Shealy Expert Report) ¶ 136 ("To make optical measurements, a drive current for driving the LED chip must be selected. In order to drive the LED chips in a way that simulates the way that they are driven in the Accused Products, I established a testing procedure to determine the drive current for the chips in the Accused Products."). Dr. Shealy then measured "the optical output per LED chip under drive current conditions that simulated those found in the working lights," *id.* ¶ 143.

---

infringement for each of the accused products by a preponderance of the evidence, and that [patentee] bears the risk of using representative products").

In testing approximately 50 LEDs over the range of drive currents, Dr. Shealy found that, while some LEDs provided a light power output greater than 40 milliwatts, others did not. *See, e.g.*, D.I. 258-1, Ex. 76. In some instances, where the measured output fell below 40 milliwatts, CAO ceased accusing such products of infringement. D.I. 280 at 43-44; D.I. 261-2, Ex. 39 (Dr. Shealy Expert Report) ¶ 151 ("I tested the LED chip from this product and found that it was not configured to output light at greater than about 40 milliwatts. Accordingly, it is my understanding that this product is no longer accused of infringement."); D.I. 341, Tr. 98:10-12.

However, in other instances where the measured output fell below 40 milliwatts, Dr. Shealy nevertheless concluded that the Accused Products satisfied the 40 milliwatt limitation because "the calculated drive current forwarded to me was implausibly low," admitting that he "did not perform the measurements to calculate each drive current" himself. *See* D.I. 261-2, Ex. 39 (Dr. Shealy Expert Report) ¶ 152. Explaining away the inconsistency, Dr. Shealy opines:

> For example, the product identified as GE17 (product number 43252) was reported to me as having an operable drive current of 20 mA, which results in a voltage of 2.686 V (measured across only one of two diodes—this number should be doubled to compare to the specifications). I understand that Current has identified the LED package in this product as product number NF2W757DRT-V1. The specifications for this LED package indicate that the maximum forward current is 200 mA, the nominal forward current is 150 mA, and the forward voltage is typically 6.32 V. Based on these specifications, my experience in the field, my analysis of more than 50 products in this case, and my observation of the LED chip, I conclude that the drive current reported to me was erroneous. Turning to my measurements, I see that the output of the chip reaches 40 mW at a drive current of approximately 36 mA—still well below the maximum and nominal forward currents reported in the specification. In addition, the efficiency at this current is excellent and only slightly below peak. A person of ordinary skill in the art would not use this device at the low drive current reported to me. Based upon my analysis, it is my opinion that GE17 includes a semiconductor chip that "is a light emitting diode (LED) chip configured to output light at greater than about 40 milliwatts."

*Id.*; *see also id.* ¶¶ 153-54.

Thus, in these instances, it appears Dr. Shealy justified his non-infringing results by speculating that certain outputs would have been infringing had they been tested under the proper drive current. Neither CAO nor Dr. Shealy address whether Dr. Shealy asked Dr. Cao to re-test his purportedly erroneous drive current measurements. And it does not appear that Dr. Shealy attempted to ascertain the actual drive currents for these LEDs himself; instead, he simply notes the drive current he used to obtain a 40 milliwatt output. *See, e.g.*, D.I. 261-2, Ex. 39 (Dr. Shealy Expert Report) ¶ 152 ("Turning to my measurements, I see that the output of the chip reaches 40 mW at a drive current of approximately 36 mA—still well below the maximum and nominal forward currents reported in the specifications."). That Dr. Shealy rejected Dr. Cao's drive current measurements in certain instances, but appears to have accepted them in others,[10] suggests that Dr. Shealy's methodology—testing the 40 milliwatt limitation by relying on drive currents supplied by Dr. Cao—is unreliable. *See MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 248 F. App'x 199, 203 (Fed. Cir. 2007) ("While the various tests carried out by [the expert] may be commonly used in the industry to examine defects in silicon wafers, the record indicates that the results of those tests cannot prove that all the claim limitations are met. To the extent that [the expert] varied the standard testing methodology, the record supports the trial court's conclusion that such modifications rendered the tests unreliable.").

CAO argues that Dr. Shealy's results are "fully supported by the analysis in his report." D.I. 280 at 44. But neither CAO nor Dr. Shealy's report address whether Dr. Cao's drive current measurements were derived using an accepted methodology. Indeed, "it is [CAO's] burden, as the

---

[10] *See* D.I. 256-1, Ex. 57 ¶ 58 ("In addition, as explained in my Opening Infringement Report I used the calculated drive current reported to me except in the very few instances where the drive current reported was implausibly low.").

party offering [Dr. Shealy's] opinions, to prove its admissibility by a preponderance of the evidence. *See King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, No. 2:06-CV-1797, 2016 WL 5887152, at \*2 (E.D. Pa. Jan. 22, 2016) (citing *Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 418 (3d Cir. 1999)).

Accordingly, to the extent Dr. Shealy's used Dr. Cao's drive currents to measure optical output, Dr. Shealy's opinions are excluded. This includes, but is not limited to, paragraphs 152-154 of Dr. Shealy's report. Dr. Shealy may opine on whether the LEDs in the Accused Products have light output greater than 40 milliwatts only if he confirmed that the drive currents he used were appropriate or otherwise derived the drive current measurements himself—as he explains he did on certain occasions.[11]

### f. Mr. Benya and Dr. Shealy's Secondary Considerations Opinions

Seeking exclusion of Dr. Shealy and Mr. Benya's opinions on secondary considerations of non-obviousness, including long-felt need, and failure of others, Defendants first contend that Dr. Shealy and Mr. Benya's "breathtaking" opinions that the claims are not obvious because Dr. Cao's invention covers the entire field of "LED light sources for illuminating spaces used by humans" is untethered from the claims. D.I. 249 at 48. But those opinions are rooted in the claims of the '961 patent, which recite a "semiconductor light source for emitting light to illuminate a space used by humans." '961 patent at 9:51–52. This is not a ground for exclusion.

---

[11] *See* D.I. 256-1, Ex. 57 ¶ 57 n.23 ("Because of Dr. Eden's seeming criticisms of my adoption of certain drive currents, I have done additional testing to confirm that the drive currents I utilized were appropriate. For example, I recently obtained a new A19 lamp (69117) with the same overall structure and features as GE-D03. The range of currents I measured when applying the average voltage to each of the 8 LED packages was 31 41 mA, with an average value of 36 mA. The drive current I previously applied (as reflected in SHEALY-DEL_000000128) was 31 mA.").

Defendants next argue that neither Dr. Shealy nor Mr. Benya connected "the alleged secondary indicia to the novel features of claim 21," noting that "'LED light sources for illuminating spaces used by humans' were known in the prior art." D.I. 249 at 48-49 (citation omitted). But Mr. Benya and Dr. Shealy's reports bely that assertion, *see* D.I. 256-1, Ex. 58 (Mr. Benya Expert Report) ¶ 484; D.I. 261-2, Ex. 39 (Dr. Shealy Expert Report) ¶¶ 38, 189. And to the extent Defendants nevertheless maintain that Mr. Benya and Dr. Shealy have not established the requisite nexus,[12] "[w]hether a patentee has established a nexus is a question of fact," *Campbell Soup Co. v. Gamon Plus, Inc.*, 10 F.4th 1268, 1277 (Fed. Cir. 2021), and Defendants' arguments go to "the weight and credibility of [the experts'] testimony, which can be addressed on cross-examination." *See Mfg. Res. Int'l, Inc. v. Civiq Smartscapes, LLC*, No. 17-269, 2019 WL 4198194, at *7 (D. Del. Sept. 4, 2019). This is not a ground for exclusion.

Accordingly, Defendants' motion seeking to exclude Dr. Shealy and Mr. Benya's opinions on secondary considerations of non-obviousness is denied.

### g. Ms. Kindler's Commercial Success Opinions

Defendants principally contend that Ms. Kindler's commercial success opinion is "conclusory and unreliable," D.I. 249 at 50, not tied to the asserted claims because she relied on news articles that do not mention CAO Group Inc., CAO Lighting, its products, or any of the Accused Products," *id.* at 49, and defective because she did not analyze any purported sales as "compared to the relevant market, which she does not even attempt to define," *id.* at 50. This Court disagrees.

---

[12] Evidence of objective indicia is only relevant to the obviousness inquiry "if there is a nexus between the claimed invention and the objective indicia." *Bosch Automotive Service Solutions, LLC v. Matal*, 878 F.3d 1027, 1036 (Fed. Cir. 2017) (quotations and alterations omitted).

In a section titled, "Benefits of the Invention of the '961 Patent and Associated Demand," Ms. Kindler ties commercial success to the patented invention, relying on (among other data) discussions with CAO's technical experts, and incorporates deposition testimony placing the accused sales into their market. *See* D.I. 256-1, Ex. 55 ¶¶ 100-02.

Defendants' motion seeking to exclude Dr. Kindler's opinions concerning commercial success is denied.

### h.  Dr. Shealy's and Mr. Benya's Commercial Success Opinions

Defendants argue that Dr. Shealy's and Mr. Benya's commercial success opinions should be excluded because neither Dr. Shealy, learned in electrical and computer engineering, nor Mr. Benya, an electrical engineer and lighting designer, has the requisite expertise to opine on commercial success. D.I. 249 at 49-50.  This Court agrees.

Because "[c]ommercial success evidence should be considered 'so long as what was sold was within the scope of the claims,'" *In re Glatt Air Techniques, Inc.*, 630 F.3d 1026, 1030 (Fed. Cir. 2011) (citation omitted), Dr. Shealy's and Mr. Benya's technical testimony may be helpful in discerning claim scope.  However, because Dr. Shealy and Mr. Benyalack lack formal training in marketing and business, despite apparently having some business and entrepreneurial experience, any non-technical opinions Dr. Shealy and Mr. Benya seek to provide on commercial success exceeds their technical expertise and is not permissible. *See XpertUniverse, Inc. v. Cisco Sys., Inc.*, C.A. No. 09-157-RGA, 2013 WL 865974, at *3 (D. Del. Mar. 7, 2013) (explaining that call center and computer science expert's opinion that "market performance is attributable to [patentee's] technology, found in his ultimate conclusions on commercial success and industry acceptance, exceeds his technical expertise and is not permissible" (citation omitted)).

Thus, Defendants' motion seeking to exclude Dr. Shealy and Mr. Benya's opinions concerning commercial success is granted-in-part.

## III.    CONCLUSION

For the foregoing reasons, the Court grants-in-part and denies-in-part Plaintiff's and Defendants' motions to exclude certain expert testimony.

* * *

WHEREFORE, at Wilmington this 30th day of January, 2023, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motions to Exclude Under Daubert and Federal Rule of Evidence 702 (D.I. 254 in C.A. No. 20-690, D.I. 243 in C.A. No. 20-681) are granted-in-part and denied-in-part as follows:

    a.  Plaintiff's motion to exclude Dr. Robert Karlicek's opinion is granted-in-part and denied-in-part as described herein;

    b.  Plaintiff's motion to exclude Dr. J. Gary Eden's opinions is granted-in-part and denied-in-part as described herein;

    c.  Plaintiff's motion to exclude Dr. Michael Krames' invalidity analysis is denied; and

    d.  Plaintiff's motion to exclude Mr. Richard Lettiere's reasonable royalty opinion is denied.

2. Defendants' Motions to Preclude Expert Testimony (D.I. 259 in C.A. No. 20-690, D.I. 248 in C.A. No. 20-681) are granted-in-part and denied-in-part as follows:

    a.  Defendants' motion to exclude Dr. James Shealy's representativeness opinions on the second reflective layer is denied;

28

    b.  Defendants' motion to exclude Dr. James Shealy's opinions as to the 40 milliwatt limitation is granted-in-part as described herein;

    c.  Defendants' motion to exclude Mr. James Benya and Dr. James Shealy's secondary considerations opinions is denied;

    d.  Defendants' motion to exclude Ms. Lauren Kindler's commercial success opinions is denied; and

    e.  Defendants' motion to exclude Dr. James Shealy and Mr. James Benya's commercial success opinions is granted-in-part as described herein.

3.  Because the Memorandum Opinion is filed under seal, the parties shall meet and confer and, no later than February 7, 2023, submit a joint proposed redacted version. In the absence of a timely request compliant with applicable standards, the Court will unseal the entire Order.

GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE